SZAFERMAN, LAKIND
BLUMSTEIN & BLADER, P.C.
101 Grovers Mill Road, Suite 200
Lawrenceville, NJ 08648
By:     Robert L. Lakind
        Arnold C. Lakind
        Daniel S. Sweetser
Tel:  (609) 275-0400
Fax:  (609) 275-4511

*Attorneys for Plaintiffs*

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CYNTHIA ANN REDUS-TARCHIS, FREDRIC and BONNIE OLIVER, and MICHAEL PATTI,<br><br>    Plaintiffs,<br><br>v.<br><br>NEW YORK LIFE INVESTMENT MANAGEMENT, LLC,<br><br>    Defendant. | Civil No. 2:14-cv-07991-WHW-CLW<br><br>Jury Trial Demanded |

## AMENDED COMPLAINT

Plaintiff Cynthia Ann Redus-Tarchis, whose street address is 8 Douglas Drive, Princeton

Junction, New Jersey 08550; Plaintiffs Fredric and Bonnie Oliver, whose street address is 9

Hightop Lane, Jericho, New York 11753; and Plaintiff Michael Patti, whose street address is 12

Valerie Drive, Glen Head, New York 11545 (together, "Plaintiffs"), bring this action against

Defendant New York Life Investment Management, LLC ("Defendant" or "NYLIM"), which

maintains an office at 169 Lackawanna Avenue, Parsippany, New Jersey 07054. Plaintiffs allege the following upon information and belief except for those allegations as to themselves, which are alleged upon personal knowledge. The allegations are based upon an investigation conducted by and through Plaintiffs' counsel, which included, *inter alia*, a review of documents filed with the Securities and Exchange Commission (the "SEC") and other public information.

## OVERVIEW OF ACTION

1. Plaintiffs bring this action against Defendant on behalf of and for the benefit of the MainStay Marketfield Fund (the "Marketfield Fund"), the MainStay Large Cap Growth Fund (the "Large Cap Fund"), the MainStay High Yield Corporate Bond Fund (the "Corporate Bond Fund"), and the MainStay High Yield Opportunities Fund (the "High Yield Opportunities Fund") (collectively, the "Funds") pursuant to Section 36(b) of the Investment Company Act of 1940 (the "1940 Act"), 15 U.S.C. § 80a-35(b) ("Section 36(b)").

2. Defendant is the investment adviser and manager for the Funds and receives an annual fee from each Fund for providing investment management services to each Fund.

3. Pursuant to Section 36(b), Defendant owes a fiduciary duty to each Fund with respect to the investment management fees paid by each such Fund.

4. Defendant breached that fiduciary duty by receiving investment management fees from each of the Funds that are so disproportionately large that they bear no reasonable relationship to the services provided by Defendant and could not have been the product of arm's-length bargaining.

5. Defendant delegates substantially all of its responsibilities for providing investment management services to the Funds to certain sub-contractors: "Subadvisers" who

provide primarily investment advisory services, and a "Sub-administrator" that provides administrative services to the Funds.

6. Defendant pays (or causes each Fund to pay) a portion of the Funds' investment management fees to the sub-contractors in exchange for their services.

7. The investment management fees that Defendant charges to the Funds include a mark-up on top of the fees paid to the sub-contractors of approximately 69% to 104%, which Defendant retains as compensation for services it purportedly provides to the Funds. The mark-up retained by Defendant totaled $200,650,000 in fiscal year 2014.

8. The mark-up retained by Defendant is disproportionate to the services actually provided by Defendant (and not by the sub-contractors), which are limited primarily to supervision and oversight of the sub-contractors and *de minimis* expenses for the Funds' officers and office space.

9. Because the scope of services actually provided by Defendant is so limited, among other reasons, Defendant incurs low operating expenses in providing services to the Funds. As a result, the mark-up retained by Defendant consists primarily of profit.

10. The Funds' investment management fee arrangements have enabled Defendant to retain for itself the benefits of economies of scale resulting from increases in each of the Funds' assets under management during recent years, without appropriately sharing those benefits with the Funds through breakpoints or other reductions to the Funds' management fee rates.

11. The investment management fees charged by Defendant to each of the Marketfield Fund, the Large Cap Fund and the Corporate Bond Fund are disproportionate to the low quality of the services provided to those funds. The Marketfield Fund, the Large Cap Fund

and the Corporate Bond Fund have performed poorly under Defendant's management, with investment returns lagging behind those funds' benchmarks.

12.     Plaintiffs bring this action to recover for each of the Funds the excessive and unlawful investment management fees in violation of Section 36(b), as well as lost profits and other actual damages caused by each of the Funds' payment of those fees.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under Section 36(b) of the 1940 Act, 15 U.S.C. § 80a-35(b).

14.     This Court has jurisdiction of the claims pursuant to Sections 36(b)(5) and 44 of the 1940 Act, 15 U.S.C. §§ 80a-35(b)(5), 80a-43, and 28 U.S.C. § 1331.

15.     Venue is proper in this judicial district pursuant to Section 44 of the 1940 Act, 15 U.S.C. § 80a-43, and 28 U.S.C. § 1391 because Defendant is an inhabitant of this district, maintains an office in this district, and/or transacts business in this district, and because certain of the acts and transactions giving rise to Plaintiffs' claims occurred in this district.

## PARTIES

16.     Plaintiff Cynthia Ann Redus-Tarchis, a resident of the State of New Jersey, is a shareholder in the Large Cap Fund and the Marketfield Fund, and has continuously owned shares in such Funds since at least July 20, 2011, and September 24, 2013, respectively.

17.     Plaintiffs Fredric and Bonnie Oliver, residents of the State of New York, are shareholders in the Marketfield Fund and have continuously owned shares in the Marketfield Fund since at least March 2013.

18.     Plaintiff Michael Patti, a resident of the State of New York, is a shareholder in the Corporate Bond Fund and the High Yield Opportunities Fund, and has continuously owned shares in such Funds since at least 2002 and September 2014, respectively.

19.     Defendant NYLIM is a Delaware limited liability company and maintains an office at 169 Lackawanna Avenue, Parsippany, New Jersey 07054.  Defendant is an indirect, wholly-owned subsidiary of New York Life Insurance Company.

## THE FUNDS' ORGANIZATION AND OPERATIONS

20.     Each of the Funds is an open-end management investment company, also known as a "mutual fund," registered under the 1940 Act.

21.     The Corporate Bond Fund and Large Cap Fund are organized as series within the Mainstay Funds (the "MainStay Funds"), which is a Massachusetts business trust organized in January 1986.  The MainStay Funds consists of 12 mutual funds, including the Corporate Bond Fund and the Large Cap Fund.

22.     The Marketfield Fund and the High Yield Opportunities Fund are organized as series within the MainStay Funds Trust (the "MainStay Funds Trust"), which is a Delaware statutory trust created in April 2009.  The MainStay Funds Trust consists of 38 mutual funds, including the Marketfield Fund and the High Yield Opportunities Fund.

23.     The 50 mutual funds comprising the MainStay Funds and the MainStay Funds Trust are collectively referred to herein as the "MainStay Group of Funds."

24.     Like other mutual funds, the Funds are collective investments that pool money of investors and invest the money in a portfolio of securities.

