# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| CYNTHIA ANN REDUS-TARCHIS, FREDRIC and BONNIE OLIVER, and MICHAEL PATTI, | : : : : | Civil Action No. 14-7991 (WHW/CLW) |
| Plaintiffs, | : : | ***Filed Electronically*** |
| v. | : : | *ORAL ARGUMENT REQUESTED* |
| NEW YORK LIFE INVESTMENT MANAGEMENT LLC, | : : : | |
| Defendant. | : : | |

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

<div align="right">

Liza Walsh
Katelyn O'Reilly
CONNELL FOLEY LLP
One Newark Center
1085 Raymond Boulevard, 19th Floor
Newark, NJ 07102
 (973) 757-1100

</div>

Mary K. Dulka (admitted *pro hac vice*)
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 813-8800

*Attorneys for Defendant New York Life Investment Management LLC*

James O. Fleckner (admitted *pro hac vice*)
David Rosenberg (admitted *pro hac vice*)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..............................................................................1

FACTUAL BACKGROUND.................................................................................3

    I.      NYLIM's Responsibilities as the Funds' Manager and the Trustees' Oversight of NYLIM...............................................................3

    II.     Respective Roles Under the Widely Used Manager/Subadvisor Structure .......................................................................................7

    III.    The Trustees' Review and Approval of Management Fees................10

    IV.    Plaintiffs' Challenge to a Portion of the Total Fees Paid Under the Subadvisory Structure ...................................................................12

PROCEDURAL BACKGROUND.........................................................................13

LEGAL STANDARDS .......................................................................................14

    I.      The Requirements to State a Claim Under ICA Section 36(b)...........14

    II.     Rule 12(b)(6) Requires Dismissal of Conclusory Claims Contradicted by the Public Record and Documents Upon Which the Complaint Relies ............................................................16

ARGUMENT ....................................................................................................17

    I.      The Complaint Must Be Dismissed for Failure to Allege That the Funds' Total Fees Are Disproportionately Large .........................18

    II.     The Complaint Must Be Dismissed Because Its Claims Are Contradicted by the Agreements It Cites ...........................................22

    III.    Plaintiffs' Conclusory Allegations Disparaging the Trustees' Approval of NYLIM's Fees Are Unsupported by Sufficient Factual Allegations and Are Contradicted by the Public Record .......26

    IV.    The Complaint's Remaining Allegations Are Insufficient to State a Claim .......................................................................................33

A.    Allegations About Performance Fail to Support
      Plaintiffs' Claims ..................................................................33

B.    Allegations About Economies of Scale Fail to Support
      Plaintiffs' Claims ..................................................................35

      1.    The Complaint Cannot Establish the Existence of
            Economies of Scale During the Relevant Period ...........35

      2.    The Complaint and the Public Record Show That Any
            Economies of Scale Were Shared with the Funds..........37

CONCLUSION ....................................................................................40

ii

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Amron v. Morgan Stanley Inv. Advisors Inc.*,
  464 F.3d 338 (2d Cir. 2006) .......................................................................28, 33

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................................17

*Bailey v. Reed*,
  29 Fed. App'x 874 (3d Cir. 2002) ...................................................................17

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 554 (2007)........................................................................................16

*Benak ex rel. the Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P.*,
  No. 01-5734, 2004 WL 1459249 (D.N.J. Feb. 9, 2004)..............................15, 21

*Burks v. Lasker*,
  441 U.S. 471 (1979).......................................................................................26

*Coffman v. Pruco Life Ins. Co.*,
  No. 10-03663, 2011 WL 4550152 (D.N.J. Sept. 29, 2011)..............................25

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
  694 F.2d 923 (2d Cir. 1982) ........................................................15, 16, 33, 38

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
  528 F. Supp. 1038 (S.D.N.Y. 1981),
  *aff'd*, 694 F.2d 923 (2d Cir. 1982) .............................................................19, 37

*Genesis Bio-Pharm., Inc. v. Chiron Corp.*,
  27 F. App'x 94 (3d Cir. 2002) ........................................................................17

*Green v. Fund Asset Mgmt., L.P.*,
  286 F.3d 682 (3d. Cir. 2002) .........................................................................15

*Hecker v. Deere*,
  556 F.3d 575 (7th Cir. 2009) .........................................................................20

ACTIVE/82784402.1

*Hoffman v. UBS-AG*,
   591 F. Supp. 2d 522 (S.D.N.Y. 2008) ......................................................25, 34, 38

*In re AllianceBernstein Mut. Fund Excessive Fee Litig.*,
   No. 04-4885, 2006 WL 74439 (S.D.N.Y. June 11, 2006)............................17, 37

*In re BlackRock Mut. Funds Advisory Fee Litig.*,
   No. 14-1165, 2015 WL 1418848 (D.N.J. Mar. 25, 2015) ..................................31

*In re Eaton Vance Mut. Funds Fee Litig.*,
   403 F. Supp. 2d 315 (S.D.N.Y. 2005),
   *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110 (2d
   Cir. 2007) ........................................................................................................ 19

*In re Franklin Mut. Funds Fee Litig.*,
   478 F. Supp. 2d 677 (D.N.J. 2007)...........................................16, 20, 34, 35, 36

*In re NAHC, Inc. Sec. Litig.*,
   306 F.3d 1314 (3d Cir. 2002) .............................................................................4

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
   441 F. Supp. 2d 579 (S.D.N.Y. 2006) ......................................................... 18, 19

*In re Scudder Mut. Funds Fee Litig.*,
   No. 04 Civ. 1921, 2007 WL 2325862 (S.D.N.Y. Aug. 14, 2007).....................22

*Jones v. Harris Assocs. L.P.*,
   559 U.S. 335 (2010)............................................. 15, 26, 27, 32, 33, 38

*Kalish v. Franklin Advisers, Inc.*,
   742 F. Supp. 1222 (S.D.N.Y 1999),
   *aff'd*, 928 F.2d 590 (2d Cir. 1991)...............................................................34, 38

*Kasilag v. Hartford Inv. Fin. Servs., LLC*,
   No. 11-1083, 2012 WL 6568409 (D.N.J. Dec. 17, 2012) ..................................31

*Kent v. Tabafunda*,
   No. 07-4973, 2008 WL 2510723 (D.N.J. June 19, 2008) ..................................17

*Krantz v. Prudential Invs. Fund Mgmt. LLC*,
   305 F.3d 140 (3d Cir. 2002) .....................................................................22, 27

iv

*Krantz v. Prudential Invs. Fund Mgmt. LLC*,
   77 F. Supp. 2d 559 (D.N.J. 1999),
   *aff'd*, 305 F.3d 140 (3d Cir. 2002)................................................................16

*Krinsk v. Fund Asset Mgmt., Inc.*,
   875 F.2d 404 (2d Cir. 1989) ...........................................................................15

*Krinsk v. Fund Asset Mgmt. Inc.*,
   No. 85-8428, 1986 WL 205 (S.D.N.Y May 9, 1986),
   *aff'd*, 875 F.2d 404 (2d Cir. 1989)................................................................36

*Lawson v. FMR LLC*,
   134 S. Ct. 1158 (2014)......................................................................................3

*Migdal v. Rowe Price-Fleming Intern., Inc.*,
   248 F.3d 321 (4th Cir. 2001) .............................................................28, 30, 35

*Olesh v. Dreyfus Corp.*,
   No. 94-1664, 1995 WL 500491 (E.D.N.Y. Aug. 8, 1995) ...............................16

*Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*,
   998 F.2d 1192 (3d Cir. 1993) ............................................................................4

*Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co. (U.S.A.)*,
   677 F.3d 178 (3d Cir. 2012) ............................................................................40

*Sivolella v. AXA Equitable Life Ins. Co.*,
   Civ. A. No. 11-4194, 2012 WL 4464040 (D.N.J. Sept. 25, 2012)....................31

*Strougo v. BEA Assocs.*,
   No. 98-3725, 1999 WL 147737 (S.D.N.Y. Mar. 18, 1999) ..............................22

*Verkouteren v. Blackrock Fin. Mgmt., Inc.*,
   37 F. Supp. 2d 256 (S.D.N.Y. 1999),
   *aff'd*, 208 F.3d 204 (2d Cir. 2000)................................................................29

*Wexler v. Equitable Capital Mgmt. Corp.*,
   No. 93-3834, 1994 WL 48807 (S.D.N.Y. 1994) ..............................................32

ACTIVE/82784402.1

STATUTES, RULES & REGULATIONS

15 U.S.C. § 80a-2(a)(19) (ICA § 2(a)(19)) ............................................................28

15 U.S.C. § 80a-10(a) (ICA § 10(a)) ...................................................................5

15 U.S.C. § 80a-15(a)(1) (ICA § 15(a)(1)) ..........................................................7

15 U.S.C. § 80a-15(c) (ICA § 15(c)) ...............................................................7, 29

15 U.S.C. § 80a-35(b) (ICA § 36(b))..................................................................*passim*

15 U.S.C. § 80a-35(b)(3) (ICA § 36(b)(3)) ........................................................35

15 U.S.C. § 80a-46(b) (ICA § 47(b)).............................................................13, 40

68 Fed. Reg. (CCH) ¶ 61,720 (Oct. 23, 2003) .....................................................8

FED. R. CIV. P. 12(b)(6) ............................................................................16, 18, 25

OTHER AUTHORITIES

*About Strategic Insight*, STRATEGIC INSIGHT ..........................................................11

Exemption from Shareholder Approval for Certain Subadvisory Contracts,
    SEC Release No. 26,230, 2003 WL 22423216 (Oct. 23, 2003) ..........................8