25.     Each Fund issues shares to investors, such as Plaintiffs, who invest money in the Fund, and those investors become shareholders in the Fund.  Each share issued by a Fund

5

represents, and may be redeemed for, a *pro rata* interest in the Fund's underlying portfolio of securities (less any fees and other liabilities).

26.     Like most other mutual funds, the Funds do not have employees or facilities of their own.  The Funds' operations are conducted by external service providers pursuant to contracts with the Funds.

27.     Defendant serves as the investment adviser and manager for each of the Funds.

28.     Other service providers, including certain of Defendant's affiliates, provide other services to the Funds and their shareholders, such as communicating with shareholders about the Funds, maintaining records of each shareholder's ownership of Fund shares, and managing the process by which Fund shares are purchased by or redeemed from shareholders.

29.     The funds comprising the MainStay Group of Funds are all overseen by the same board of trustees (the "Board"), consisting of 8 members.

30.     The Board is responsible for selecting and monitoring service providers for each of the Funds and the 46 other mutual funds in the MainStay Group of Funds, among other things.

## THE MANAGEMENT FEES
## CHARGED TO THE FUNDS BY DEFENDANT

31.     Defendant serves as the investment adviser and manager to the Corporate Bond Fund and the Large Cap Fund pursuant to an Amended and Restated Management Agreement between Defendant and the MainStay Funds (the "MainStay Funds Management Agreement"), most recently amended on February 27, 2015.

32.     Defendant serves as the investment adviser and manager to the Marketfield Fund and the High Yield Opportunities Fund pursuant to a Management Agreement between Defendant and the MainStay Funds Trust (the "MainStay Funds Trust Management Agreement"), most recently amended on February 27, 2015.

1618879.1

33.     The MainStay Funds Management Agreement and the MainStay Funds Trust Management Agreement contain substantially the same terms and are collectively referred to herein as the "Management Agreements."

34.     The Management Agreements require Defendant to provide certain investment advisory and administrative services to each Fund, as more fully described in ¶¶ 56-59, *infra*.

35.     In exchange for the investment advisory and administrative services provided by Defendant to the Funds, the Management Agreements require each Fund to pay Defendant an annual management fee that is calculated as a percentage of the Fund's assets under management or "AUM."

36.     The management fee rates charged to each Fund by Defendant pursuant to the Management Agreements are as follows:

| Fund | Management Fee Rate |
|------|---------------------|
| Marketfield Fund[1] | Up to $7.5 billion in AUM – 1.40%<br>From $7.5 billion to $15 billion – 1.38%<br>From $15 billion to $22.5 billion – 1.36%<br>Over $22.5 billion in AUM – 1.34% |
| Large Cap Fund | Up to $500 million in AUM – 0.750%<br>From $500 million to $750 million – 0.725%<br>From $750 million to $1 billion – 0.710%<br>From $1 billion to $2 billion – 0.700%<br>From $2 billion to $3 billion – 0.660%<br>From $3 billion to $7 billion – 0.610%<br>From $7 billion to $9 billion – 0.585%<br>Over $9 billion in AUM – 0.575% |
| Corporate Bond Fund | Up to $500 million in AUM – 0.600%<br>From $500 million to $5 billion – 0.550%<br>From $5 billion to $7 billion – 0.525%<br>Over $7 billion in AUM – 0.500% |

---

[1]     Prior to February 28, 2014, the management fee rate charged to the Marketfield Fund was 1.40% on all AUM.

| Fund | Management Fee Rate |
|------|--------------------|
| High Yield Opportunities Fund | Up to $3 billion in AUM – 0.80%<br>Over $3 billion in AUM – 0.775% |

37.    The following table sets forth the amount of management fees charged to each Fund by Defendant pursuant to the Management Agreements for fiscal year 2014 and each Fund's effective management fee rate for that year.  Also called a "blended" rate, the effective management fee rate is the weighted average of the rates paid by a Fund on each level of AUM—*e.g.*, for the Corporate Bond Fund, 0.60% on the first $500 million in AUM, 0.55% on the next $4.5 billion, 0.525% on the next $2 billion, and 0.50% on AUM in excess of $7 billion.

| Fund | Management Fees Paid – FY 2014 | Effective Management Fee Rate – FY 2014 |
|------|-------------------------------|------------------------------------------|
| Marketfield Fund | $250,598,000 | 1.39% |
| Large Cap Fund | $118,611,000 | 0.60% |
| Corporate Bond Fund | $ 47,715,000 | 0.54% |
| High Yield Opportunities Fund | $10,318,000 | 0.80% |

**THE FEES PAID TO THE SUBADVISERS AND SUB-ADMINISTRATOR**

38.    Defendant has delegated to certain sub-contractors substantially all of its responsibility under the Management Agreements for providing investment advisory and administrative services to the Funds.

39.    Defendant pays (or causes each Fund to pay) a portion of each Fund's annual management fees to the sub-contractors in exchange for the investment advisory and administrative services provided by the sub-contractors.

40.     With respect to investment advisory services, Defendant has sub-contracted with other investment advisers (the "Subadvisers") to perform substantially all of the investment advisory services required by each Fund, as well as certain administrative services, as more fully described in ¶ 61, *infra*.

41.     Defendant has retained a different Subadviser for each of the Funds, as summarized in the following chart:

| Fund | Subadviser |
| --- | --- |
| Marketfield Fund | Marketfield Asset Management LLC |
| Large Cap Fund | Winslow Capital Management, Inc. |
| Corporate Bond Fund | MacKay Shields LLC |
| High Yield Opportunities Fund | MacKay Shields LLC |

42.     Defendant has entered into a Subadvisory Agreement with each of the Subadvisers, which, among other things, includes a fee schedule establishing the fees to be paid to the Subadviser each year.

43.     The fees paid to each Subadviser pursuant to the Subadvisory Agreements were established through arm's-length negotiations between Defendant and each Subadviser.

44.     Upon information and belief, the fees paid to each Subadviser include not only the cost to such Subadviser of providing the required investment advisory and administrative services, but also a profit.

45.     The annual fee paid to each of the Subadvisers is calculated as a percentage of the relevant Fund's AUM, as summarized in the following table:

1618879.1

| Fund | Subadvisory Fee Rate |
|---|---|
| Marketfield Fund | Up to $7.5 billion in AUM – 0.700%<br>From $7.5 billion to $15 billion – 0.690%<br>From $15 billion to $22.5 billion – 0.680%<br>Over $22.5 billion in AUM – 0.670% |
| Large Cap Fund | Up to $100 million in AUM – 0.400%<br>From $100 million to $350 million – 0.350%<br>From $350 million to $600 million – 0.300%<br>From $600 million to $1 billion – 0.250%<br>From $1 billion to $2.5 billion – 0.200%<br>From $2.5 billion to $5 billion – 0.240%<br>Over $5 billion in AUM – 0.250% |
| Corporate Bond Fund | Up to $500 million in AUM – 0.300%<br>From $500 million to $5 billion – 0.275%<br>From $5 billion to $7 billion – 0.2625%<br>Over $7 billion in AUM – 0.250% |
| High Yield Opportunities Fund | Up to $3 billion in AUM – 0.40%<br>Over $3 billion in AUM – 0.3875% |

46.    The following table sets forth the amount of subadvisory fees paid to each Fund's Subadviser for fiscal year 2014 and each Fund's effective subadvisory fee rate for that year.

| Fund | Subadvisory Fees Paid – FY 2014 | Effective Subadvisory Fee Rate – FY 2014 |
|---|---|---|
| Marketfield Fund | $125,299,000 | 0.69% |
| Large Cap Fund | $48,296,000 | 0.24% |
| Corporate Bond Fund | $23,842,000 | 0.27% |
| High Yield Opportunities Fund | $5,159,000 | 0.40% |

47.    With respect to administrative services, Defendant has subcontracted with State Street Bank & Trust Company ("State Street" or the "Sub-Administrator") to provide certain administrative services to each of the Funds, as more fully described in ¶ 62, *infra*.