Hillary Jackson, *Trustee of the Year Nominees, 2015,*
    FUND DIRECTIONS (Feb. 2, 2015)...........................................................................5

Interpretive Matters Concerning Independent Directors of Investment
    Companies, SEC Release No. 24,083, 1999 WL 820629 (Oct. 14, 1999).........28

John J. Brennan et al., *Report of the Advisory Group on Best Practices for
    Fund Directors*, INVESTMENT COMPANY INSTITUTE (June 24, 1999).................28

*John Y. Kim is elected president of New York Life*, NEW YORK LIFE
    (May 20, 2015)......................................................................................................7

The MainStay Funds Notice of Application, SEC Release No. 27,595,
    2006 WL 3677913 (Dec. 11, 2006) .......................................................................9

ACTIVE/82784402.1

The MainStay Funds Order Granting Exemption, SEC Release No.
27,656, 2007 WL 81955 (Jan. 8, 2007) .........................................................9, 23

Multi-Manager Funds - Aggregate Advisory Fee Rate,
SEC IM Guidance Update No. 2014-03 (February 2014)................................8, 9

Reply Brief for Plaintiff-Appellant, *Krantz v. Prudential Invs. Fund Mgmt.
LLC*, No. 02-1266 (3d Cir. May 14, 2002), 2002 WL 32818563 .....................21

ROBERT POZEN AND THERESA HAMACHER, THE FUND INDUSTRY:
HOW YOUR MONEY IS MANAGED (2012)...............................................................8

S. REP. No. 91-184 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4897 ........................18

*Trustee of the Year: Susan Kerley, Independent Chair, MainStay Funds;
Independent Director, Legg Mason Partners Funds*, FUND
DIRECTIONS (Apr. 16, 2010) ................................................................................6

ACTIVE/82784402.1

## **PRELIMINARY STATEMENT**

Plaintiffs' Second Amended Complaint ("SAC" or "Complaint") asserts in conclusory fashion that Defendant New York Life Investment Management LLC ("NYLIM") received excessive fees for management of four mutual funds, merely because NYLIM hired subadvisors to assist with its duties and paid them a portion of the total management fee.  But NYLIM's employment of this manager/subadvisor structure—widely utilized throughout the mutual fund industry and endorsed by NYLIM's regulator—cannot itself constitute a breach of NYLIM's fiduciary duty under Section 36(b) of the Investment Company Act of 1940 ("ICA").

Rather, to state a Section 36(b) claim, Plaintiffs must plead sufficient facts showing that the *total* management fee that the funds paid was so disproportionately large that it bore no reasonable relationship to the services rendered and could not have been a result of arm's-length bargaining.  Plaintiffs' attack on only a portion of the fee is a fatal defect that does not satisfy their pleading burden regarding the *total* management fee, and the Complaint should be dismissed for this reason alone.

Even beyond that threshold deficiency, an independent ground for dismissal is that the very documents Plaintiffs themselves rely upon directly contradict Plaintiffs' unwarranted attack on NYLIM's use of the subadvisory structure.  For

example, Plaintiffs selectively and misleadingly quote from the management

agreements at issue while omitting other language demonstrating the significant

duties and responsibilities retained, and not delegated, by NYLIM.  The full text of

those agreements refutes Plaintiffs' allegation that NYLIM delegated

"substantially all of its responsibilities."

Further undermining Plaintiffs' claims is the public record that expressly

refutes Plaintiffs' blatant misrepresentation that there was no arm's-length

bargaining over the management fees because, according to Plaintiffs, the

independent trustees who approved those fees relied *solely* on information

prepared by NYLIM.  To the contrary, the funds' publicly filed shareholder reports

clearly recite how the trustees requested and reviewed extensive information

prepared by well-respected outside third-parties, considered legal advice from their

separate and independent counsel, and actively negotiated fee waivers and other

concessions from NYLIM that benefited the funds and their shareholders.  In

addition, the Third Circuit has categorically rejected allegations that the trustees'

oversight of multiple funds managed by the same adviser constitutes evidence that

the trustees were inattentive or that the fee approval process was flawed.

Plaintiffs' claims are deficient for two other reasons:  (i) case law in this

District has rejected an identical attempt to point to the funds' performance as

proof that the management fees were excessive; and (ii) although Plaintiffs allege

that NYLIM did not share economies of scale with the funds, they fail to plead the existence of any such economies of scale and the public record shows that, in fact, the funds benefited from the trustees' fee negotiations with NYLIM.

Plaintiffs therefore fail to state a claim under Section 36(b), and the Complaint should be dismissed with prejudice.

## FACTUAL BACKGROUND

### I. NYLIM's Responsibilities as the Funds' Manager and the Trustees' Oversight of NYLIM

Plaintiffs Cynthia Ann Redus-Tarchis, Fredric Oliver, Bonnie Oliver, and Michael Patti ("Plaintiffs") claim to be shareholders suing derivatively on behalf of four mutual funds: the MainStay Large Cap Growth Fund ("Large Cap Fund" or "LCF"), the MainStay Marketfield Fund ("Marketfield Fund" or "MF"), the MainStay High Yield Corporate Bond Fund ("Corporate Bond Fund" or "CBF"), and the MainStay High Yield Opportunities Fund ("High Yield Opportunities Fund" or "HYOF") (collectively, the "Funds").[1]  As the Supreme Court has noted, "[v]irtually all mutual funds are structured so that they have no employees of their own; they are managed, instead, by independent investment advisers."  *Lawson v. FMR LLC*, 134 S. Ct. 1158, 1171 (2014).  The Funds here are no exception:  they

---

[1] SAC ¶¶ 16-18.  The Corporate Bond Fund and the Large Cap Fund are series within The MainStay Funds, and the Marketfield Fund and High Yield Opportunities Fund are series within the MainStay Funds Trust.  SAC ¶¶ 21-22.

ACTIVE/82784402.1

have no employees, and instead contract with outside parties to perform

management and other services.[2]

Management Agreements approved by the Funds' trustees spell out

NYLIM's responsibilities as the Funds' investment manager.[3]  Principally,

NYLIM must "develop overall investment strategy and provide recommendations

to the Board regarding each Fund's investment objective and strategy; [and]

manage all aspects of the advisory operations of each Fund and the composition of

the portfolio of each Fund, including the purchase, retention and disposition of

securities therein, in accordance with the investment objectives, policies and

restrictions of the Fund . . . ."[4]

---

[2] SAC ¶ 26.

[3] SAC ¶¶ 27, 31-32.  The February 28, 2015 The MainStay Funds Management
Agreement ("MSF Agreement") and the February 28, 2015 MainStay Funds Trust
Management Agreement ("MSFT Agreement," collectively, the "Management
Agreements") are attached to the June 19, 2015 Declaration of Mary K. Dulka
("Dulka Decl.") as Exhibits A and B.  The Management Agreements (as well as
the Subadvisory Agreements discussed *infra*) are exhibits to the Funds'
Registration Statements publicly filed with the United States Securities and
Exchange Commission ("SEC"), and this Court can take judicial notice of those
public SEC filings on a motion to dismiss.  *In re NAHC, Inc. Sec. Litig.*, 306 F.3d
1314, 1331 (3d Cir. 2002).  Moreover, when—as here—a "complaint is based on
[a] contract," a court can consider the contract on a motion to dismiss.  *Pension
Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196-97 (3d Cir.
1993).  *See, e.g.*, SAC ¶¶ 31-37, 40, 42-43, 45, 56-61, 63, 66, 76, 89-92, 96, 110,
120-122, 127-129, 144, 152, 160 (citing or quoting the Management Agreements
and Subadvisory Agreements).

[4] SAC ¶ 57.  *See also* MSF Agreement at II.A; MSFT Agreement at II.A.  The
obligations in the Management Agreements apply not only to the Funds, but also to

A board of eight trustees (the "Trustees" or the "Board") negotiates and enters into the Management Agreements on the Funds' behalf.[5]  Only one trustee is an "interested person" under the ICA, and the other seven are independent (the "Independent Trustees"), a level of independence that far exceeds the statutory requirement that 40% of a board must be independent.[6]

The Funds' public filings reflect that all of the Trustees have considerable experience serving in senior-level positions in finance, business and the law, and bring to bear specific expertise relevant to overseeing and negotiating with the Funds' manager:

- **Peter Meenan (chairman)** has held a number of positions in 40 years in the fund industry, including head of Global Funds at Citicorp and as the general counsel of several major investment advisory firms. Mr. Meenan has served as the chair of the Independent Directors' Council ("IDC's") Task Force on Director Self-Evaluation.  Recently, Mr. Meenan was nominated for 2014 Trustee of the Year by Fund Directions.[7]

---

the 46 other funds subject to the same agreements.

[5] SAC ¶ 29.

[6] Dulka Decl. Ex. F, February 27, 2015 Statement of Additional Information for Large Cap Fund, Corporate Bond Fund, and High Yield Opportunities Fund ("2015 SAI") at 61-62; Dulka Decl. Ex. G, April 30, 2015 Statement of Additional Information for Marketfield Fund ("2015 MF SAI") at 53-54.  *See also* ICA § 10(a), 15 U.S.C. § 80a-10(a) (requiring at least 40% of trustees to be independent).

[7] Hillary Jackson, *Trustee of the Year Nominees, 2015,* FUND DIRECTIONS at 9 (Feb. 2, 2015), http://www.funddirections.com/governance/trustee-of-the-year-nominees-12/.