1618879.1

48.     Defendant has entered into a Master Fund Sub-Accounting and Sub-Administration Agreement (the "Sub-Administration Agreement") with State Street, which, among other things, establishes the fees to be paid to State Street each year.

49.     The fees paid to State Street pursuant to the Sub-Administration Agreement were established through arm's-length negotiations between Defendant and State Street.

50.     Upon information and belief, the fees paid to State Street pursuant to the Sub-Administration Agreement include not only the cost to State Street of providing the required administrative services, but also a profit.

51.     While the fee rate charged by State Street under the Sub-Administration Agreement is not publicly disclosed, according to publicly disclosed administrative services agreements for other mutual funds, State Street and other sub-administrators charge unaffiliated mutual funds (such as the Funds) administrative fee rates of no more than 0.05% of AUM for the same or substantially the same administrative services covered by the Sub-Administration Agreement.

52.     The following table sets forth the amount of fees paid to State Street for providing administrative services to each of the Funds, assuming that State Street charges 0.05% of AUM for such services:

| Fund | Administrative Fees Paid to State Street – FY 2014 | Effective Administrative Fee Rate – FY 2014 |
|---|---|---|
| Marketfield Fund | $9,048,000 | 0.05% |
| Large Cap Fund | $9,884,000 | 0.05% |
| Corporate Bond Fund | $4,418,000 | 0.05% |
| High Yield Opportunities Fund | $645,000 | 0.05% |

## THE MARK-UP RETAINED BY DEFENDANT

53.     The following table summarizes:  (i) the management fees charged to each Fund by Defendant pursuant to the Management Agreements in fiscal year 2014; (ii) the portion of the management fees paid to each Fund's Subadviser; (iii) the portion of the management fees paid to State Street; and (iv) the mark-up retained by Defendant:

| Fund | Management Fees Charged by Defendant | Subadvisory Fees Paid to Subadviser | Administrative Fees Paid to State Street | Mark-Up Retained by Defendant | Percent Mark-Up |
|---|---|---|---|---|---|
| Marketfield Fund | $250,598,000 | $125,299,000 | $9,048,000 | $116,251,000 | 86.5% |
| Large Cap Fund | $118,611,000 | $48,296,000 | $9,884,000 | $60,431,000 | 103.9% |
| Corporate Bond Fund | $47,715,000 | $23,842,000 | $4,418,000 | $19,455,000 | 68.8% |
| High Yield Opportunities Fund | $10,318,000 | $5,159,000 | $646,000 | $4,513,000 | 77.8% |
| **Total** | **$427,242,000** | **$202,596,000** | **$23,996,000** | **$200,650,000** | **88.6%** |

54.     As shown in the preceding table, the management fees charged to the Funds include a mark-up of 68.8% to 103.9% over the fees charged by the Subadvisers and State Street for providing investment advisory and administrative services to the Funds.  Overall, Defendant charged the Funds a mark-up of 88.6% over the fees paid to the Subadvisers and State Street in fiscal year 2014.

55.     The following table calculates the mark-up retained by Defendant using the effective management fee rate paid by each Fund to Defendant in fiscal year 2014, the effective subadvisory fee rate paid to the relevant Subadviser, and an administrative fee rate of 0.05% paid

12

to State Street. The fee rates are shown in basis points (or "bps"), with 1 basis point equal to 0.01% of AUM. For example, the administrative fee rate of 0.05% is shown as 5 bps.

| Fund | Effective Management Fee Rate | Effective Subadvisory Fee Rate | Administrative Fee Rate | Mark-Up Retained by Defendant | Percent Mark-Up |
|------|------|------|------|------|------|
| Marketfield Fund | 138 bps | 69 bps | 5 bps | 64 bps | 86.5% |
| Large Cap Fund | 60 bps | 24 bps | 5 bps | 31 bps | 103.9% |
| Corporate Bond Fund | 54 bps | 27 bps | 5 bps | 22 bps | 68.8% |
| High Yield Opportunities Fund | 80 bps | 40 bps | 5 bps | 35 bps | 77.8% |

## SERVICES REQUIRED BY THE MANAGEMENT AGREEMENTS

56. The Management Agreements require Defendant to provide certain investment advisory services to each Fund, including: (a) deciding which securities to purchase for or sell from the Fund's portfolio; (b) selecting broker-dealers to execute orders for those purchases and sales; and (c) complying with applicable law and the Fund's disclosed investment objectives, policies, and restrictions.

57. The Management Agreements provide, in pertinent part:

> [T]he Manager [Defendant NYLIM] shall: develop overall investment strategy and provide recommendations to the Board regarding each Fund's investment objective and strategy; manage all aspects of the advisory operations of each Fund and the composition of the portfolio of each Fund, including the purchase, retention and disposition of securities therein, in accordance with the investment objectives, policies and restrictions of the Fund, as stated in the currently effective Prospectus (as hereinafter defined); in conformity with the Declaration of Trust and By-Laws (each as hereinafter defined) of the Trust; under the instructions and directions of the [Board]; and in accordance with the applicable provisions of the 1940 Act and the rules and regulations thereunder, the provisions of the Internal Revenue Code of 1986,

13

as amended (the "Code"), relating to regulated investment companies and all rules and regulations thereunder, and all other applicable federal and state laws and regulations.  In connection with the services provided under this [Management] Agreement, the Manager will use its best efforts to manage each Fund so that it will qualify as a regulated investment company under Subchapter M of the Code and regulations issued thereunder . . . .

The Manager will determine the securities and other instruments to be purchased, sold or entered into by each Fund and place orders with broker-dealers . . . or others pursuant to the Manager's determinations and all in accordance with each Fund's policies as set out in the Prospectus of the Fund or as adopted by the Board . . . .  The Manager will determine what portion of each Fund's portfolio will be invested in securities and other assets and what portion, if any, should be held uninvested in cash or cash equivalents.  Each Fund will have the benefit of the investment analysis and research, the review of current economic conditions and trends and the consideration of long-range investment policy generally available to the Manager's investment advisory clients . . . .

[T]he Manager will be responsible for selecting the brokers or dealers that will execute the purchases and sales for a Fund.  The Manager will place orders pursuant to its determination with or through such persons, brokers or dealers . . . in conformity with the policy with respect to brokerage as set forth in the Trust's Registration Statement or as the Board may direct from time to time . . . .