ACTIVE/82784402.1

- **Susan B. Kerley (Contracts Committee chair)** has over 25 years of experience in the mutual fund industry.  She is a former member of the Board of Governors and the Executive Committee of the Investment Company Institute ("ICI"), the national association of U.S. investment companies, and is the former chair of the Governing Council of the IDC.  Ms. Kerley was named as 2009 Trustee of the Year by Fund Directions.[8]

- **Alan R. Latshaw** is a former partner at Ernst & Young LLP.  He has over 20 years of accounting experience, focusing his career on mutual fund accounting and audit issues.  He was a member of the Investment Companies Committee of the American Institute of Certified Public Accountants, serving as its chairman from 1997-2001.

- **John A. Weisser** is a former managing director of Salomon Brothers, Inc., where, among other things, he managed a team specializing in taxable fixed-income securities.

- **Richard H. Nolan, Jr.** has over 25 years of experience managing a wide array of equity and fixed-income portfolios.  He currently is a managing director of ICC Capital Management, a registered investment adviser, and he previously worked with pension funds at Alliance Capital Management.

- **Richard S. Trutanic** has over 25 years of experience in the fund industry that has focused on international and alternative investments.  He is currently the chairman and chief executive officer of Somerset & Company, a financial advisory firm, and among his prior experiences, he worked as a lawyer with a practice in securities law.

- **Roman L. Weil** has been a professor for over 45 years, having served as the V. Duane Rath Professor Emeritus of Accounting at the Chicago Booth School of Business, a Program Fellow at Stanford Law School, and as a visiting professor at New York University Stern

---

[8] *Trustee of the Year: Susan Kerley, Independent Chair, MainStay Funds; Independent Director, Legg Mason Partners Funds*, FUND DIRECTIONS (Apr. 16, 2010), http://www.funddirections.com/uncategorized/trustee-of-the-year-susan-kerley-independent-chair-mainstay-funds-independent-director-legg-mason-partners-funds/.

ACTIVE/82784402.1

School of Business, among others.  His scholarship has focused primarily on the areas of economics and accounting.  Mr. Weil has also served on the Education and Governance Committees of the IDC.

- **John Y. Kim** is the chairman of NYLIM.  He is also the chief investment officer (and, as of May 20, 2015, is also the President) of NYLIM's parent, New York Life Insurance Company ("New York Life").[9]

ICA Section 15 requires that a majority of a fund's independent trustees annually approve the fund's investment advisory agreements, which must expressly state the fees that the fund pays for management services.[10]  As yet a further layer of diligence and scrutiny over these Funds' fees beyond the statutory requirements, the Board established a Contracts Committee composed entirely of Independent Trustees to oversee the Funds' contracts, such as the Management Agreements, and to ensure "that the interests of the Funds and their shareholders are served by the terms of these contracts."[11]

## II.   Respective Roles Under the Widely Used Manager/Subadvisor Structure

The Management Agreements expressly permit NYLIM to hire subadvisors, allowing NYLIM to find and engage experts in specific investment disciplines to

---

[9] *See* 2015 SAI at 55-58 and 2015 MF SAI at 47-51 (listing information for all Fund trustees); *John Y. Kim is elected president of New York Life*, NEW YORK LIFE (May 20, 2015), http://www.newyorklife.com/about/john-y-kim-elected-nyl-president.

[10] *See* ICA § 15(a)(1), 15 U.S.C. § 80a-15(a)(1) and ICA § 15(c), 15 U.S.C. § 80a-15(c).

[11] 2015 SAI at 59-60; 2015 MF SAI at 52-53.

manage "all or a portion of the assets" in the Funds.[12]  As industry experts

explained, this arrangement allows a fund complex "to add new fund types to their

product lineup, even when they don't have the investment expertise in-house."[13]

This structure, "first introduced in the early 1990s," has "grown in popularity" to

the point where "[m]any mutual funds today use a so-called 'multi-manager

structure . . . .'"[14]

NYLIM has pursued this opportunity to benefit the Funds' shareholders by

hiring registered investment advisers possessing specialized knowledge and

expertise appropriate for each Fund and its unique investment objectives and

strategies:  Marketfield Asset Management LLC ("MAM") for the Marketfield

Fund; Winslow Capital Management, LLC ("Winslow") for the Large Cap Fund;

and MacKay Shields LLC ("MacKay") for the Corporate Bond Fund and High

Yield Opportunities Fund (collectively the "Subadvisors").[15]  NYLIM's regulator,

---

[12] SAC ¶ 60.  *See also* MSF Agreement at II.A.3; MSFT Agreement at II.A.3.

[13] ROBERT POZEN AND THERESA HAMACHER, THE FUND INDUSTRY: HOW YOUR MONEY IS MANAGED 455 (2012).

[14] Exemption from Shareholder Approval for Certain Subadvisory Contracts, SEC Release No. 26,230, 2003 WL 22423216, at *2 (Oct. 23, 2003); Multi-Manager Funds - Aggregate Advisory Fee Rate, SEC IM Guidance Update No. 2014-03 at *1 (February 2014), https://www.sec.gov/divisions/investment/guidance/im-guidance-2014-03.pdf ("2014 Guidance Update").

[15] SAC ¶ 41.  Each Fund has different objectives and strategies and each is invested in different asset classes.  *See* 2015 SAI at 7; Dulka Decl. Ex. K, December 31, 2014 Marketfield Annual Report ("MF 2014 Annual Rpt.") at 12.

8

the SEC, specifically stated that NYLIM can engage these Subadvisors—with the Trustees' "review and approval"—so long as NYLIM provides "general management services" and maintains "overall supervisory responsibility for the general management and investment of each Sub-Advised Fund's assets."[16]

NYLIM must "continue to oversee the services provided by" the Subadvisors; importantly, any use of a subadvisor does "not relieve" NYLIM of its overall responsibilities to the Funds.[17]  As explicitly stated in these separate Subadvisory Agreements, NYLIM bears "the ultimate responsibility for and control of all functions performed" by the Subadvisors, can direct the Subadvisors to take specific actions, and can disapprove actions proposed by the Subadvisors.[18] NYLIM also retains certain portfolio management duties not delegated to the Subadvisors.  For example, NYLIM remains responsible for "develop[ing] overall

---

[16] Dulka Decl. Ex. H, The MainStay Funds Notice of Application, SEC Release No. 27,595, 2006 WL 3677913, at *4 (Dec. 11, 2006) (proposing actions that NYLIM would take if the SEC granted the exemption); *see also* Dulka Decl. Ex. I, The MainStay Funds Order Granting Exemption, SEC Release No. 27,656, 2007 WL 81955 (Jan. 8, 2007) ("2007 Exemptive Order") (agreeing to NYLIM's proposal, on the terms set forth in the application).  The SEC has "issued over 200 multi-manager [exemptive] orders" facilitating the use of this arrangement.  2014 Guidance Update at *1.

[17] MSF Agreement at II.A.3; MSFT Agreement at II.A.3; *see also* SAC ¶ 63.

[18] Dulka Decl. Ex. C, October 5, 2012 Subadvisory Agreement between NYLIM and MAM ("MF Sub Agreement") ¶ 13; Dulka Decl. Ex. D, October 1, 2014 Subadvisory Agreement between NYLIM and Winslow ("LCF Sub Agreement") ¶ 13; Dulka Decl. Ex. E, August 1, 2008 Subadvisory Agreement between NYLIM and MacKay ("CBF and HYOF Sub Agreement") ¶ 13 (collectively the "Subadvisory Agreements").

ACTIVE/82784402.1

investment strategy and provid[ing] recommendations to the Board regarding each Fund's investment strategy and performance."[19]  NYLIM's Portfolio Analytics and Risk Oversight Group (formerly known as the Investment Consulting Group) continues to provide "detailed investment performance reports" to the Board and other "investment oversight and analytical services" to the Funds.[20]

## III.    The Trustees' Review and Approval of Management Fees

As part of their diligence process in reviewing the Management Agreements and Subadvisory Agreements, and approving the fees at issue, the Trustees considered information provided by NYLIM, the Subadvisors, and independent third-parties that are well-respected in the mutual fund industry.[21]  Among other

---

[19] *Compare* MSFT Agreement at II.A *with* MF Sub Agreement ¶ 2; *compare* MSF Agreement at II.A *with* LCF Sub Agreement ¶ 2 *and* CBF and HYOF Sub Agreement ¶ 2.  The Management Agreements likewise permit NYLIM to enter into contracts with a sub-administrator "in which [NYLIM] delegates to such sub-administrator any or all" of its administrative duties under the Management Agreement, such as monitoring portfolio compliance with applicable laws and regulations and overseeing computation of net asset value.  SAC ¶¶ 60, 62; *see also* MSF Agreement at III.A.8; MSFT Agreement at III.A.8.  As with the Subadvisors, NYLIM still must "supervise any sub-administrator" and "at all times maintain responsibility for providing the administrative services."  MSF Agreement at III.A.8; MSFT Agreement at III.A.8.

[20] MF 2014 Annual Rpt. at 42; *see also* Dulka Decl. Ex. O, April 30, 2014 Large Cap Fund Semi-Annual Report ("LCF 2014 Semi-Annual Rpt.") at 29; Dulka Decl. Ex. P, April 30, 2014 Corporate Bond Fund Semi-Annual Report ("CBF 2014 Semi-Annual Rpt.") at 45; Dulka Decl. Ex. Q, April 30, 2014 High Yield Opportunities Fund Semi-Annual Report ("HYOF 2014 Semi-Annual Rpt.") at 42.

[21] MF 2014 Annual Rpt. at 42-45; LCF 2014 Semi-Annual Rpt. at 29-32; CBF 2014 Semi-Annual Rpt. at 45-48; HYOF 2014 Semi-Annual Rpt. at 42-45.