58.    The Management Agreements also require Defendant to provide certain administrative services to each Fund, some of which overlap with the investment advisory services set forth in ¶¶ 56-57, *supra*.  Among other things, the Management Agreements require Defendant to provide the following administrative services:

a.    **General Administrative Services**, including furnishing the Funds with office facilities.

b.      **Coordination with Custodian**, including providing the Trust's custodian on each business day with information relating to the execution of all portfolio transactions on behalf of each Fund.

c.      **Recordkeeping**, including maintaining financial accounting and other books and records required by the 1940 Act and other applicable law.

d.      **Compliance Services**, including implementing the Fund's compliance program; monitoring each Fund's compliance with its investment and tax guidelines and other compliance policies; overseeing compliance with the Funds' Code of Ethics; assessing and reporting to the Board regarding risk and risk management; and coordinating with the SEC and other regulators in connection with examinations, inquiries, or requests for exemptive relief or no-action guidance.

e.      **Board Reporting and Corporate Governance**, including providing reports, evaluations, information, analyses, and materials to the Board; providing the Funds with such officers as are necessary to carry out the Funds' operations; and recommending and implementing Fund policies.

f.      **Fund Operations**, including preparing and arranging for filing and dissemination of the Funds' regulatory filings and disclosure materials; providing or coordinating the provision of legal and auditing services to the Funds; providing assistance to the Board in valuing the securities and other instruments held by each Fund; overseeing the computation of each Fund's net asset value or "NAV"; overseeing the computation of each Fund's net income, dividend rates, yield, and other investment performance information; and providing assistance with respect to shareholder meetings for the Funds.

59.     The Management Agreements also require Defendant to pay the salaries and expenses of those individuals who serve as officers of the Fund.

**DEFENDANT HAS DELEGATED SUBSTANTIALLY ALL OF ITS
RESPONSIBILITIES UNDER THE MANAGEMENT AGREEMENTS
TO THE SUBADVISERS AND THE SUB-ADMINISTRATOR**

60.     The Management Agreements allow Defendant to delegate to sub-contractors its responsibilities to provide investment advisory services and administrative services to the Funds, providing in pertinent part:

> [T]he Manager may, through a subadvisory agreement or other arrangement, delegate to a subadvisor any of the duties enumerated in this [Management] Agreement, including the management of all or a portion of the assets being managed . . . .

> [T]he Manager may enter into one or more contracts with a sub-administrator ("Sub-Administration Contract") in which the Manager delegates to such sub-administrator any or all [of] its duties specified in this [Management] Agreement . . . .

61.     For each Fund, Defendant has delegated substantially all of its responsibilities under the Management Agreements for providing investment advisory services, as well as certain administrative services, to the Subadvisers, as shown in the following table:

| Service | Management Agreements Between the Funds and Defendant | Subadvisory Agreements Between Defendant and the Subadvisers |
|---|---|---|
| Security Selection | "[T]he Manager shall . . . manage all aspects of the advisory operations of each Fund and the composition of the portfolio of each Fund, including the purchase, retention and disposition of securities held therein . . . ."<br><br>"The Manager will determine the securities and other instruments to be purchased, sold or entered into by each Fund . . . .  The Manager will determine what portion of each Fund's portfolio will be invested in | "[T]he Subadvisor will provide a continuous investment program for the [Fund] and determine the composition of the assets of the [Fund], including determination of the purchase, retention or sale of the securities, cash and other investments contained in the portfolio.   The Subadvisor will conduct investment research and conduct a continuous program of evaluation, investment, sales and reinvestment of [the Fund's assets] by determining the securities and other investments that shall be purchased, |

16

| Service | Management Agreements Between the Funds and Defendant | Subadvisory Agreements Between Defendant and the Subadvisers |
|---|---|---|
| | securities and other assets and what portion, if any, should be held uninvested in cash or cash equivalents." | entered into, sold, closed or exchanged for the [Fund] . . . , and what portion of the [Fund] should be held in the various securities and other investments in which it may invest . . . ." |
| Broker-Dealer Selection | "Manager will be responsible for selecting the brokers or dealers that will execute the purchases and sales for a Fund." | "The Subadvisor is responsible for . . . broker-dealer selection and for negotiation of broker commission rates." |
| Portfolio and Tax Compliance | "The Manager shall manage . . . each Fund . . . in accordance with the investment objectives, policies and restrictions of the Fund, as stated in the currently effective Prospectus . . . ; in conformity with the Declaration of Trust and By-Laws . . . of the [Fund]; under the instructions and directions of the [Board]; and in accordance with the applicable provisions of the 1940 Act and the rules and regulations thereunder, the provisions of the Internal Revenue Code of 1986 . . . relating to regulated investment companies and all rules and regulations thereunder, and all other applicable federal and state laws and regulations."<br><br>"The Manager will use its best efforts to manage each Fund so that it will qualify as a regulated investment company under Subchapter M of the [Internal Revenue] Code . . . ." | "The Subadvisor will provide the services under this Agreement in accordance with the [Fund's] investment objective or objectives, policies and restrictions as stated in [the Fund's] Registration Statement filed with the [SEC] . . . ."<br><br>"The Subadvisor will conform with the 1940 Act and all rules and regulations thereunder, all other applicable federal and state laws and regulations, any applicable procedures adopted by the [Board], and the provisions of the Registration Statement of the [Fund] . . . ."<br><br>"The Subadvisor understands that the [Fund] need[s] to be managed so as to permit the [Fund] to qualify or continue to qualify as a regulated investment company under Subchapter M of the Internal Revenue Code, and will coordinate efforts with the Manager with that objective." |

17

| Service | Management Agreements Between the Funds and Defendant | Subadvisory Agreements Between Defendant and the Subadvisers |
|---|---|---|
| Coordination with Custodian | "The Manager or any sub-administrator shall provide the Trust's custodian on each business day with information relating to the execution of all portfolio transactions . . . ." | "In connection with the purchase and sale of securities for the [Fund], the Subadvisor will arrange for the transmission to the custodian and portfolio accounting agent for the [Fund], on a daily basis, such . . . documents and information . . . as may be reasonably necessary to enable the custodian and portfolio accounting agent to perform their administrative and recordkeeping responsibilities . . . ." |
| Assistance with Pricing of Portfolio Securities | "The Manager shall . . . provide assistance to the Board in valuing the securities and other instruments held by each Fund, to the extent reasonably required by such valuation policies and procedures as may be adopted by each Fund." | "The Subadvisor will assist the custodian and portfolio accounting agent for the [Fund] in determining or confirming . . . the value of any portfolio securities or other [assets of the Fund] for which the custodian and portfolio accounting agent seek assistance from, or which they identify for review by, the Subadvisor." |
| Reporting to Board | "The Manager shall , . . furnish such reports, evaluations, information or analyses and materials to the Board as the Board may request from time to time . . . ." | "The Subadvisor will provide reports to [the Board], for consideration at meetings of the Board, on the investment program for the [Fund] and the issuers and securities represented in the [Fund], and will furnish to the . . . Board . . . such periodic and special reports as the [Board] and the Manager may reasonably request." |
| Recordkeeping | "The Manager shall keep the Fund's books and records required to be maintained by it." | "The Subadvisor will make available to [the Fund] and the Manager . . . all of the [Fund's] investment records and ledgers maintained by the Subadvisor . . . ." |

62.   Defendant has delegated to State Street certain of its responsibilities under the

Management Agreements for providing administrative services to the Funds.   The Sub-