ACTIVE/82784402.1

things, the Trustees engaged an independent service provider, Strategic Insight

Mutual Fund Research and Consulting, LLC ("Strategic Insight"), "to report

objectively on the Fund[s]' investment performance, management and subadvisory

fees and ordinary operating expenses . . . particularly as compared to similar funds

and accounts managed by [NYLIM and the Subadvisors] and peer funds identified

by Strategic Insight."[22]  In 2014, the Trustees also engaged an additional

independent third-party consultant, Bobroff Consulting, Inc., "to review the

methods used to allocate costs" to and among the Funds to assist the Board in its

annual profitability analysis when considering the management fees.[23]

      As a result of their substantial due diligence and negotiation with NYLIM,

the Trustees found that the total management fees, and the portion of those fees

that NYLIM paid to the Subadvisors, "were within a range that is competitive" and

unanimously approved the Management Agreements.[24]

_____

[22] MF Annual Rpt. at 42; LCF 2014 Semi-Annual Rpt. at 29; CBF 2014 Semi-Annual Rpt. at 45; HYOF 2014 Semi-Annual Rpt. at 42.  Strategic Insight "provide[s] products and services to a wide range of clients, including executives from more than 200 investment management and insurance companies, distributors, investment banks, hedge funds, consultants and law firms."  *About Strategic Insight*, STRATEGIC INSIGHT, http://sionline.com/aboutsi/ (last visited June 19, 2015).

[23] MF 2014 Annual Rpt. at 43.  More information about Bobroff Consulting, Inc., which was headed by a former SEC attorney with over 40 years of experience in investment management, is available at http://bobroffconsulting.com/about.html.

[24] MF 2014 Annual Rpt. at 45; LCF 2014 Semi-Annual Rpt. at 32; CBF 2014 Semi-Annual Rpt. at 48; HYOF 2014 Semi-Annual Rpt. at 44-45.

ACTIVE/82784402.1

Under those agreements, NYLIM's fees vary according to the assets in each Fund.  Those agreements contain breakpoints that reduce the rate charged when the Funds' assets exceed particular dollar amounts.[25]  The 2014 effective management fee rate after those breakpoints was 0.55% for the Corporate Bond Fund, 0.60% for the Large Cap Fund, 0.80% for the High Yield Opportunities Fund, and 1.39% for the Marketfield Fund.[26]

## IV.    Plaintiffs' Challenge to a Portion of the Total Fees Paid Under the Subadvisory Structure

Plaintiffs bring four counts in the Complaint under ICA Section 36(b), one for each Fund, alleging that the Funds paid excessive fees.  Rather than challenge the total management fees paid by the Funds, Plaintiffs take direct aim at the Funds' use of the widely adopted subadvisory structure.  Plaintiffs focus on the portion of the fee representing the difference between the total management fee and what the Subadvisors and the Funds' Sub-Administrator, State Street Bank & Trust Company, are paid.  Plaintiffs erroneously and pejoratively call the amount

---

[25] SAC ¶ 36.  *See also* MSF Agreement at Schedule A; MSFT Agreement at Schedule A.  The breakpoints for the Funds are shown in Appendix A attached hereto.

[26] Dulka Decl. Ex. M, October 31, 2014 Corporate Bond Fund Annual Report ("CBF 2014 Annual Rpt.") at 36; Dulka Decl. Ex. L, October 31, 2014 Large Cap Fund Annual Report ("LCF 2014 Annual Rpt.") at 24-25; Dulka Decl. Ex. O, October 31, 2014 High Yield Opportunities Fund Annual Report ("HYOF Annual Rpt.") at 38; MF 2014 Annual Rpt. at 37.  *See* Appendix A herein.  The effective management fee rate "is the weighted average of the rates paid by a Fund on each level of" assets under management.  SAC ¶ 37.

12

of the fee retained by NYLIM as a "mark-up."[27]  However, NYLIM receives a fee

for acting as the Funds' manager.  It provides valuable services and has significant

duties and responsibilities.  The fact that it pays a portion of its fee to Subadvisors

to perform certain duties does not transform the portion it retains into a mark-up.

Plaintiffs also assert that the Trustees should have "caused the Funds to contract

directly with the Subadvisers," cutting NYLIM out of the picture completely.[28]

Plaintiffs seek to recover as damages an amount of the fees paid to NYLIM that are

allegedly excessive or, alternatively, to rescind the Management Agreements and

receive restitution in the amount of the allegedly excessive portion of the

management fees.[29]

## PROCEDURAL BACKGROUND

Ms. Redus-Tarchis and the Olivers, together with Victor and Linda Miller,

filed their original complaint ("Compl.") on December 23, 2014, asserting

---

[27] For example, Plaintiffs claim that the "mark-up charged to the Funds by Defendant . . . is disproportionate to Defendant's supervision and oversight services and provision of officers and office space for the Funds," that it is much larger than "the operating expenses incurred by [NYLIM] in providing management services to the Funds," and that it therefore "consists primarily of profit to [NYLIM]."  SAC ¶¶ 64, 72-77; *see also id.* ¶¶ 7-9, 53-55, 66, 70, 119 (additional allegations regarding the so-called "mark-up").

[28] SAC ¶¶ 8, 134.

[29] SAC ¶¶ 147, 148, 155,156, 163, 164, 171, 172.  Because the Management Agreements cover a number of funds, or series, within their respective trusts, granting the recessionary remedy Plaintiffs seek under ICA § 47(b), 15 U.S.C. § 80a-46(b), would affect funds and shareholders that are not party to this litigation.

13

excessive fee claims on behalf of the Large Cap Fund, Marketfield Fund and

Corporate Bond Fund.  (ECF Doc. No. 1.)  That complaint was superseded by an

Amended Complaint filed on April 20, 2015, that:  (i) dropped the Millers as

plaintiffs; (ii) added a new plaintiff, Michael Patti; and (iii) added claims on behalf

of the High Yield Opportunities Fund that Mr. Patti claims to have owned since

September 2014.  (ECF Doc. No. 23.)  Shortly thereafter, Plaintiffs sought leave to

further amend their allegations to reflect that Ms. Redus-Tarchis no longer owned

shares in the Marketfield Fund, which this Court granted on May 5, 2015.  (ECF

Doc. No. 25.)  Plaintiffs then filed their Second Amended Complaint on May 6,

2015.  (ECF Doc. No. 26.) [30]

## LEGAL STANDARDS

### I.    The Requirements to State a Claim Under ICA Section 36(b)

Section 36(b) provides that "the investment adviser [a/k/a manager] of a

registered investment company shall be deemed to have a fiduciary duty with

respect to the receipt of compensation for services, or of payments of a material

nature, paid by such registered investment company or by the security holders

thereof."  15 U.S.C. § 80a-35(b).  The statute allows a shareholder to bring claims

to enforce this duty on behalf of the fund.  *Id.*; *Green v. Fund Asset Mgmt., L.P.*,

286 F.3d 682, 685 (3d. Cir. 2002).  In reviewing Section 36(b) claims, "the court is

---

[30] A redline of the Second Amended Complaint against the original complaint
("Complaint Redline") is attached to the Dulka Declaration as Exhibit R.

not authorized 'to substitute its business judgment for that of a mutual fund's board of directors in the area of management fees.'"  *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 928 (2d Cir. 1982) (quoting legislative history).[31]

To state a claim under Section 36(b), a plaintiff must allege facts showing that a manager's fee "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."  *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 346 (2010).  In assessing whether a fee meets that disproportionality standard, the Supreme Court has endorsed six factors (the "*Gartenberg* factors"):  (i) the nature and quality of the manager's services; (ii) the profitability of the mutual fund to the manager; (iii) economies of scale realized by the manager; (iv) comparative fee structures with similar funds; (v) the independence and conscientiousness of the independent trustees; and (vi) the existence of "any 'fall-out financial benefits,' those collateral benefits that accrue to the [manager] because of its relationship with the mutual fund."  *Jones*, 559 U.S. at 344 & n.5 (citing *Gartenberg*, 694 F.2d at 929-32).

Courts have also made clear that under Section 36(b), the trustees are not required to negotiate the lowest possible fees or the "best deal possible."  *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 409 (2d Cir. 1989) (internal quotation

---

[31] *See also Benak ex rel. the Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P.*, No. 01-5734, 2004 WL 1459249, at *7 (D.N.J. Feb. 9, 2004) (quoting same legislative history, and dismissing Section 36(b) claims).

15

marks omitted).  Rather, in evaluating a Section 36(b) claim, the test is "whether the fee schedule represents a charge ***within the range*** of what would have been negotiated at arm's-length in the light of all of the surrounding circumstances." *Gartenberg*, 694 F.2d at 928 (emphasis added).

Claims under Section 36(b) "are particularly appropriate for dismissal for failure to state a claim under [FED. R. CIV. P.] 12(b)(6)."  *Krantz v. Prudential Invs. Fund Mgmt. LLC*, 77 F. Supp. 2d 559, 562 (D.N.J. 1999) (dismissing complaint), *aff'd*, 305 F.3d 140 (3d Cir. 2002); *see also Olesh v. Dreyfus Corp.*, No. 94-1664, 1995 WL 500491, at *11 (E.D.N.Y. Aug. 8, 1995) (dismissing complaint).  Rule 12(b)(6) motions further the congressional intent to "prevent the harassment of investment [managers] by ill-founded or nuisance law suits, the so-called strike suit."  *In re Franklin Mut. Funds Fee Litig.*, 478 F. Supp. 2d 677, 687 (D.N.J. 2007) ("*Franklin*") (dismissing action) (citing Section 36(b)'s legislative history, at H.R. REP. 1382, 91st Cong., 2d Sess., 8 (1970)).