18

Administration Agreement requires State Street to provide the following administrative services, among others:

a. **Portfolio Compliance** – monitoring and providing reports regarding compliance of each Fund's portfolio with the Fund's investment objectives, policies, and restrictions as set forth in the Fund's Registration Statement, as well as with the 1940 Act and other applicable laws and regulations;

b. **Tax Compliance** – monitoring each Fund's compliance with relevant provisions of federal tax law, including testing compliance with requirements regarding diversification of assets and distribution of income, as well as preparation of tax forms and filings;

c. **Financial Reporting and Recordkeeping** – preparing and maintaining various financial records and reports for each Fund, reporting to the Board on financial matters, and coordinating audits of the Funds' financial statements;

d. **Portfolio Pricing** – assisting with pricing of each Fund's portfolio securities and daily calculation of each Fund's NAV, and maintaining related books and records;

e. **Performance Reporting** – calculating each Fund's portfolio performance, total return, yield, and other investment performance information;

f. **Dividend Calculations** – calculating periodic dividends to be declared by each Fund;

g. **Regulatory Filings and Disclosure Materials** – preparing and coordinating the filing of the Funds' regulatory filings and disclosure materials, including annual shareholder reports; and

19

h.   **Board Reporting and Support** – preparing reports to the Board and other materials for meetings of the Board.

### THE MARK-UP RETAINED BY DEFENDANT IS DISPROPORTIONATE TO THE SERVICES PROVIDED BY DEFENDANT

63.   After delegating substantially all of its responsibilities for providing investment advisory and administrative services, Defendant's responsibilities under the Management Agreements are limited to primarily (a) supervising and overseeing the Subadvisers and State Street, and (b) providing officers and office space for the Funds.

64.   The 69% to 104% mark-up charged to the Funds by Defendant over the fees paid to the Subadvisers and State Street is disproportionate to Defendant's supervision and oversight services and provision of officers and office space for the Funds.

65.   Defendant's responsibilities for supervising and overseeing the Subadvisers and State Street are minimal compared to the Subadvisers' day-to-day implementation of the Funds' investment programs and State Street's day-to-day administration of the Fund.

66.   The expenses of the Funds' officers and office space purportedly paid by Defendant pursuant to the Management Agreements are *de minimis* and do not justify the mark-up charged by Defendant to the Funds.

67.   The Prospectus identifies six individuals who are officers of the Funds.

68.   All six of the Funds' officers also serve as officers of the other 46 mutual funds comprising the MainStay Group of Funds.

69.   All six of the Funds' officers are employed by Defendant and, upon information and belief, devote a majority of their time to their responsibilities as employees of Defendant and its affiliates, and not to their responsibilities as officers of the Funds.

1618879.1

70.     Any portion of the annual compensation paid by Defendant to the Funds' officers that is fairly allocable to their service as officers of the Funds (as opposed to their responsibilities as employees of Defendant and their responsibilities as officers of the other funds in the MainStay Group of Funds) is *de minimis* relative to the mark-up charged to the Funds by Defendant over the subadvisory fees paid by Defendant to the Subadvisers.

71.     Each of the Funds, and the 46 other mutual funds comprising the MainStay Group of Funds, share the same office space as Defendant and its affiliates.

72.     Insofar as the Funds make use of Defendant's offices, any portion of Defendant's annual rent that is fairly allocable to the Funds' use of those offices (as opposed to the use of those offices by Defendant, its affiliates, or the other funds in the MainStay Group of Funds) is *de minimis* relative to the mark-up charged to the Funds by Defendant.

**THE MARK-UP CONSISTS PRIMARILY OF PROFIT TO DEFENDANT**

73.     Due to the limited scope of services actually provided by Defendant, the operating expenses incurred by Defendant are low.

74.     Many of the expenses incurred by Defendant in supervising and overseeing the Subadvisers and State Street are joint and common across all of the 50 funds in the MainStay Group of Funds.  Any portion of those expenses that is fairly allocable to Defendant's provision of those services with respect to the Funds is *de minimis*.

75.     Similarly, as alleged above, any portion of Defendant's expenses of providing officers and office space to the MainStay Group of Funds that is fairly allocable to the Funds is *de minimis*.

76.     Moreover, the Management Agreements require the Funds to pay (or to reimburse Defendant for) many of the operating costs incurred by Defendant in providing management

services to the Funds.  For example, the Management Agreements require the Funds to pay (or reimburse Defendant for), among other expenses:  (a) an allocable portion of the cost to Defendant of maintaining an internal legal and compliance department; (b) a portion of the salary of the Funds' Chief Compliance Officer; (c) all charges and expenses of the Funds' outside counsel and independent accountants; (d) certain expenses incurred in connection with pricing the Funds' portfolio securities; (e) all expenses of meetings of Fund shareholders; (f) all expenses of preparing, printing, and mailing prospectuses, proxies, and other reports to Fund shareholders; and (g) all fees and expenses of registering and maintaining the registration of Fund shares with the SEC, including the preparation and printing of the Funds' registration statements and prospectuses.

77.    As a result, the operating expenses incurred by Defendant in providing management services to the Funds represent a small fraction of the mark-up retained by Defendant from the management fees charged to the Funds.  The mark-up consists primarily of profit to Defendant.

### DEFENDANT REALIZED ECONOMIES OF SCALE AS THE FUNDS' AUM INCREASED

78.    The Corporate Bond Fund's AUM have increased during the past several years, with AUM growing from approximately $5.7 billion as of October 31, 2009 to approximately $8.7 billion as of the end of the Fund's most recently reported fiscal year on October 31, 2014.

79.    As a result of the increase in AUM, the amount of management fees charged to the Corporate Bond Fund by Defendant increased by more than 101%, from approximately $23,720,000 in fiscal year 2009 to approximately $47,715,000 in fiscal year 2014.

1618879.1

80.     The Large Cap Fund's AUM have increased during the past several years, with AUM growing from approximately $3.6 billion as of October 31, 2009 to approximately $20.4 billion as of the Fund's most recently reported fiscal year on October 31, 2014.

81.     As a result of the increase in AUM, the amount of management fees charged to the Large Cap Fund by Defendant increased by more than 715%, from approximately $14,548,000 in fiscal year 2009 to more than $118,611,000 in fiscal year 2014.

82.     The Marketfield Fund's AUM have increased since Defendant became the Fund's investment adviser effective October 5, 2012.  The Marketfield Fund's AUM increased from approximately $4.4 billion as of December 31, 2012 (the end of the fiscal year during which Defendant became the Fund's investment) to approximately $20 billion as of June 30, 2014. Although the Marketfield Fund's AUM subsequently declined due to poor investment performance and resulting redemptions by shareholders, the Fund remains above historic asset levels, with approximately $9.0 billion in AUM as of the end of the Fund's most recently completed fiscal year on December 31, 2014.

83.     As a result of the increase in AUM, the amount of management fees paid by the Marketfield Fund increased by more than 727%, from approximately $30,297,000 during fiscal year 2012 (of which approximately $18,409,000 was paid to the Fund's prior adviser) to approximately $250,598,000 in fiscal year 2014.

84.     The High Yield Opportunities Fund's AUM have increased during the past several years with AUM growing from approximately $206 million as of October 31, 2009 to approximately $1.18 billion as of the Fund's most recently reported fiscal year on October 31, 2014.

1618879.1

85.     As a result of the increase in AUM, the management fees charged to the High Yield Opportunities Fund increased by more than 849%, from approximately $1,087,000 in fiscal year 2009 to more than $10,318,000 in fiscal year 2014.