## II.   Rule 12(b)(6) Requires Dismissal of Conclusory Claims Contradicted by the Public Record and Documents Upon Which the Complaint Relies

Claims must be dismissed under Rule 12(b)(6) where a plaintiff fails to provide "direct or inferential allegations respecting all the material elements" of his claims.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 562 (2007) (internal citation omitted).  To avoid dismissal, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570).  "Threadbare

recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice" to state a claim.  *Id.* at 678.  "[C]onclusory allegations

or legal conclusions masquerading as factual allegations will not suffice to prevent

a motion to dismiss."  *Bailey v. Reed*, 29 Fed. App'x 874, 875 (3d Cir. 2002)

(internal quotations omitted).

Allegations also need not be credited if they are contradicted by the public

record or by documents upon which the complaint relies.  *See Genesis Bio-Pharm.,*

*Inc. v. Chiron Corp.*, 27 F. App'x 94, 99-100 (3d Cir. 2002) (affirming dismissal

where allegations were contradicted by cited documents); *Kent v. Tabafunda*, No.

07-4973, 2008 WL 2510723, at *3-4 (D.N.J. June 19, 2008) (dismissing complaint

where allegations were contradicted by public record).  Courts specifically grant

motions to dismiss Section 36(b) claims where the plaintiff's allegations are

contradicted by public records that "paint a more complete picture . . . of the Fund

in question."  *See, e.g.*, *In re AllianceBernstein Mut. Fund Excessive Fee Litig.*,

No. 04-4885, 2006 WL 74439, at *2 (S.D.N.Y. Jan. 11, 2006).

## ARGUMENT

Each of these independent reasons warrants dismissal of the Complaint

under FED. R. CIV. P. 12(b)(6):  (i) Plaintiffs have failed to plead sufficient facts, as

they must, that the total management fee (not just a portion of the fee) was

17

excessive; (ii) Plaintiffs' central claim that a portion of the management fees was excessive because NYLIM delegated substantially all of its responsibilities to subadvisors is contradicted by the very contracts upon which the Complaint relies; (iii) Plaintiffs' conclusory allegations that the Trustees abdicated their responsibilities during the process of approving the management fees are contradicted by the public record; and (iv) the remaining allegations are insufficient because the Funds' performance does not render the fees excessive, Plaintiffs plead no facts showing that economies of scale existed during the relevant time period, and the public record shows that the Funds benefited from the Trustees' fee negotiations with NYLIM.

## I.   The Complaint Must Be Dismissed for Failure to Allege That the Funds' Total Fees Are Disproportionately Large

As a threshold matter, the Complaint fails because it challenges only a portion of the management services and fees, rather than the total services and fees. As Section 36(b)'s legislative history makes clear, Congress "intended that the court look at . . . ***all services*** . . . and ***all compensation and payments received***" when analyzing a Section 36(b) claim.[32]  Accordingly, "the fees' disproportionality to services must be shown with regard to the ***total*** amount of fees charged . . . ." *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 602

---

[32] S. REP. No. 91-184, at 4910 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4897 (emphasis added).

ACTIVE/82784402.1

(S.D.N.Y. 2006) ("*Salomon Smith Barney*") (emphasis in original) (dismissing Section 36(b) claim).  *See also Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 528 F. Supp. 1038, 1055 (S.D.N.Y. 1981) (concluding that "[t]he ultimate decision of the Trustees was objectively reasonable, as the ***total fee*** was fair to the Fund"), *aff'd*, 694 F.2d 923 (2d Cir. 1982) (emphasis added).

Courts routinely dismiss Section 36(b) claims that do not adequately challenge that the total fee was disproportionate and excessive, and instead only complain about how a portion of that fee was used.  In *Salomon Smith Barney*, the court rejected the plaintiffs' assertion that the management fee was excessive because a portion of the total fee was used in a way that did not benefit fund shareholders, noting that such an allegation "falls outside of § 36(b) so long as the ***total amount charged*** in and of itself is not outsized."  441 F. Supp. 2d at 603 (challenging portion of fee paid to brokers).

Similarly, in *In re Eaton Vance Mutual Funds Fee Litigation*, the court rejected the plaintiffs' argument that the management fees "were by definition excessive" because portions of the fees allegedly did not benefit shareholders, characterized by plaintiffs as paying "something for nothing."  403 F. Supp. 2d 310, 315 (S.D.N.Y. 2005) (denying reconsideration of dismissal of Section 36(b) claim), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110 (2d Cir.

ACTIVE/82784402.1

2007).[33]   In an analogous context, the Seventh Circuit explained the rationale from the investors' standpoint:  "The total fee, not the internal, post-collection distribution of the fee, is the critical figure for someone interested in the cost of including a certain investment in her portfolio and the net value of that investment."  *Hecker v. Deere*, 556 F.3d 575, 586 (7th Cir. 2009) (affirming dismissal of ERISA claim as to mutual fund fees).

Here, the Complaint fails to state a claim because it contains no well-pleaded allegations addressing how the ***total*** management fee is disproportionate to ***all*** services rendered, as Section 36(b) requires.  Instead, Plaintiffs focus on that portion of the fee that Plaintiffs improperly and misleadingly characterize as a "mark-up."  But courts have rejected such piecemeal scrutiny that ignores the total fee.  Plaintiffs' allegation that a portion of the fee "is disproportionate to the services actually provided by [NYLIM] (and not by the sub-contractors)" also glaringly ignores the statute's legislative history and flies in the face of this Court's holding that "under Section 36(b) it is the ***overall*** nature and quality of the services provided" that must be considered, not a mere "percentage of those services."  *Benak,* 2004 WL 1459249, at *8 (emphasis added).

---

[33] *Accord Franklin*, 478 F. Supp. 2d at 681, 688 (dismissing Section 36(b) claim alleging "something for nothing").

ACTIVE/82784402.1

The total fee for the Marketfield Fund provides a good example as to why the law requires an evaluation of the total fee, not the post-collection distribution of that fee.  As manager of the Marketfield Fund's predecessor fund before October 5, 2012, MAM (now the Marketfield Fund's Subadvisor) charged a 1.40% management fee with no breakpoints as asset levels increased.[34]  After the fund was reorganized into the current Marketfield Fund with NYLIM as manager and MAM as Subadvisor, the total management fee it paid initially remained at the same 1.40%.[35]  The Marketfield Fund, therefore, paid the ***same total management fee*** when MAM was the manager that it paid when NYLIM was manager and MAM its Subadvisor.

As of February 28, 2014, the Trustees negotiated with NYLIM for breakpoints that ultimately ***reduced*** the total management fee below 1.40%, to 1.39%.[36]  At the same time, the public filings reflect that after NYLIM became the Marketfield Fund's manager, more management services were provided than when MAM was the manager.[37]  Thus, the manager/subadvisor structure has actually

---

[34] Dulka Decl. Ex. S, July 2, 2012 Trust of Professional Managers, Proxy Statement (Form PRE-14A) at 16.

[35] SAC ¶ 36, n. 1.  Only when MAM no longer had management responsibilities, and could focus on its narrower role as Subadvisor, did MAM agree to a 0.70% Subadvisory fee.  SAC ¶ 46.

[36] MF 2014 Annual Rpt. at 37.

[37] A comparison of the current Management Agreement applicable to the Marketfield Fund and the 2009 management agreement that its predecessor fund

*reduced* the Fund's total management fee while ***increasing*** the management

services and has benefited the Funds and their shareholders.[38]

Because the Complaint does not, and cannot, plausibly allege that the total

management fee of any Fund is disproportionately large for all the services

rendered, it should be dismissed.  Merely complaining about the allocation of fees

between advisers is not actionable under Section 36(b), and not an appropriate

issue to ask this Court to decide.

## II. The Complaint Must Be Dismissed Because Its Claims Are Contradicted by the Agreements It Cites

A separate ground for dismissing the Complaint is that the documents

Plaintiffs rely upon contradict their own claims.  Plaintiffs' central allegation that

NYLIM's compensation is disproportionate because NYLIM "delegates

substantially all of its responsibilities for providing investment management

---

entered into with MAM demonstrate that a number of new services were added after NYLIM became the manager, including, but not limited to, compliance and risk management.  *Compare* MSFT Agreement at III.A.1, III.A.4, III.A.6 *with* Dulka Decl. Ex. T, 2009 Marketfield Advisory Agreement ¶ 2.

[38] The effective management fee rates for the other three Funds—0.55%, 0.60%, and 0.80%—fall easily within the range of fees that courts have held are not excessive.  *See Krantz v. Prudential Invs. Fund Mgmt. LLC*, 305 F.3d 140, 143-44 (3d Cir. 2002) (affirming dismissal where fees were 0.60%, as described in Reply Brief for Plaintiff-Appellant, No. 02-1266 (3d Cir. May 14, 2002), 2002 WL 32818563, at *10); *accord In re Scudder Mut. Funds Fee Litig.*, No. 04 Civ. 1921, 2007 WL 2325862, at *4 (S.D.N.Y. Aug. 14, 2007) (dismissing complaint where advisory fees were 0.54% and 0.56%); *Strougo v. BEA Assocs.*, No. 98-3725, 1999 WL 147737, at *1 (S.D.N.Y. Mar. 18, 1999) (dismissing Section 36(b) claim where fees were over 1.00%).

ACTIVE/82784402.1

services to the Funds . . . ." grossly distorts the public record by deliberately citing only excerpts of documents and presenting them out of context.[39]  When reviewed in their entirety, the cited agreements confirm that NYLIM retains crucial and substantial duties.