86.     The increase in management fees charged to each Fund as detailed in the preceding paragraphs was not accompanied by a proportionate increase in the work or cost required by Defendant to provide services to the Funds pursuant to the Management Agreements.

87.     Defendant realized economies of scale as the Funds' AUM increased, which reduced the cost, as a percentage of the Funds' AUM, of providing services to each Fund, and increased the profitability to Defendant of providing those services.

88.     Defendant's supervision and oversight of the Subadvisers has not meaningfully increased as the Funds' AUM have increased.

89.     Defendant has continued to request and evaluate the same or substantially the same reports and other information with respect to each Subadviser as the Funds' AUM have increased, and the work or cost to Defendant of reviewing and evaluating that information has not increased proportionately with AUM.

90.     Nor has the work or cost to Defendant of providing the administrative services purportedly provided pursuant to the Management Agreements meaningfully increased as the Funds' AUM have increased.

91.     Defendant is required to monitor compliance with the same or substantially the same regulatory requirements regardless of a fund's AUM, and the work or cost required to monitor such compliance with respect to the Funds has not increased proportionately as the Funds' AUM have increased.

92.     Defendant is required to maintain the same or substantially the same financial, accounting, and other books and records regardless of a fund's AUM, and the work or cost required to maintain such books and records with respect to the Funds has not increased proportionately as the Funds' AUM have increased.

93.     Defendant is required to prepare the same or substantially the same reports and informational materials for the Board regardless of a fund's AUM, and the work or cost required to prepare those reports and materials with respect to the Funds has not increased proportionately as the Funds' AUM increased.

94.     Defendant provides the same or substantially the same officers and office space regardless of a fund's AUM, and the cost of providing officers and office space with respect to the Funds has not increased proportionately as the Funds' AUM increased.

**DEFENDANT HAS NOT ADEQUATELY SHARED
THE BENEFITS OF ECONOMIES OF SCALE WITH THE FUNDS**

95.     Because investment advisers and managers realize economies of scale as a mutual fund's AUM increase, the management fee rate charged to a mutual fund often decreases as the fund's AUM increase.

96.     Mutual fund management fee schedules often include breakpoints, which reduce a fund's fee rate as AUM increase.

97.     Absent breakpoints or other reductions to the fee rate, or if the breakpoints or other reductions do not appropriately reduce the effective fee rate paid by a fund, the benefits of economies of scale accrue to a fund's investment adviser in the form of higher fees and profits.

98.     Although the management fee schedules for the Large Cap Fund and the Corporate Bond Fund include breakpoints (*see* ¶ 36, *supra*), each Fund's AUM have exceeded the final breakpoint in the Fund's fee schedule for many years, such that the Funds have not

benefited from economies of scale as AUM have continued to increase beyond the final breakpoint.

99.     The Large Cap Fund surpassed its final breakpoint of $9 billion more than three years ago during fiscal year ended October 31, 2011, and its AUM have remained above $9 billion since then.

100.     As of October 31, 2014, the Large Cap Fund had approximately $20.1 billion in AUM, exceeding the final breakpoint in the Fund's fee schedule by approximately $11.1 billion.

101.     The Corporate Bond Fund surpassed its final breakpoint of $7 billion more than two years ago during the fiscal year ended October 31, 2012, and its AUM have remained above $7 billion since then.

102.     As of October 31, 2014, the Corporate Bond Fund had approximately $8.7 billion in AUM, exceeding the final breakpoint in the Fund's fee schedule by approximately $1.7 billion.

103.     By not instituting additional breakpoints in the management fee schedules for the Large Cap and Corporate Bond Funds, Defendant has failed to appropriately share the benefits of economies of scale realized as each Fund's AUM increase beyond the last breakpoint in its respective fee schedule, and captured the vast majority of those benefits for itself.

104.     For example, between fiscal year 2011 and fiscal year 2014, the Large Cap Fund's AUM increased from approximately $12.9 billion to approximately $20.4 billion, and the effective management fee rate paid by the Large Cap Fund decreased by 3 basis points, from 0.63% to 0.60%.

1618879.1

105.    The 3 basis point decrease in the Large Cap Fund's effective management fee rate from 2011 to 2014 translates into a savings to the Fund of approximately $6,128,000 annually based on AUM as of the end of fiscal year 2014.

106.    In contrast, due to the increase in AUM from 2011 to 2014, the dollar amount of fees paid by the Large Cap Fund increased by approximately $64,186,000, from $54,425,000 in fiscal year 2011 to $118,611,000 in fiscal year 2014.

107.    Thus, the increase in the Large Cap Fund's AUM from 2011 to 2014 produced benefits to Defendant (increased management fees) that were more than 10.5 times the benefits to the Large Cap Fund (reductions in the management fee rate).

108.    Between fiscal year 2011 and fiscal year 2014, the Corporate Bond Fund's AUM increased from approximately $6.3 billion to approximately $8.7 billion, and the effective management fee rate paid by the Corporate Bond Fund decreased by 1 basis point, from 0.55% to 0.54%.

109.    The 1 basis point decrease in the Corporate Bond Fund's effective management fee rate from 2011 to 2014 translates into a savings to the Fund of approximately $884,000 annually based on AUM as of the end of fiscal year 2014.

110.    In contrast, due to the increase in AUM from 2011 to 2014, the dollar amount of fees paid by the Corporate Bond Fund increased by approximately $11,845,000 from $35,870,000 in fiscal year 2011 to approximately $47,715,000 in fiscal year 2014.

111.    Thus, the increase in the Corporate Bond Fund's AUM from 2011 to 2014 produced benefits to Defendant (increased management fees) that were more than 13.4 times the benefits to the Corporate Bond Fund (reductions in the management fee rate).

1618879.1

112.   Although breakpoints were added to the management fee schedule for the Marketfield Fund effective February 28, 2014 (*see* ¶ 36, *supra*), the initial breakpoint is set too high at $7.5 billion, failing to share any of the economies of scale realized below that threshold; the breakpoints are spaced too far apart, at intervals of $7.5 billion in AUM; and the fee reductions made by the breakpoints are too small, with each breakpoint reducing the fee rate by only 2 basis points.  As a result, Defendant has failed to appropriately share the benefits of economies of scale realized in managing the Marketfield Fund, and captured the vast majority of those benefits for itself.

113.   During fiscal year 2014 (the first year in which the Marketfield Fund's breakpoints became effective), breakpoints reduced the effective management fee paid by the Marketfield Fund by 1 basis point, from 1.40% to 1.39%.

114.   The 1 basis point decrease in the Marketfield Fund's effective management fee rate from 2012 to 2014 translates into savings to the Fund of approximately $2,738,000 annually based on AUM as of the end of fiscal year 2014.

115.   In contrast, due to the increase in AUM from fiscal year 2012 to 2014, the dollar amount of fees paid by the Marketfield Fund annually increased by approximately $220,301,000 from $30,297,000 in 2012 to more than $250,598,000 in 2014.

116.   Thus, the increase in the Marketfield Fund's AUM from 2012 to 2014 produced benefits to Defendant (increased management fees) that are more than 161 times the benefits to the Marketfield Fund (reductions in the management fee rate).