The Complaint relies principally on selective quotes from the Subadvisory Agreements, such as "the Subadvisor will provide a continuous investment program for the [Fund] and determine the composition of the assets of the [Fund] . . . ."[40]  Yet Plaintiffs omit the immediately preceding and critical contractual language mandating that the investment program shall be "[s]ubject to the supervision of . . . [NYLIM]" at all times.[41]  While the Complaint harps on the "limited scope of services actually provided by" NYLIM, it omits entirely any reference to the "Control" sections of the Subadvisory Agreements requiring that NYLIM remain responsible for *all* services provided by the Subadvisors: "Notwithstanding any other provision of the Agreement, it is understood and agreed that [NYLIM] shall at *all times retain the ultimate responsibility for and control of all functions* performed pursuant to this Agreement, and reserves the

---

[39] SAC ¶ 5.

[40] SAC ¶ 61.

[41] MF Sub Agreement ¶ 2; LCF Sub Agreement ¶ 2; CBF and HYOF Sub Agreement ¶ 2.

23

right to direct, approve or disapprove any action hereunder taken on its behalf by the Subadvisor."[42]

Plaintiffs are equally selective and misleading in citing to the Management Agreements.  The Complaint ignores completely the language requiring NYLIM to retain responsibility for all Fund management decisions, consistent with the regulatory conditions:[43]

> [NYLIM] will continue to oversee the services provided by [subadvisors and their employees] and *any such delegation will not relieve [NYLIM] of any of its obligations under this Agreement.*[44]

Plaintiffs also selectively omit provisions requiring NYLIM to "(i) continually evaluate the performance of each subadvisor to a Fund, if applicable, through quantitative and qualitative analysis and consultations with such subadvisor; (ii) periodically make recommendations to the Board as to whether the contract with one or more subadvisors should be renewed, modified or terminated; and (iii) periodically report [on] the results of its evaluation and monitoring functions."[45]

---

[42] SAC ¶ 73; MF Sub Agreement ¶ 13 (emphasis added); LCF Sub Agreement ¶ 13 (emphasis added); CBF and HYOF Sub Agreement ¶ 13 (emphasis added).

[43] *See* 2007 Exemptive Order.

[44] MSF Agreement at II.A.3 (emphasis added); MSFT Agreement at II.A.3 (emphasis added).

[45] MSF Agreement at II.A.3; MSFT Agreement at II.A.3.  Plaintiffs also mischaracterize NYLIM's agreement with the Sub-Administrator by only mentioning language in the Management Agreements allowing NYLIM to delegate administrative responsibilities.  SAC ¶ 60 (quoting MSF Agreement at III.A.8; MSFT Agreement at III.A.8).  The Complaint's excerpt again omits the key

24

Moreover, in asserting that NYLIM supposedly delegated "substantially all of its responsibilities" under the Management Agreements, Plaintiffs conveniently ignore **_their very own Complaint_**, which lists several other obligations by NYLIM under those Agreements but makes **_no_** allegation whatsoever that they have been delegated.[46]  These include NYLIM's duties to (i) "periodically assess risk management at the level of the affiliated and unaffiliated service providers to the Funds;" (ii) "apply for SEC exemptive relief or SEC staff no-action guidance;" (iii) "provide or coordinate the provision of legal services;" and (iv) "facilitate audits," either by the Fund's accountants or by regulators.[47]

These discrepancies are fatal to Plaintiffs' Complaint.  Where the allegations in a complaint "are contradicted by the document[s] it cites, the document[s] control[]" on a Rule 12(b)(6) motion.  *Coffman v. Pruco Life Ins. Co.*, No. 10-03663, 2011 WL 4550152, at *2 (D.N.J. Sept. 29, 2011) (internal quotations omitted).  Contrary to Plaintiffs' selective, and self-serving, excerpts and argument, the entirety of the agreements at issue reveals the Complaint's absence

---

language reposing in NYLIM the ultimate "responsibility for providing the administration services" and establishing that NYLIM "will supervise any sub-administrator."  MSF Agreement at III.A.8; MSFT Agreement at III.A.8.

[46] *See* SAC ¶¶ 58, 61-62.

[47] SAC ¶ 58; *see* MSF Agreement at III.A.4, III.A.6; MSFT Agreement at III.A.4, III.A.6.  Other courts have recognized that under the manager/subadvisor structure, managers and subadvisors "perform distinct services."  *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 540 (S.D.N.Y. 2008).

ACTIVE/82784402.1

of well-pleaded facts supporting Plaintiffs' central contention that NYLIM

delegated substantially all of its responsibilities and that the management fees

therefore were excessive.  Accordingly, the Complaint should be dismissed for

failure to state a claim.

### III.   Plaintiffs' Conclusory Allegations Disparaging the Trustees' Approval of NYLIM's Fees Are Unsupported by Sufficient Factual Allegations and Are Contradicted by the Public Record

The Complaint further lacks sufficient and plausible factual allegations

supporting Plaintiffs' conclusory claims that NYLIM's compensation necessarily

is excessive because it resulted from a deficient trustee approval process.

Congress designed the ICA "to place the unaffiliated directors in the role of

'independent watchdogs,'" with "primary responsibility for looking after the

interests of the funds' shareholders."  *Burks v. Lasker*, 441 U.S. 471, 484-85

(1979) (quoting *Tannenbaum v. Zeller*, 552 F.2d 402, 406 (2d Cir. 1977)).  Given

that prominent statutory role, "[w]here a board's process for negotiating and

reviewing investment-adviser compensation is robust, a reviewing court should

afford commensurate deference to the outcome of the bargaining process."  *Jones*,

599 U.S. at 351.  "[T]he standard for fiduciary breach under § 36(b) does not call

for judicial second-guessing of informed board decisions."  *Id.* at 352.  Indeed,

"[t]he ***essence*** of the test is whether or not under all the circumstances ***the***

ACTIVE/82784402.1

*transaction carries the earmarks of an arm's length bargain*." *Id.* at 347 (quoting

*Pepper v. Litton*, 308 U.S. 295, 306 (1939)) (emphasis added).

Plaintiffs, however, invite precisely the type of judicial second-guessing that

the Supreme Court cautions against, based on nothing more than the conclusory

and unfounded allegations that the Trustees (1) failed to "devot[e] the time and

attention necessary to independently assess the investment advisory fees,"[48] and (2)

abdicated their watchdog role by "rel[ying] on information and analyses that were

prepared by Defendant" so that, in effect, "[t]he investment management fees . . .

are determined by [NYLIM]."[49]  Such conclusory allegations are insufficient to

state a Section 36(b) claim, and the public record that this Court can consider on a

motion to dismiss also directly contradicts those baseless claims.

*First*, the Third Circuit has categorically rejected Plaintiffs' argument that

the Trustees are too distracted because the "Board conducts its oversight

responsibilities . . . for the 46 other funds in the MainStay Group of Funds."[50]  To

the contrary, the Third Circuit recognized that "membership on the boards of

several funds within a mutual fund complex is the prevailing practice in the

industry."  *Krantz*, 305 F.3d at 143-44 (internal quotations omitted) (affirming

dismissal of Section 36(b) claim based on allegations that the trustees served on

---

[48] SAC ¶ 126.

[49] SAC ¶¶ 124, 129.

[50] SAC ¶ 128.

27

multiple fund boards). Indeed, funds can benefit from having the same group of highly qualified trustees develop expertise in considering similar issues faced by, and services provided to, those funds.[51] Courts also consistently reject bald allegations, such as those in paragraph 127 of the Complaint, that trustees' outside obligations prevent their diligent service to their funds.[52]

The public record also debunks Plaintiffs' conclusory allegations of inattentiveness. The Trustees spent considerable time deliberating over the Management Agreements and Subadvisory Agreements and reviewing materials pertinent to NYLIM's fees: the full Board received information "throughout the year," met at least quarterly, and held a two-day meeting to approve the

---

[51] *See* John J. Brennan et al., *Report of the Advisory Group on Best Practices for Fund Directors*, INVESTMENT COMPANY INSTITUTE at 28 (June 24, 1999), http://www.idc.org/pdf/rpt_best_practices.pdf ("[S]ervice on multiple boards can provide the independent directors of those boards with an opportunity to obtain better familiarity with the many aspects of fund operations that are complex-wide in nature.").

[52] *See, e.g.*, *Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 345 (2d Cir. 2006) (allegations that directors "serve on the boards of many other mutual funds, businesses, and charitable organizations" are "insufficient as a matter of law"); *Migdal v. Rowe Price-Fleming Intern., Inc.*, 248 F.3d 321, 331 (4th Cir. 2001) ("that directors . . . might be busy does not suggest that they were in any way 'interested' as defined by the ICA"). Plaintiffs do not allege, nor could they, that the Independent Trustees are "interested person[s]" given their responsibilities to multiple NYLIM funds. *See* Interpretive Matters Concerning Independent Directors of Investment Companies, SEC Release No. 24,083, 1999 WL 820629, at *6 (Oct. 14, 1999) ("a director of a fund who also is a director of another fund managed by the same adviser generally would not be viewed as an interested person of the fund under [15 U.S.C. § 80a-]2(a)(19)").

ACTIVE/82784402.1

Management Agreements, and the Contracts Committee separately met eight times in one year.[53]  That frequency of attention is more than sufficient.  *See, e.g.*, *Verkouteren v. Blackrock Fin. Mgmt., Inc.*, 37 F. Supp. 2d 256, 260 (S.D.N.Y. 1999) (dismissing Section 36(b) claim where the process required only ***three*** meetings of the independent board members), *aff'd*, 208 F.3d 204 (2d Cir. 2000).