117.   Although a breakpoint was added to the fee schedule for the High Yield Opportunities Fund's effective February 28, 2014 (*see* ¶ 36, *supra*), the breakpoint is set too high

at $3.0 billion, versus the Fund's AUM of approximately $1.18 billion as of the end of fiscal year 2014.

118.    As a result, the breakpoint has not produced any reduction in the management fee charged to the High Yield Opportunities Fund, enabling Defendant to capture the benefits of economies of scale for itself.

## THE FUNDS' POOR INVESTMENT PERFORMANCE UNDER DEFENDANT'S MANAGEMENT

119.    The mark-up retained by Defendant is disproportionate to the low-quality of the investment management services provided and the poor investment performance experienced by the Funds under Defendant's management.

120.    Except for the High Yield Opportunities Fund, each of the other three Funds has performed poorly under Defendant's management, with each Fund's investment returns trailing behind its benchmark.

121.    As shown in the following table, the Corporate Bond Fund's investment returns have been lower than the Fund's benchmark, the Credit Suisse High Yield Index, for each of the most recent 1- and 5-year periods as of the end of fiscal year 2014.

| Total Return through October 31, 2014 | 1-Year | 5-Year |
|---|---|---|
| Corporate Bond Fund | 4.58% | 8.97% |
| Credit Suisse High Yield Index | 5.54% | 10.17% |
| Difference | -0.96% | -1.20% |

122.    The Large Cap Fund's investment returns have been lower than the Fund's benchmark, the Russell 1000 Growth Index, for each of the most recent 1- and 5-year periods as of the end of fiscal year 2014.

| Total Return through October 31, 2014 | 1-Year | 5-Year |
|---|---|---|
| Large Cap Fund | 15.26% | 16.53% |
| Russell 1000 Growth Index | 17.11% | 17.43% |
| Difference | -1.85% | -0.90% |

123.    The Marketfield Fund's investment returns have been lower than the Fund's benchmark, the S&P 500 Index, for the most recent 1-year period (the only reported period since Defendant became the investment manager to the Fund in October 2012) as of the end of fiscal year 2014.

| Total Return through December 31, 2014 | 1-Year |
|---|---|
| Marketfield Fund | -12.31% |
| S&P 500 Index | 13.69% |
| Difference | -26.00% |

## THE FEES DEFENDANT CHARGES TO
## THE FUNDS ARE NOT NEGOTIATED AT ARM'S LENGTH

124.    The investment management fees paid by the Funds under the Management Agreements are determined by Defendant.

125.    The Board is required to approve the Management Agreements and the fees paid by each Fund under the Management Agreements on an annual basis.

126.    The Board has approved the Management Agreements each year without devoting the time and attention necessary to independently assess the investment advisory fees paid by each Fund or to effectively represent the interests of Fund shareholders *vis-à-vis* Defendant.

127.    Serving on the Board is a part-time job for the Board members, most of whom are employed full-time in senior-level positions in management, finance, or academia, and/or serve on the boards of directors of other public and privately-held companies and institutions.

128.    The Board conducts its oversight responsibilities not only for each of the Funds, but also for the 46 other funds in the MainStay Group of Funds.

129.    In approving the Management Agreements for the Funds, the Board relied on information and analyses that were prepared by Defendant or were designed to support Defendant's rationalization for the fees charged to the Funds.

130.    Defendant has not provided, and the Board has not considered, information or analyses reflecting the interests of the Funds or their shareholders with respect to the investment management fees or critically assessing Defendant's rationalization for those fees.

131.    With respect to the mark-up charged by Defendant over the subadvisory fees it pays to the Subadvisers, the Board has accepted Defendant's representations that the fee is justified by Defendant's supervision and oversight of the Subadvisers and administrative services provided pursuant to the Management Agreements.

132.    Defendant has not provided, and the Board has not considered, appropriate information about Defendant's delegation of substantially all of its responsibilities under the Management Agreements to the Subadvisers and State Street, the value of the services actually provided by Defendant to the Funds, the cost to Defendant of providing such services, or the economies of scale realized by Defendant in providing such services.

133.    The Board has not solicited proposals from other advisers to provide the services to be provided to the Funds by Defendant pursuant to the Management Agreements.

1618879.1

134.     The Board has not caused the Funds to contract directly with the Subadvisers for the investment advisory services they provide to the Funds or with State Street for the administrative services it provides.

135.     The Board has approved the payment by each Fund to Defendant of investment management fees that include a mark-up of 69% to 104% over the fees paid by Defendant to the Subadvisers and State Street for providing substantially all of the investment advisory and administrative services required by the Funds.

136.     The Board has approved investment advisory and subadvisory fees that enable Defendant to retain investment management fees (net of fees paid to the Subadvisers and State Street) that are disproportionate to the services actually provided by Defendant pursuant to the Management Agreements.

137.     The Board has approved investment advisory fee arrangements that enable Defendant to retain for itself the vast majority of the benefits of economies of scale resulting from increases in each of the Funds' AUM without appropriately sharing those benefits with the Funds.

**THE EXCESSIVE INVESTMENT MANAGEMENT FEES HARM THE FUNDS**

138.     The investment management fees are paid out of each Fund's assets.  Each dollar in fees paid by a Fund directly reduces the value of the Fund's investment portfolio.

139.     The payment of excessive investment management fees to Defendant harms each of the Funds on a going forward basis because each Fund loses investment returns and profits it could earn on the amounts paid out as fees if those amounts had remained in the Fund's portfolio and available for investment.

1618879.1

140.    Each Fund has sustained millions of dollars in damages due to the excessive investment management fees paid to Defendant.

**COUNT I**
**ON BEHALF OF THE MARKETFIELD FUND**
**AGAINST DEFENDANT FOR VIOLATION OF SECTION 36(b)**

141.    Plaintiffs repeat and reallege each and every allegation contained in ¶¶ 1-17, 19-20, 22-30, 32-77, 82-83, 86-98, 112-116, 119-120, 123-140 above as if fully set forth herein.

142.    Plaintiffs assert this Count on behalf of and for the benefit of the Marketfield Fund.

143.    Defendant is the investment adviser to the Marketfield Fund.

144.    Under Section 36(b), Defendant owes a fiduciary duty to the Marketfield Fund with respect to its receipt of investment management fees and other compensation from the Fund.

145.    Defendant breached its fiduciary duty under Section 36(b) by charging investment management fees to the Marketfield Fund that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by Defendant and could not have been the product of arm's-length bargaining.

146.    As a direct, proximate, and foreseeable result of Defendant's breach of its fiduciary duty under Section 36(b), the Marketfield Fund has sustained millions of dollars in damages.

147.    Pursuant to Section 36(b)(3), Plaintiffs seek to recover, on behalf of and for the benefit of the Marketfield Fund, the actual damages resulting from Defendant's breach of its fiduciary duty, including the excessive investment management fees paid by the Marketfield

Fund to Defendant and investment returns that would have accrued to the Marketfield Fund had those fees remained in the portfolio and available for investment.

148.    Alternatively, pursuant to Section 47 of the 1940 Act, 15 U.S.C. § 80a-46, Plaintiffs seek rescission of the MainStay Funds Trust Management Agreement and restitution of all excessive investment management fees paid by the Marketfield Fund pursuant to the MainStay Funds Trust Management Agreement.