*Second*, public records completely undermine Plaintiffs' conclusory and unfounded allegation that the Trustees were so beholden to NYLIM that NYLIM actually "determined" the fees.[54]  The SEC filings demonstrate that the Trustees did not limit themselves to the information provided by NYLIM.  Instead, the Trustees sought out and relied upon information about other funds' fees, expenses and performance furnished by Strategic Insight and Bobroff Consulting, Inc., ***two independent, third-party sources that the Trustees themselves engaged***, and also considered legal advice from their separate and independent counsel.[55]

Plaintiffs' criticism of materials prepared by NYLIM also lacks any merit, since the ICA ***explicitly requires*** precisely this conduct:  "It shall be the duty of the directors of a registered investment company to request and evaluate, ***and the duty of an investment adviser to such company to furnish***, such information as may

---

[53] CBF 2014 Semi-Annual Rpt. at 45; 2015 SAI at 57-61; 2015 MF SAI at 49-54.

[54] SAC ¶ 124.

[55] *See* MF 2014 Annual Rpt. at 42; LCF 2014 Semi-Annual Rpt. at 29; CBF 2014 Semi-Annual Rpt. at 45; HYOF 2014 Semi-Annual Rpt. at 42.

ACTIVE/82784402.1

reasonably be necessary to evaluate the terms of any [advisory] contract . . . ."  15 U.S.C. § 80a-15(c) (emphasis added).[56]  This is simple common sense:  "One would expect any conscientious director to request information from management and staff on the day-to-day operations for which they are responsible."  *Migdal*, 248 F.3d at 331.  NYLIM cannot be held liable where the process follows the exact statutory requirements.

Plaintiffs' assertion that "the Board has not considered . . . the interests of the Funds or their shareholders with respect to the investment management fees or critically assess[ed] [NYLIM's] rationalization for those fees" also is directly contradicted by the statements in the publicly available shareholder reports.[57]  Those reports reflect that the Trustees had a separate Contracts Committee tasked with this very responsibility, namely, "assist[ing] the Board in overseeing contracts to which the Funds are or are proposed to be parties and ***[ensuring] that the interests of the Funds and their shareholders are served by the terms of these contracts***."[58]  Plaintiffs' allegation is further undermined by public records showing the fee waivers the Trustees negotiated with NYLIM.[59]  For example,

---

[56] SAC ¶ 129 (alleging that the Trustees relied "on information and analyses that were prepared by [NYLIM] or were designed to support [NYLIM]'s rationalization for the fees charged to the Funds").

[57] SAC ¶ 130.

[58] 2015 SAI at 59-60 (emphasis added); 2015 MF SAI at 52-53 (emphasis added).

[59] SAC ¶ 130.

ACTIVE/82784402.1

NYLIM has "voluntarily agreed to waive a portion of its [Marketfield Fund] management fee" and has "contractually agreed to waive fees and/or reimburse expenses" for the High Yield Opportunities Fund so that the total of various fees, including the management fee, does not exceed a certain cap.[60]

In addition, Plaintiffs allege that NYLIM "has not provided, and the Board has not considered, appropriate information about . . . the economies of scale realized by [NYLIM]."[61]  These claims, too, are bereft of factual support and directly refuted by the public filings demonstrating that in 2014, the "Board . . . *considered a report from [NYLIM], prepared at the request of the Board*, that addressed economies of scale . . . ."[62]

This extensive litany of instances in which the Complaint is contradicted by the public record distinguishes this case from recent ones brought in this District challenging other managers' fees.  *See In re BlackRock Mut. Funds Advisory Fee Litig.*, Civ. A. No. 14-1165, 2015 WL 1418848 (D.N.J. Mar. 25, 2015); *Kasilag v. Hartford Inv. Fin. Servs., LLC*, Civ. No. 11-1083, 2012 WL 6568409 (D.N.J. Dec. 17, 2012); *Sivolella v. AXA Equitable Life Ins. Co.*, Civ. A. No. 11-4194, 2012 WL 4464040 (D.N.J. Sept. 25, 2012).  Those cases are distinguishable on a number of

---

[60] MF 2014 Annual Rpt. at 37; HYOF 2014 Annual Rpt. at 38 ("Total Annual Fund Operating Expenses for Class A shares" not to exceed 1.30%).

[61] SAC ¶ 132.

[62] MF 2014 Annual Rpt. at 44.

other grounds as well, including but not limited to:  in both *BlackRock* and *Hartford* the defendant was alleged to have provided its services to other funds at lower fees; in *Hartford* the management breakpoints did not capture subadvisor breakpoints; and *AXA* only addressed whether plaintiffs had standing to sue, not the sufficiency of the complaint's substantive claims.

<p style="text-align:center">* * *</p>

In sum, the Complaint fails to state a claim that the Trustees' approval of the management fees did not carry "the earmarks of an arm's length bargain" as required by the Supreme Court.  *Jones*, 559 U.S. at 347.  The allegations are not plausible on their face, are devoid of any factual support, and are directly contradicted by the public record about the conscientious and fully-informed fee approval process conducted by well-qualified Trustees who, among other things, sought out multiple sources of independent third-party information and negotiated fee waivers.  The Complaint, therefore, should be dismissed.  *See, e.g.*, *Wexler v. Equitable Capital Mgmt. Corp.*, No. 93-3834, 1994 WL 48807, at *4 (S.D.N.Y. 1994) (dismissing Section 36(b) claim where complaint alleged trustees' "failure to negotiate" fees).

<p style="text-align:center">32</p>

## IV. The Complaint's Remaining Allegations Are Insufficient to State a Claim

### A. Allegations About Performance Fail to Support Plaintiffs' Claims

Plaintiffs' allegations about the Funds' performance also are insufficient to salvage their claims. Indeed, the Complaint does not criticize the High Yield Opportunities Fund's performance at all.[63] And Plaintiffs cannot state a Section 36(b) claim by asserting that "each of the other three funds has performed poorly under Defendant's management," allegedly resulting in fees that were disproportionately large given the supposed "low-quality of the investment management services provided" to those Funds."[64]

Performance is **not** a *Gartenberg* factor and, even if underperformance could be shown as to the Funds (which even Plaintiffs admit cannot be done as to all Funds), it would not prove excessive fees. *Amron*, 464 F.3d at 344. The relevant *Gartenberg* factor is the **quality** of the manager's services, not the performance of the funds. *Jones*, 559 U.S. at 344 n.5 (citing *Gartenberg*, 694 F.2d, at 929-32). Although the Complaint, in conclusory fashion, labels NYLIM's services as "low-

---

[63] SAC ¶ 119.

[64] SAC ¶¶ 119-20; *see also id.* ¶ 11. In their original complaint, Plaintiffs admitted that the Large Cap Fund **outperformed** its benchmark for the three-year period ending November 30, 2014. Compl. ¶ 118. Tellingly, Plaintiffs' current Complaint chose to hide this fact by deleting all comparisons between the Funds and their benchmarks over a three-year period. *See* Complaint Redline at 29-30 (comparing Compl. ¶¶ 117-18 *with* SAC ¶¶ 121-22).

33

quality,"[65] it lacks factual allegations permitting a plausible inference that NYLIM executed its "administrative or management duties in less than an efficient and satisfactory manner," as required under the governing test. *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1229 (S.D.N.Y 1999), *aff'd*, 928 F.2d 590 (2d Cir. 1991). Given that the Complaint provides only "allegations of underperformance," and "offers no allegations about the [quality of the] actual services provided," Plaintiffs "fail to satisfy the first *Gartenberg* factor." *Hoffman*, 591 F. Supp. 2d at 539.

A decision from this District makes the point precisely. In *Franklin*, the plaintiffs asserted that fees were excessive based, in part, on the allegation that one fund's "performance ranking [was] 731 of 855 relevant funds." 478 F. Supp. 2d at 687. The Court was "not persuaded" that this allegation of significant underperformance, even when coupled with allegations that the same funds "had some of the highest fees in the industry," was sufficient to state a claim under Section 36(b). *Id.* at 688. In dismissing the complaint, the Court relied, in part, on the reasoning of the Fourth Circuit:

> Investing is not a risk-free endeavor. Even the most knowledgeable advisers do not always perform up to expectations, and investments themselves involve quite different magnitudes of risk. Furthermore, investment results are themselves cyclical. An underachieving fund one year may be an overachieving fund the next.

---

[65] SAC ¶¶ 11, 119.

ACTIVE/82784402.1

*Id.* at 687-88 (quoting *Migdal*, 248 F.3d at 327-28).

Just as in *Franklin*, *Hoffman*, and *Migdal*, this Court should reject the "invitation to permit discovery" based on alleged underperformance, particularly given the conclusory nature of the allegations here. *Migdal*, 248 F.3d at 328.

## B. Allegations About Economies of Scale Fail to Support Plaintiffs' Claims

Likewise, Plaintiffs' claims are not saved by the conclusory allegations that NYLIM failed to share benefits from economies of scale. The Complaint cannot allege that any such economies of scale existed during the only year at issue because the Funds' asset levels declined during that time. And even if any economies of scale did exist, the public record shows that they were shared with the Funds.

### 1. The Complaint Cannot Establish the Existence of Economies of Scale During the Relevant Period

As an initial matter, Plaintiffs fail to allege sufficient facts permitting a plausible inference that economies of scale actually existed during the only time period relevant to this action. The ICA allows shareholders to recover only those fees paid in the year immediately preceding their suit (the "Relevant One-Year Period"). *See* ICA § 36(b)(3) ("No award of damages shall be recoverable for any period prior to one year before the action was instituted."). This "highly restrictive limitation[] on actions under Section 36(b) evidence[s] an intent by Congress to

ACTIVE/82784402.1

protect investment advisors and their affiliates from open-ended litigation and nuisance suits."  *Krinsk v. Fund Asset Mgmt. Inc*., No. 85-8428, 1986 WL 205, at *2 (S.D.N.Y May 9, 1986), *aff'd*, 875 F.2d 404 (2d Cir. 1989); *accord Franklin*, 478 F. Supp. 2d at 686 ("Congress . . . intended, by limiting recovery to one year, to curb the potential for increased costs of litigation and the abusive use of lawsuits.").