## COUNT II
## ON BEHALF OF THE LARGE CAP FUND
## AGAINST DEFENDANT FOR VIOLATION OF SECTION 36(b)

149.    Plaintiffs repeat and reallege each and every allegation contained in ¶¶ 1-16, 19-21, 23-31, 33-77, 80-81, 86-100, 103-107, 119-120, 122, 124-140  above as if fully set forth herein.

150.    Plaintiffs assert this Count on behalf of and for the benefit of the Large Cap Fund.

151.    Defendant is the investment adviser to the Large Cap Fund.

152.    Under Section 36(b), Defendant owes a fiduciary duty to the Large Cap Fund with respect to its receipt of investment management fees and other compensation from the Fund.

153.    Defendant breached its fiduciary duty under Section 36(b) by charging investment management fees to the Large Cap Fund that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by Defendant and could not have been the product of arm's-length bargaining.

154.    As a direct, proximate, and foreseeable result of Defendant's breach of its fiduciary duty under Section 36(b), the Large Cap Fund has sustained millions of dollars in damages.

1618879.1

155.    Pursuant to Section 36(b)(3), Plaintiffs seek to recover, on behalf of and for the benefit of the Large Cap Fund, the actual damages resulting from Defendant's breach of its fiduciary duty, including the excessive investment management fees paid by the Large Cap Fund to Defendant and investment returns that would have accrued to the Large Cap Fund had those fees remained in the portfolio and available for investment.

156.    Alternatively, pursuant to Section 47 of the 1940 Act, 15 U.S.C. § 80a-46, Plaintiffs seek rescission of the MainStay Funds Management Agreement and restitution of all excessive investment advisory fees paid by the Large Cap Fund pursuant to the MainStay Funds Management Agreement.

## COUNT III
### ON BEHALF OF THE CORPORATE BOND FUND
### AGAINST DEFENDANT FOR VIOLATION OF SECTION 36(b)

157.    Plaintiffs repeat and reallege each and every allegation contained in ¶¶ 1-15, 18-21, 23-31, 33-79, 86-98, 101-103, 108-111, 119-121, 124-140  above as if fully set forth herein.

158.    Plaintiffs assert this Count on behalf of and for the benefit of the Corporate Bond Fund.

159.    Defendant is the investment adviser to the Corporate Bond Fund.

160.    Under Section 36(b), Defendant owes a fiduciary duty to the Corporate Bond Fund with respect to its receipt of investment management fees and other compensation from the Fund.

161.    Defendant breached its fiduciary duty under Section 36(b) by charging investment management fees to the Corporate Bond Fund that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by Defendant and could not have been the product of arm's-length bargaining.

1618879.1

162.     As a direct, proximate, and foreseeable result of Defendant's breach of its fiduciary duty under Section 36(b), the Corporate Bond Fund has sustained millions of dollars in damages.

163.     Pursuant to Section 36(b)(3), Plaintiffs seek to recover, on behalf of and for the benefit of the Corporate Bond Fund, the actual damages resulting from Defendant's breach of its fiduciary duty, including the excessive investment management fees paid by the Corporate Bond Fund to Defendant and investment returns that would have accrued to the Corporate Bond Fund had those fees remained in the portfolio and available for investment.

164.     Alternatively, pursuant to Section 47 of the 1940 Act, 15 U.S.C. § 80a-46, Plaintiffs seek rescission of the MainStay Funds Management Agreement and restitution of all excessive investment advisory fees paid by the Corporate Bond Fund pursuant to the MainStay Funds Management Agreement.

**COUNT IV**
**ON BEHALF OF THE HIGH YIELD OPPORTUNTITIES FUND**
**AGAINST DEFENDANT FOR VIOLATION OF SECTION 36(b)**

165.     Plaintiffs repeat and reallege each and every allegation contained in ¶¶ 1-15, 18-20, 22-30, 32-77, 84-97, 117-118, 124-140  above as if fully set forth herein.

166.     Plaintiffs assert this Count on behalf of and for the benefit of the High Yield Opportunities Fund.

167.     Defendant is the investment adviser to the High Yield Opportunities Fund.

168.     Under Section 36(b), Defendant owes a fiduciary duty to the High Yield Opportunities Fund with respect to its receipt of investment management fees and other compensation from the Fund.

169.    Defendant breached its fiduciary duty under Section 36(b) by charging investment management fees to the High Yield Opportunities Fund that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by Defendant and could not have been the product of arm's-length bargaining.

170.    As a direct, proximate, and foreseeable result of Defendant's breach of its fiduciary duty under Section 36(b), the High Yield Opportunities Fund has sustained millions of dollars in damages.

171.    Pursuant to Section 36(b)(3), Plaintiffs seek to recover, on behalf of and for the benefit of the High Yield Opportunities Fund, the actual damages resulting from Defendant's breach of its fiduciary duty, including the excessive investment management fees paid by the High Yield Opportunities Fund to Defendant and investment returns that would have accrued to the High Yield Opportunities Fund had those fees remained in the portfolio and available for investment.

172.    Alternatively, pursuant to Section 47 of the 1940 Act, 15 U.S.C. § 80a-46, Plaintiffs seek rescission of the MainStay Funds Management Agreement and restitution of all excessive investment advisory fees paid by the High Yield Opportunities Fund pursuant to the MainStay Funds Management Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment on behalf of and for the benefit of each of the Funds as follows:

A.    declaring that Defendant has violated Section 36(b), 15 U.S.C. § 80a-35(b), through the receipt of excessive investment management fees from each Fund;

1618879.1

B.   permanently enjoining Defendant from further violations of Section 36(b);

C.   awarding compensatory damages against Defendant, including repayment to each Fund of all unlawful and excessive investment management fees paid by such Fund from one year prior to the commencement of this action through the date of trial, lost investment returns on those amounts, and interest thereon;

D.   rescinding each of the Management Agreements pursuant to Section 47 of the 1940 Act, 15 U.S.C. § 80a-46, including restitution to each Fund of the excessive investment management fees paid to Defendant by such Fund pursuant to the Management Agreements from one year prior to the commencement of this action through the date of trial, lost investment returns on those amounts, and interest thereon;

E.   awarding Plaintiffs reasonable costs in this action, including attorneys' fees, expert witness fees, and such other items as may be allowed to the maximum extent permitted by law; and

F.   such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury.


Dated:  April 20, 2015

                                        **SZAFERMAN, LAKIND,**
                                        **BLUMSTEIN & BLADER, P.C.**


                                        _/s/ Robert L. Lakind_____
                                        Robert L. Lakind
                                        Arnold C. Lakind
                                        Daniel S. Sweetser

101 Grovers Mill Road, Suite 200
Lawrenceville, NJ 08648
Tel:  (609) 275-0400
Fax:  (609) 275-4511

**ZWERLING, SCHACHTER &
ZWERLING, LLP**
Robin F. Zwerling
Jeffrey C. Zwerling
Susan Salvetti
Andrew W. Robertson
Ana M. Cabassa-Torres
41 Madison Avenue
New York, NY 10010
Tel: (212) 223-3900
Fax: (212) 371-5969

**KLAYMAN & TOSKES, P.A.**
Lawrence L. Klayman
2424 N. Federal Highway, Suite 450
Boca Raton, FL 33431
Tel:  (561) 997-9956

*Attorneys for Plaintiffs*

1618879.1