Here, while the Complaint points to increases in the Funds' assets before 2014, it admits that assets under management ***declined*** for the Marketfield Fund during the Relevant One-Year Period, decreasing from $20 billion as of June 30, 2014 to $9 billion as of December 31, 2014.[66]  Publicly filed documents for the other three Funds also demonstrate that they, too, experienced declines in assets during the Relevant One-Year Period.[67]

---

[66] SAC ¶ 82; *see also* MF 2014 Annual Rpt. at 22 (Marketfield assets fell from $19 billion to $9 billion from January 1, 2014 to December 31, 2014).

[67] The Corporate Bond Fund's AUM decreased during its past fiscal year, from $8.8 billion to $8.7 billion.  CBF 2014 Annual Rpt. at 27.  Plaintiffs' original complaint admitted this fact, though Plaintiffs removed this allegation in their Second Amended Complaint.  *See* Complaint Redline at 21-22 (*comparing* Compl. ¶ 78 *with* SAC ¶ 78).  The High Yield Opportunities Fund's AUM likewise decreased during its most recent fiscal year.  HYOF 2014 Annual Rpt. at 26. Although the Large Cap Fund had a slight increase in assets from October 31, 2013, to October 31, 2014—from $19.2 billion to $20.4 billion—as of January 31, 2015, the asset level dropped below that of the 2013 level, to $19.1 billion.  *See* Dulka Decl. Ex. U, January 31, 2015 Large Cap Fund Quarterly Schedule of Portfolio Holdings at 55; *see also* SAC ¶ 80 and LCF 2014 Annual Rpt. at 16.

ACTIVE/82784402.1

Courts have held that economies of scale were not pleaded when a fund's assets declined during the relevant one-year period, regardless of previous increases in assets. *AllianceBernstein*, 2006 WL 74439, at *2 (rejecting "financial trends [concerning economies of scale] outside the relevant time period"). For this reason alone, Plaintiffs' economies of scale argument here fails to state a claim.

### 2. The Complaint and the Public Record Show That Any Economies of Scale Were Shared with the Funds

Even if the Court could assume that economies of scale existed while assets declined during the Relevant One-Year Period (which it should not), Plaintiffs fail to state a claim because the Funds have in fact benefited from multiple breakpoints. All Plaintiffs impermissibly seek to do is have the Court substitute their preferred breakpoints for those negotiated and approved by the Trustees.

Plaintiffs admit that the Large Cap Fund had seven different breakpoints, the Corporate Bond Fund and Marketfield Fund each had three, and the High Yield Opportunities Fund had two.[68] Notwithstanding the fact that the Funds benefited from these breakpoints during the Relevant One-Year Period, Plaintiffs argue that these breakpoints were set at the wrong levels.[69] But as the Supreme Court held,

---

[68] SAC ¶ 36. The third breakpoint Plaintiffs allege for the Marketfield Fund, for asset levels over $22.5 billion dollars, is a fee waiver. MF 2014 Annual Rpt. at 37.

[69] *See, e.g.*, SAC ¶¶ 98 (alleging that the Corporate Bond Fund and Large Cap Fund breakpoints were set too low); *id.* ¶¶ 112, 117 (alleging that the Marketfield Fund's and Opportunity Fund's initial breakpoints were set too high).

"courts are not well suited to make . . . precise calculations" about whether specific fee rates are "representative of arm's-length bargaining." *Jones,* 559 U.S. at 353. Indeed, Section 36(b) "does not require [them]" to do so. *Id.* at 352-53. *Gartenberg* itself held that fee schedules "[c]learly . . . take[] account of economies of scale" where "the rate of fees diminishes progressively," as occurs with breakpoints.[70]  For a plaintiff to prevail on a Section 36(b) claim, "[i]t is not enough for [a] Court to find that a better bargain was possible."[71]  The relevant question is "whether the fund has permitted shareholders to participate, ***at least in part***, in the economies of scale it has realized." *Kalish*, 742 F. Supp. at 1239 (emphasis added).

Because a claim under Section 36(b) is stated only if the fee "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining,"[72] complaints that ask a court to impermissibly "substitute its business judgment for that of a mutual fund's board . . . in the area of management fees"[73] necessarily fails to state a claim. *See Hoffman*, 591 F. Supp. 2d at 540 ("Plaintiffs' claim that the breakpoint fees were set unreasonably high . . . is not sufficient to establish a

---

[70] *Gartenberg*, 528 F. Supp. at 1054.

[71] *Gartenberg*, 528 F. Supp. at 1047.

[72] *Jones*, 559 U.S. at 346.

[73] *Gartenberg*, 694 F.2d at 928 (internal quotation marks omitted).

38

failure to pass along economies of scale . . . .").  Plaintiffs' allegations about breakpoints thus fail under the governing law because each Fund had multiple breakpoints, which is among the many ways to share economies of scale.

The public record also undermines Plaintiffs' claims by demonstrating that the Trustees have ensured that the Funds benefit from potential economies of scale. During 2013, the Trustees specifically asked for and received from NYLIM a report "that addressed economies of scale in the mutual fund business generally, the changing economics of the mutual fund business and the various ways in which the benefits of economies of scale may be shared" with the Funds.[74]  Following receipt of that report, effective on February 28, 2014—*after* the Trustees assumed responsibility for the Marketfield Fund and NYLIM became its adviser—the Marketfield Fund obtained the benefit of "contractual breakpoints to *reduce* the Fund's management fee as well as a new voluntary management fee waiver."[75] The result is that the Marketfield Fund now has breakpoints and pays a lower effective management rate to NYLIM than the Fund paid before NYLIM became its investment advisor.[76]

---

[74] Dulka Decl. Ex. J, December 31, 2013 Marketfield Annual Report ("MF 2013 Annual Rpt.") at 45.

[75] MF 2013 Annual Rpt. at 45 (emphasis added); *see also* MF 2014 Annual Rpt. at 44; SAC ¶ 36 & n.1.

[76] *See supra* at 21-22.  Plaintiffs concede that NYLIM similarly instituted a new breakpoint for the High Yield Opportunities Fund that was effective on February

ACTIVE/82784402.1

Further, NYLIM's fee schedule for the Large Cap Fund provides breakpoints that allow rates to diminish progressively, even though the Fund's Subadvisor, Winslow, negotiated to have its subadvisory rate *increase* as assets grow.[77]  NYLIM does not pass on Winslow's subadvisory rate increases to shareholders; instead, NYLIM's breakpoints *reduce* the Large Cap Fund's total management fee when assets grow, thereby absorbing Winslow's rate increases itself so that the Fund's shareholders participate in any economies of scale.[78]

In sum, Plaintiffs' assertion that the Funds fail to benefit from economies of scale does not state a plausible Section 36(b) claim for excessive fees.  Not only does the Complaint fail to plead the existence of economies of scale during the Relevant One-Year Period, but the Complaint and public record demonstrate that the Funds have benefited from breakpoints that reduce fees at different asset levels.

## <u>CONCLUSION</u>

For the foregoing reasons, NYLIM respectfully requests that this Court enter an Order granting its Motion to Dismiss Plaintiffs' Complaint and dismissing Plaintiffs' claims with prejudice.[79]

---

28, 2014.  SAC ¶ 117.

[77] SAC ¶ 45 (rates increase after assets exceed $2.5 billion).

[78] SAC ¶ 36.

[79] Because Plaintiffs have not stated a Section 36(b) claim, they are not entitled to a separate remedy under ICA Section 47(b).  *See Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co. (U.S.A.)*, 677 F.3d 178, 186 (3d Cir. 2012).

ACTIVE/82784402.1

Dated:  June 19, 2015

Respectfully submitted,


s/ Liza M. Walsh
Liza M. Walsh
Katelyn O'Reilly
CONNELL FOLEY, LLP
One Newark Center
1085 Raymond Boulevard, 19th Floor
Newark, NJ 07102
Tel.: (973) 757-1100

OF COUNSEL:

James O. Fleckner (admitted *pro hac vice*)
David Rosenberg (admitted *pro hac vice*)
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, MA 02109
Tel.: (617) 570-1000

Mary K. Dulka (admitted *pro hac vice*)
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
Tel.: (212) 813-8800

*Attorneys for Defendant New York Life
Investment Management LLC*

ACTIVE/82784402.1

# Appendix A: Fund Fee Schedules Based on Assets Under Management

| Large Cap Fund |
|---|
| 0.750% up to $500 million |
| 0.725% from $500 million to $750 million |
| 0.710% from $750 million to $1 billion |
| 0.700% from $1 billion to $2 billion |
| 0.660% from $2 billion to $3 billion |
| 0.610% from $3 billion to $7 billion |
| 0.585% from $7 billion to $9 billion |
| 0.575% in excess of $9 billion |

| Marketfield Fund |
|---|
| 1.40% up to $7.5 billion |
| 1.38% from $7.5 billion to $15 billion |
| 1.36% in excess of $15 billion |

| Opportunities Fund |
|---|
| 0.800% up to $3 billion |
| 0.775% in excess of $3 billion |

| Corporate Bond Fund |
| --- |
| 0.600% up to $500 million* |
| 0.550% from $500 million to $5 billion |
| 0.525% from $5 billion to $7 billion |
| 0.500% in excess of $7 billion |

*Pursuant to the Management Agreement, the Corporate Bond Fund also pays to NYLIM a fund accounting fee of 0.01% of that Fund's net assets under management.  MSF Agreement at Schedule A.