SZAFERMAN, LAKIND
BLUMSTEIN & BLADER, P.C.
101 Grovers Mill Road, Suite 200
Lawrenceville, NJ 08648
By:     Robert L. Lakind
        Arnold C. Lakind
        Daniel S. Sweetser
Tel:  (609) 275-0400
Fax:  (609) 275-4511

*Attorneys for Plaintiffs*

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| CYNTHIA ANN REDUS-TARCHIS, FREDRIC and BONNIE OLIVER, and MICHAEL PATTI, | Civil No. 2:14-cv-07991-WHW-CLW |
| Plaintiffs, | |
| v. | Oral Argument Requested |
| NEW YORK LIFE INVESTMENT MANAGEMENT, LLC, | |
| Defendant. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 2

ARGUMENT .................................................................................................................. 6

I.      DEFENDANT'S FIDUCIARY DUTY UNDER SECTION 36(b) AND *JONES* .............. 6

II.     THE APPLICABLE PLEADING STANDARD ..................................................... 9

III.    RULE 8(a) IS SATISFIED WHERE THE FACTS ALLEGED SUPPORT A
        PLAUSIBLE INFERENCE THAT THE FEES ARE DISPROPORTIONATELY
        LARGE TO THE SERVICES PROVIDED AND OUTSIDE AN ARM'S-LENGTH
        NEGOTIATED RANGE .................................................................................... 10

IV.     DEFENDANT CHARGES MANAGEMENT FEES TO THE FUNDS THAT ARE
        DISPROPORTIONATELY LARGE TO THE SERVICES PROVIDED AND
        OUTSIDE AN ARM'S-LENGTH NEGOTIATED RANGE .................................... 11

        A.   Defendant's Fees Are Not Justified by the Services It Provides ............... 11

        B.   Defendant's Arguments Regarding the Services It Allegedly Provides Raises
             Questions of Fact ...................................................................................... 14

        C.   Defendant's Alternative Fee Comparison Does Not Support Dismissal ......... 16

V.      DEFENDANT REALIZED ECONOMIES OF SCALE AND DOES NOT
        APPROPRIATELY SHARE THE BENEFITS WITH THE FUNDS ........................ 17

        A.   The Complaint Adequately Alleges that NYLIM Realized Economies of Scale
             and Failed to Appropriately Share the Benefits with the Funds ................ 17

        B.   The Decrease in Assets for Some of the Funds In Fiscal Year 2014 Does Not
             Undermine Plaintiffs' Economies of Scale Allegations ............................ 21

VI.     THE FUNDS' UNDERPERFORMANCE AND THE LOW-QUALITY OF
        DEFENDANT'S SERVICES ............................................................................. 22

VII.    PLAINTIFFS CHALLENGE THE TOTAL AMOUNT OF MANAGEMENT FEES
        CHARGED TO THE FUNDS ........................................................................... 24

VIII.   APPROVAL OF THE ADVISORY FEES BY THE BOARD IS ENTITLED TO
        LITTLE OR NO DEFERENCE .......................................................................... 25

        A.   Plaintiffs Have Alleged a Deficient Board Approval Process ................... 26

        B.   Board Approval Cannot Be the Basis for Dismissal at the Pleading Stage ........ 29

CONCLUSION .............................................................................................................. 30

## TABLE OF AUTHORITIES

**Cases**

*Benak v. Alliance Capital Mgmt.,*
  No. Civ. A. 01-5734, 2004 WL 1459249 (D.N.J. Feb. 9, 2004) .................................................. 25

*Am. Chem. & Equip., Inc. 401(K) Ret. Plan v. Principal Mgmt. Corp.,*
  No. 4:14-cv-00044, 2014 WL 5426908 (S.D. Iowa Sept. 10, 2014) ..................................*Passim*

*Amron v. Morgan Stanley Inv. Advisors Inc.,*
  464 F.3d 338 (2d Cir. 2006)................................................................................................... 23, 28

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ..................................................................................................................... 9

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ..................................................................................................................... 9

*Coffman v. Pruco Life Ins. Co.,*
  No. 10-CV-03663, 2011 WL 4550152 (D.N.J. Sept. 29, 2011) ................................................. 15

*Curd v. SEI Investments Mgmt. Corp.,*
  No. 13-7219, 2015 WL 4243495 (E.D. Pa. July 14, 2015).................................................*Passim*

*Curran v. Principal Mgmt. Corp.,*
  No. 4:09-cv-00433, 2010 WL 2889752 (S.D. Iowa June 8, 2010) ....................................*Passim*

*Daily Income Fund, Inc. v. Fox,*
  464 U.S. 523 (1984) ................................................................................................................. 7, 26

*Dumond v. Mass. Fin. Servs. Co.,*
  No. Civ. A. 04-11458, 2006 WL 149038 (D. Mass. Jan. 19, 2006) .......................................... 11

*Fair Wind Sailing, Inc. v. Dempster,*
  764 F.3d 303 (3d Cir. 2014)........................................................................................................ 9

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.,*
  573 F. Supp. 1293 (S.D.N.Y. 1983), *aff'd* 740 F.2d 190 (2d Cir. 1984) ............................ 10, 23

*Genesis Bio-Pharm., Inc. v. Chiron Corp.,*
  27 F. App'x 94 (3d Cir. 2002)................................................................................................... 15

*Goodman v. J.P. Morgan Inv. Mgmt., Inc.,*
  No. 2:14-cv-414, 2015 WL 965665 (S.D. Ohio Mar. 4, 2015)..........................................*Passim*

*Hecker v. Deere & Co.,*
   556 F.3d 575 (7th Cir. 2009)..................................................................................... 25

*Hoffman v. UBS-AG,*
   591 F. Supp. 2d 522 (S.D.N.Y. 2008)............................................................. 15, 23

*Hunt v. Invesco Funds Group, Inc.,*
   No. H-04-02555, 2006 WL 1581846 (S.D. Tex. June 5, 2006)........................... 11

*In re AllianceBernstein Mut. Fund Excessive Fee Litig.,*
   No. 04 Civ. 4885, 2006 WL 1520222 (S.D.N.Y. May 31, 2006)......................... 22

*In re BlackRock Mut. Funds Advisory Fee Litig.,*
   Civ. No. 14-1165, 2015 WL 1418848 (D.N.J. Mar. 27, 2015)...................... *Passim*

*In re Eaton Vance Mut. Funds Fee Litig.,*
   403 F. Supp. 2d 310 (S.D.N.Y. 2005)...................................................................... 25

*In re Federated Mut. Funds Excessive Fee Litig.,*
   No. 2:04-cv-352-2009 WL 5821045 (W.D. Pa. Sept. 30, 2009) ............... 10, 11, 14, 21

*In re Franklin Mut. Funds Fee Litig.,*
   478 F. Supp. 2d 677 (D.N.J. 2007) ......................................................................... 8

*In re Mut. Funds Inv. Litig.,*
   590 F. Supp. 2d 741 (D. Md. 2008) ...................................................................... 25

*In re Salomon Smith Barney Mut. Fund Fees Litig.,*
   441 F. Supp. 2d 579 (S.D.N.Y. 2006)..................................................................... 25

*Jones v. Harris Assocs. L.P.,*
   559 U.S. 335 (2010) ...................................................................................... *Passim*

*Kalish v. Franklin Advisers, Inc.,*
   742 F. Supp. 1222 (S.D.N.Y. 1990)........................................................................ 22

*Kamen v. Kemper Fin. Servs., Inc.,*
   500 U.S. 90 (1991) ................................................................................................. 8

*Kasilag v. Hartford Inv. Fin. Servs., LLC,*
   Civ. No. 11-1083, 2012 WL 6568409 (D.N.J. Dec. 17, 2012) ...................... *Passim*

*Kent v. Tabafunda,*
   No. 07-4973, 2008 WL 2510723, at *4 (D.N.J. June 19, 2008) ........................... 15

*Krantz v. Prudential Inv. Fund Mgmt. LLC,*
   305 F.3d 140 (3d Cir. 2002)............................................................................ 28, 16

*Krantz v. Prudential Inv. Fund Mgmt. LLC,*
   77 F. Supp. 2d 559 (D.N.J. 1999) ................................................................ 28

*Krinsk v. Fund Asset Mgmt., Inc.,*
   715 F. Supp 472 (S.D.N.Y. 1988) ............................................................... 22

*Krinsk v. Fund Asset Mgmt., Inc.,*
   875 F.2d 404 (2d Cir. 1989) ....................................................................... 25

*Migdal v. Rowe Price-Fleming Int'l, Inc.,*
   248 F.3d 321 (4th Cir. 2001) ........................................................ 17, 23, 28

*Olesh v. Dreyfus Corp.,*
   No. CV-94-1664, 1995 WL 500491 (E.D.N.Y. Aug. 8, 1995) ................... 25

*R.W. Grand Lodge of F. & A.M. of Penn. v. Salomon Bros. All Cap Value Fund,*
   425 F. App'x 25 (2d Cir. 2011) ............................................................ 13, 25

*Reso v. Artisan Partners Ltd. P'ship,*
   No. 11-CV-873, 2011 WL 5826034 (E.D. Wis. Nov. 18, 2011) ........................*Passim*

*Siemers v. Wells Fargo & Co.,*
   C05-04518, 2006 WL 2355411 (N.D. Cal. Aug. 14, 2006) ....................... 23

*Sins v. Janus Capital Mgmt., LLC,*
   No. 05-cv-01647, 2006 WL 3746130 (D. Colo. Dec. 15, 2006) ........... 11, 22

*Strigliabotti v. Franklin Resources, Inc.,*
   No. C 04-00883, 2005 WL 645529 (N.D. Cal. Mar. 7, 2005) .................... 22

*Verkouteren v. Blackrock Fin. Mgmt., Inc.,*
   37 F. Supp. 2d 256 (S.D.N.Y. 1999) ........................................................... 28

*Wexler v. Equitable Capital Mgmt. Corp.,*
   No. 93 Civ. 3834, 1994 WL 48807 (S.D.N.Y. Feb. 17, 1994) ................... 28

*Wicks v. Putnam Inv. Mgmt., LLC,*
   No. Civ. A. 04-10988, 2005 WL 705360 (D. Mass. Mar. 28, 2005) ......... 11

*Zehrer v. Harbor Capital Advisors, Inc.,*
   No. 14C 789, 2014 WL 6478054 (N.D. Ill. Nov. 18, 2014) ..................*Passim*

**Statutes**

15 U.S.C. § 80a-35(b) ...................................................................................... 7

**Rules**

Fed. R. Civ. P. 8(a) ......................................................................................................... 2

Fed. R. Civ. P. 8(a)(2) ..................................................................................................... 9

**Other Authorities**

DAVID SWENSEN, UNCONVENTIONAL SUCCESS: A FUNDAMENTAL APPROACH TO
   PERSONAL INVESTMENT (2005) ................................................................................... 17

H.R. REP. NO. 87-2274 (1962) ....................................................................................... 7

H.R. REP. NO. 91-1382 (1970) ....................................................................................... 8

S. REP. NO. 91-184, *reprinted in* 1970 U.S.C.C.A.N. 4897 ......................................... 7

Plaintiffs submit this memorandum of law in opposition to Defendant New York Life Investment Management, LLC's ("Defendant" or "NYLIM") Motion to Dismiss Plaintiffs' Second Amended Complaint ("Complaint").

## INTRODUCTION

Defendant's investment management fee arrangements with the Funds[1] epitomize the conflicts of interest and potential for abuse that led Congress to enact § 36(b) of the Investment Company Act of 1940 (the "ICA").   In fiscal year 2014 alone, NYLIM charged the Funds more than $427 million for investment management services.   Rather than provide those services itself, however, NYLIM delegated substantially all of its responsibilities for providing investment management services to certain sub-contractors: "Subadvisers," that provide investment advisory services, and a "Sub-administrator" that provides administrative services to the Funds.[2]   Notwithstanding this delegation, Defendant retained more than $200 million in fiscal year 2014 for services it provides to the Funds.  As alleged in the Complaint, these fees are disproportionately large to the services provided only by Defendant, which are limited primarily to supervision and oversight of the sub-contractors and *de minimis* expenses for the Funds' officers and office space.

The facts and circumstances pertaining to the investment management fees charged to the Funds fall squarely within the standard of liability for evaluating § 36(b) claims established by the U.S. Supreme Court in *Jones v. Harris Assocs. L.P.*, 559 U.S. 335 (2010).  As numerous courts within this district and around the country have held:  where, as here, Plaintiffs have

---

[1]     The "Funds" refer to the MainStay Marketfield Fund (the "Marketfield Fund"), the MainStay Large Cap Growth Fund (the "Large Cap Fund"), the MainStay High Yield Corporate Bond Fund (the "Corporate Bond Fund"), and the MainStay High Yield Opportunities Fund (the "High Yield Opportunities Fund").

[2]     Investment advisory services and administrative services are collectively referred to as "investment management" services.

alleged that the management fees Defendant charges to the Funds are so disproportionately large compared to the investment management services provided, Plaintiffs' have sufficiently stated a claim under § 36(b).

Unable to contest the sufficiency of Plaintiffs' allegations, Defendant ignores them and contests matters not pled. First, Plaintiffs are not challenging the subadviser management structure of mutual funds in general, or the management structure of the particular funds at issue here. Rather, Plaintiffs' challenge is that the fees charged to the Funds are disproportionately large compared to the services provided by Defendant

Second, Plaintiffs are not confining their challenge to a portion of the fees. The Complaint clearly identifies the total management fees charged to each Fund, and alleges that those fees are so disproportionately large that they bear no reasonable relationship to the services provided by Defendant and could not have been the product of arm's-length bargaining.

Overall, Defendant seeks to impose a heightened pleading standard and demand far greater detail than is required by notice pleading applicable to § 36(b) claims. Defendant would require Plaintiffs to *prove* their claims rather than *plead* them. However, the foregoing facts, taken together and considered as a whole, satisfy the applicable pleading standard under Fed. R. Civ. P. 8(a) by establishing a plausible inference that the fees charged by Defendant to the Funds violate § 36(b).

## STATEMENT OF FACTS

### The Management Fees Charged to the Funds for Defendant's Services

Defendant serves as the investment adviser and manager to the Funds pursuant to two separate but substantially identical Management Agreements. ¶¶ 31-33, 58.[3] These agreements

---

[3]    All ¶ references are to the Complaint.

require Defendant to provide investment managment services to each Fund, including: (a) deciding which securities to purchase for or sell from each Fund's portfolio; (b) selecting broker-dealers to execute orders for those purchases and sales; and (c) complying with applicable law and each Fund's disclosed investment objectives, policies, and restrictions. ¶¶ 34, 56-57. In exchange for these services, Defendant receives annual fees calculated as a percentage of each Fund's assets under management or "AUM." ¶ 35. In fiscal year 2014, the Funds collectively paid Defendant more than $427 million in management fees. ¶¶ 37, 53.

**Defendant Delegates Substantially All of Its Responsibilities Under the Management Agreements to Sub-contractors**

The Management Agreements allow Defendant to delegate its contractual responsibilities. ¶ 60. For each Fund, Defendant has delegated to sub-contractors substantially all of its responsibilities to provide investment advisory and certain administrative services. ¶¶ 38, 61. Defendant pays (or causes each Fund to pay) a portion of each Fund's fees to the sub-contractors for their services. ¶ 39.

With respect to investment advisory services, Defendant has entered into a Subadvisory Agreement with several Subadvisers, which includes a fee schedule negotiated at arm's-length between Defendant and the Subadvisers. ¶¶ 42-43.

With respect to administrative services, Defendant has entered into a Master Fund Sub-Accounting and Sub-Administration Agreement (the "Sub-Administration Agreement") with State Street Bank & Trust Company ("State Street" or the "Sub-Administrator") to provide certain administrative services to each of the Funds. ¶¶ 47, 62. State Street's fees were negotiated at arm's-length between Defendant and State Street. ¶¶ 48, 49.[4]

---

[4]     While the fee rate charged by State Street under the Sub-Administration Agreement is not publicly disclosed, according to publicly disclosed administrative services agreements for other

After delegating substantially all of its responsibilities for providing investment advisory and administrative services, Defendant's responsibilities under the Management Agreements are limited primarily to: (a) supervising and overseeing the Subadvisers and State Street; and (b) providing officers and office space for the Funds.  ¶ 63.

**The Fees Charged By Defendant to the Funds Are Disproportionately Large Compared to the Services Provided and Could Not Have Been the Product of Arm's Length Bargaining**

The following table (¶ 53) summarizes Defendant's and the sub-contractors' fees:

| Fund | Management Fees Charged by Defendant | Subadvisory Fees Paid to Subadviser | Administrative Fees Paid to State Street | Mark-Up Retained by Defendant | Percent Mark-Up |
|---|---|---|---|---|---|
| Marketfield Fund | $250,598,000 | $125,299,000 | $9,048,000 | $116,251,000 | 86.5% |
| Large Cap Fund | $118,611,000 | $48,296,000 | $9,884,000 | $60,431,000 | 103.9% |
| Corporate Bond Fund | $47,715,000 | $23,842,000 | $4,418,000 | $19,455,000 | 68.8% |
| High Yield Opportunities Fund | $10,318,000 | $5,159,000 | $646,000 | $4,513,000 | 77.8% |
| **Total** | **$427,242,000** | **$202,596,000** | **$23,996,000** | **$200,650,000** | **88.6%** |

As shown above, the management fees charged to the Funds include a mark-up of 68.8% to 103.9% over the fees charged by the Subadvisers and State Street for providing investment advisory and administrative services to the Funds.  ¶ 54.  On average, Defendant charged the Funds an excess of 88.6% over the fees paid to the Subadvisers and State Street in fiscal year 2014, equaling more than $200 million.  *Id.*

---

mutual funds, State Street and other sub-administrators charge unaffiliated mutual funds (such as the Funds) administrative fee rates of no more than 0.05% of AUM for the same or substantially the same services covered by the Sub-Administration Agreement.  ¶ 51.

Defendant's responsibilities for supervising and overseeing the Subadvisers and State Street are minimal compared to the Subadvisers' day-to-day implementation of the Funds' investment programs and State Street's day-to-day administration of the Fund.  ¶ 65.  The expenses of the Funds' officers and for office space purportedly paid by Defendant pursuant to the Management Agreements are *de minimis* and do not justify the mark-up retained by Defendant.  ¶ 66.  Further, Defendant shares responsibility for overseeing the Funds with the board of trustees for the Mainstay Group of Funds (the "Board). ¶ 128.[5]

Due to the limited scope of services provided only by Defendant, the operating expenses incurred by Defendant are low.  ¶ 73.  Many of the expenses incurred by Defendant in supervising and overseeing the Subadvisers and State Street are joint and common across all of the 50 funds in the MainStay Group of Funds. ¶ 74.  Any portion of those expenses that is fairly allocable to Defendant's provision of those services with respect to the Funds is *de minimis*.  *Id.* Moreover, the Management Agreements separately require the Funds to pay many of the operating costs incurred by Defendant in providing management services to the Funds.  ¶ 76.

**Economies of Scale Realized by Defendant**

Defendant does not meaningfully share the savings attributable to efficiencies from economies of scale with the Funds' shareholders.  As discussed below, the Funds' fee schedules have few fee breakpoints at high levels of AUM, which afford insufficient fee reductions.  As a result, Defendant has captured the benefits of economies of scale for itself.  ¶¶ 78-118.

**The Funds' Poor Investment Performance**

Except for the High Yield Opportunities Fund, the Funds have performed poorly under Defendant's management, with each Fund's investment returns trailing behind its benchmark.

---

[5]     The Board is responsible for overseeing all 50 mutual funds in the MainStay Group of Funds.  ¶¶ 23, 29.

¶ 120.  The investment returns of the Corporate Bond Fund and the Large Cap Fund have been lower than their benchmarks for each of the most recent 1- and 5-year periods as of the end of fiscal year 2014.  ¶¶ 121-122.  The Marketfield Fund's investment returns have been lower than its benchmark for the most recent 1-year period (the only reported period since Defendant became the investment manager in October 2012) as of the end of 2014.  ¶ 123.

**Board Approval of the Advisory Fees Charged to the Funds**

The Funds' Board has approved the Management Agreements each year without devoting the time and attention necessary to properly assess the management fees.  ¶¶ 125-128.  The Board has approved the payment by each Fund of fees that included a mark-up of 69% to 104% over the fees paid by Defendant to the sub-contractors.  ¶ 135.  Defendant has not provided, and the Board has not considered, appropriate information about Defendant's delegation of substantially all of its responsibilities to the Subadvisers and State Street, the services provided only by Defendant to the Funds, the cost to Defendant of providing such services, or the economies of scale realized by Defendant in providing such services.  ¶ 132.  The Board has not solicited proposals from other advisers to provide the services required pursuant to the Management Agreements, or caused the Funds to contract directly with the sub-contractors for their respective services.  ¶¶ 133-134.  At best, the Board passively accepted NYLIM's rationalization for its fees.  ¶ 131.

**ARGUMENT**

**I.    DEFENDANT'S FIDUCIARY DUTY UNDER SECTION 36(b) AND *JONES***

Congress adopted the ICA to regulate investment companies, including mutual funds. Typically, a mutual fund is created by an investment adviser, which is an entity separate from the fund.  *See Jones*, 559 U.S. at 338.  "The adviser selects the fund's directors, manages the fund's

investments, and provides other services." *Id*. In this sense, a mutual fund is often referred to as "captive" of its adviser. *Id*. at 349. Recognizing that the relationship between an investment adviser and its captive mutual fund is "fraught with potential conflicts of interest," and concerned about the "potential for abuse" in this structure, the ICA incorporates protections for mutual fund shareholders. *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536-38 (1984) (quotation marks and citations omitted).

In 1970, Congress added § 36(b) to provide additional protections to shareholders:

> [T]he investment adviser of a [mutual fund] shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by [the mutual fund], or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.

15 U.S.C. § 80a-35(b). This section creates a private right of action for fund shareholders to enforce this fiduciary duty. *See id.*

Section 36(b) reflects Congress's determination that "the forces of arms-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy." S. REP. NO. 91-184, at 4 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4901. This conclusion was based in part on a study of the mutual fund industry by the University of Pennsylvania's Wharton School of Finance and Commerce. *See* A STUDY OF MUTUAL FUNDS, H.R. REP. NO. 87-2274 (1962) ("Wharton Report").[6] The Wharton Report determined that "investment advisers often charged mutual funds higher fees than those charged the advisers' other clients," *Daily Income Fund*, 464 U.S. at 537 (citing Wharton Report at 28-30), and the "principal reason for the differences in rates" was that "competitive factors which tend to influence rates charged other clients have not been substantially operative in fixing the advisory fee rates paid by mutual funds." Wharton Report at 493-94.

---

[6]     Also available at: www.sechistorical.org/museum/galleries/tbi/gogo_c.php.

Section 36(b) reflects Congress's conclusion that "shareholders should not have to rely solely on the fund's directors to assure reasonable adviser fees." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108 (1991) (quotation marks and citation omitted). Section 36(b) affords a "mechanism by which the fairness of" investment advisory fees "could be tested in court." S. REP. NO. 91-184, at 5 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4901.

Defendant asserts that a "congressional intent" behind § 36(b) was "to 'prevent the harassment of investment [managers] by ill-founded or nuisance law suits....'" (Db at 16 (citing *In re Franklin Mut. Funds Fee Litig.*, 478 F. Supp. 2d 677, 687 (D.N.J. 2007)).[7]  However, the portion of the House Report that Defendant (and the court in *In re Franklin*) cite as evidence of this supposed "intent" actually discussed proposed amendments that were **rejected** and **not included** in § 36(b). The House proposed language in § 36(b) that would have required a plaintiff to prove a breach of fiduciary duty by "clear and convincing evidence." H.R. REP. NO. 91-1382, at 4118 (1970).[8]  It was this "increased burden" that the House was discussing in the quote cited by Defendant (and the court in *In re Franklin*). *See id.* However, this heightened standard of proof was rejected. *See id.* at 4198.

Rather, the amendment of the 1940 Act added § 36(b) which was designed to provide additional protections to fund shareholders as stated on the first page of H.R. REP. NO. 91-1382:

> The purpose of the legislation [*i.e.*, the 1970 Amendments] is to make comprehensive amendments to the Investment Company Act of 1940 (the Act) for the first time in three decades. . . . In addition to updating the Act in many respects and making numerous technical improvements in the Act, the bill would add a number of new provisions to the Act **to provide additional safeguards and protections to public investors**.

---

[7]  "Db" refers to the Brief in Support of Defendant's Motion to Dismiss Plaintiffs' Second Amended Complaint (Dkt. No. 31-1).

[8]  Also available at: www.sechistorical.org/collection/papers/1940/1940_SICA_I.pdf.

H.R. REP. No. 91-1382, at 4111 (emphasis added).

Forty years later, the Supreme Court in *Jones* reaffirmed that the 1970 amendments were designed to "bolster[] shareholder protection" because the SEC had "identified problems relating to the independence of investment company boards and the compensation received by investment advisers." *Jones,* 559 U.S. at 339. Thus, consistent with the actual intent behind the 1970 amendments and the Supreme Court's acknowledgment in Jones, Plaintiffs' claims must be assessed with an eye towards shareholder protection.

## II.    THE APPLICABLE PLEADING STANDARD

"[A] claim under § 36(b) need only meet the liberal pleading standards set forth in Rule 8" of the Federal Rules of Civil Procedure. *Zehrer v. Harbor Capital Advisors, Inc.,* No. 14 C 789, 2014 WL 6478054, at *2 (N.D. Ill. Nov. 18, 2014); *see also In re BlackRock Mut. Funds Advisory Fee Litig.,* Civ. No. 14-1165, 2015 WL 1418848, at *3, *8 (D.N.J. Mar. 27, 2015) ("*BlackRock*"). Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This standard "do[es] not require heightened fact pleading of specifics…." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

To survive a motion to dismiss, a complaint must simply contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). While this plausibility standard requires a plaintiff to show that success on the merits is more than a "sheer possibility," it is not a "probability requirement." *Id.* A district court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 308 n. 3 (3d Cir. 2014) (citation omitted).

## III.   RULE 8(a) IS SATISFIED WHERE THE FACTS ALLEGED SUPPORT A PLAUSIBLE INFERENCE THAT THE FEES ARE DISPROPORTIONATELY LARGE TO THE SERVICES PROVIDED AND OUTSIDE AN ARM'S-LENGTH NEGOTIATED RANGE

Under § 36(b), the pleading stage inquiry is whether Plaintiffs allege facts which would satisfy the basic standard articulated in *Gartenberg*, that "a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.'" *Kasilag v. Hartford Inv. Fin. Servs., LLC,* Civ. No. 11-1083, 2012 WL 6568409, at *2 (D.N.J. Dec. 17, 2012) (citing *Jones*, 559 U.S. at 351). Plaintiffs "may state a § 36(b) claim by alleging any combination of facts that plausibly support an inference that a particular fee, given all of the surrounding facts and circumstances, is disproportionately large to the services rendered in exchange for that fee." *BlackRock*, 2015 WL 1418848, at *4 (quotation marks and citation omitted).

The *Gartenberg* factors, while pertinent, are non-exclusive, and Plaintiffs are not required to plead facts with respect to each factor. *See BlackRock*, 2015 WL 1418848, at *4; *Goodman v. J.P. Morgan Inv. Mgmt., Inc.*, No. 2:14-cv-414, 2015 WL 965665, at *4 (S.D. Ohio Mar. 4, 2015); *Zehrer*, 2014 WL 6478054, at *2; *Kasilag*, 2012 WL 6568409, at *2; *In re Federated Mut. Funds Excessive Fee Litig.*, No. 2:04-cv-352, 2009 WL 5821045, at *3 (W.D. Pa. Sept. 30, 2009).

Relying on two distinguishable District Court cases more than 15 years old, Defendant asserts that "claims under section 36(b) 'are particularly appropriate for dismissal'" under Rule 12(b)(6). (Db at 16 (citation omitted).) However, Defendant conveniently ignores and/or attempts to marginalize the numerous opinions decided since *Jones* upholding the pleading sufficiency of § 36(b) excessive fee claims founded upon allegations strikingly similar to those here. *See, e.g., Curd v. SEI Investments Mgmt. Corp.*, No. 13-7219, 2015 WL 4243495 (E.D. Pa.

10

July 14, 2015); *BlackRock*, 2015 WL 1418848; *Kasilag*, 2012 WL 6568409; *Goodman*, 2015 WL 965665; *Zehrer*, 2014 WL 6478054; *Am. Chem. & Equip., Inc. 401(K) Ret. Plan v. Principal Mgmt. Corp.*, No. 4:14-cv-00044, 2014 WL 5426908 (S.D. Iowa Sept. 10, 2014); *In re Federated*, 2009 WL 5821045; *Reso v. Artisan Partners Ltd. P'ship*, No. 11-CV-873, 2011 WL 5826034 (E.D. Wis. Nov. 18, 2011); *Curran v. Principal Mgmt. Corp.*, No. 4:09-cv-00433, 2010 WL 2889752 (S.D. Iowa June 8, 2010); *Sins v. Janus Capital Mgmt., LLC*, No. 04-cv-01647, 2006 WL 3746130 (D. Colo. Dec. 15, 2006); *Hunt v. Invesco Funds Group, Inc.*, No. H-04-02555, 2006 WL 1581846 (S.D. Tex. June 5, 2006); *Dumond v. Mass. Fin. Servs. Co.*, No. Civ. A. 04-11458, 2006 WL 149038 (D. Mass. Jan. 19, 2006); *Wicks v. Putnam Inv. Mgmt., LLC*, No. Civ.A.04-10988, 2005 WL 705360 (D. Mass. Mar. 28, 2005).

## IV. DEFENDANT CHARGES MANAGEMENT FEES TO THE FUNDS THAT ARE DISPROPORTIONATELY LARGE TO THE SERVICES PROVIDED AND OUTSIDE AN ARM'S-LENGTH NEGOTIATED RANGE

### A. Defendant's Fees Are Not Justified by the Services It Provides.

"At the heart of a 36(b) claim is the relationship between the fees charged to the fund and the services rendered to the fund." *Am. Chem.*, 2014 WL 5426908, at *5. Defendant charged the Funds over $427 million in management fees in fiscal year 2014. ¶ 53. Although Defendant delegated substantially all of its responsibilities for providing investment management services, ¶¶ 38-41, 47, 60-62, it retained more than $200 million for itself. As a result, the fees are disproportionately large to the services actually provided by Defendant, which are limited primarily to supervision and oversight of the sub-contractors. ¶¶ 63-77.

Every District Court, including several in this District, that has recently considered similar allegations has found them to sufficient to state a claim. For example, the plaintiffs in *Kasilag*, as here, detailed the investment management services required to be provided by

defendant to the funds under the relevant investment management agreements, the services provided by certain subadvisers to the funds, the overlap between the two, and the difference between their fees for substantially the same services. 2012 WL 6568409, at *3. The plaintiffs in *Kasilag*, like here, alleged that investment management services provided by the sub-contractors constituted the most expensive and important services required under the management agreements, "that the additional supervisory and administrative services provided by [defendant were] minimal, and that the funds paid for these additional services through separate agreements and/or fees." *Id.* Rejecting many of the same arguments raised by Defendant here, Judge Bumb concluded that "Plaintiffs have raised a plausible inference that [defendant's] fees are excessive under § 36(b)." *Id.*

Similarly, in *Zehrer*, plaintiffs alleged that Harbor Capital, as investment adviser, delegated its investment management responsibilities to a subadviser while retaining only general oversight and supervisory responsibilities. 2014 WL 6478054, at *1. Plaintiffs alleged that Harbor Capital's retention of approximately $100 million (out of $225 million in advisory fees paid) was excessive and a breach of its fiduciary duty under § 36(b). *Id.* The court found that plaintiffs alleged sufficient facts to support a claim that Harbor Capital's fees are disproportionately large to the services rendered and that they are not the product of arm's length bargaining. *Id.* at *4; *see also Curd*, 2015 WL 4243495, at *5 (denying motion to dismiss investment advisory claims where plaintiffs alleged, *inter alia*, that defendant "subcontracts the majority of its investment advising duties to sub-advisers, yet keeps 40% of the investment management fees"); *Curran*, 2010 WL 2889752, at *9 (finding allegations that adviser-sponsor "charges more than the subadvisors, who allegedly provide the bulk of investment advice" support the reasonable inference that adviser collected excessive advisory fees).

In a parallel situation, the Second Circuit had "little trouble concluding" that plaintiffs had adequately alleged a claim under § 36(b) where defendant charged its captive funds a transfer agency fee that was significantly higher than the rate it negotiated at arm's length with an unaffiliated entity to provide the same or substantially the same services. *R.W. Grand Lodge of F. & A.M. of Penn. v. Salomon Bros. All Cap Value Fund*, 425 F. App'x 25, 30 (2d Cir. 2011). The court recognized that it is incumbent upon an adviser to "pass the resulting savings [from the use of a sub-contractor] on to investors in the form of lower fees." *Id.* The court held that "the transfer agent arrangement . . . constitutes a garden variety breach of fiduciary duty" and stated a claim under § 36(b) because "Defendants knowingly inflated the price of the transfer agent services provided to Plaintiffs and pocketed the difference between what they charged and what the services were worth." *Id.* at 30-31. Plaintiffs here make essentially the same allegation based upon Defendant's delegation of responsibilities to the sub-contractors.

Courts have also denied motions to dismiss in analogous cases where an investment adviser charged its captive funds an advisory fee rate substantially higher than the fee rate it charges other clients to perform the same or substantially the same services. *See, e.g.*, *BlackRock*, 2015 WL 1418848, at *6 ("[A]ssuming that the Funds pay as much as 106% higher fees for BlackRock advisory services than the Sub-Advised Funds pay for the same or substantially the same services, Plaintiffs' allegations support the inference that the Funds' fees are disproportionately large and outside the range of what could be negotiated at arm's length for BlackRock's advisory services."); *Goodman*, 2015 WL 965665, at *5 (noting the disparity in fees charged by defendant for servicing the funds at issue and certain subadvised funds while accepting allegations that the services provided to all of the funds are "substantially the same"); *Reso*, 2011 WL 5826034, at *8 (comparing fees charged by defendant to other funds that it

managed for providing "similar services" and holding that the higher fees charged to the captive funds "give rise to the inference that [defendant] has comparatively over-charged the funds in this case"); *In re Federated,* 2009 WL 5821045, at *6-7 (denying motion to dismiss where complaint alleged, *inter alia*, that defendants provide the same advisory services to other clients, who are able to negotiate at arm's-length, for substantially lower fees).

Defendant's contention to the contrary, Plaintiffs do not "take direct aim" at the Funds' use of a subadvisory structure. (Db at 12.)   Rather, Plaintiffs specifically challenge the investment management fees charged to the Funds.   That has nothing to do with the Funds' management structure or whether the SEC has approved of "manager of manager" fund structures.   (*See* Db at 7-9.)   As the case law previously cited makes clear, the subadviser structure of the Funds does not grant Defendant immunity from § 36(b) liability.

**B.    Defendant's Arguments Regarding the Services It Allegedly Provides Raises Questions of Fact.**

Defendant's contention that it "retains crucial and substantial duties" (Db at 23) raises a merits issue, improper for resolution on a motion to dismiss, and cannot be reconciled with the express terms of the relevant agreements.  The Complaint describes the substantial overlap in the core investment advisory services required by the Management Agreements, entered into between the Funds and Defendant, and those that Defendant has delegated to the sub-contractors. *See* ¶¶ 56-62.  Defendant's responsibilities are primarily limited to supervising and overseeing the sub-contractors and providing officers and office space to the Funds.  ¶¶ 62-63.

While Defendant argues that the Complaint "selective[ly] quotes from the Subadvisory Agreements" and omits "critical contractual language" stating that NYLIM retains supervisory and oversight responsibilities over the subadviser (Db at 23), the Complaint does, in fact, state that NYLIM retains such responsibilities.  *See* ¶¶ 8, 63-65, 74, 88, 131.  The point is that those

14

services do not justify over $200 million in fees retained by Defendant. ¶¶ 8, 63-77. Thus,

Plaintiffs allegations are not "contradicted" by any documents cited in the Complaint. (*See* Db

17, 25.)[9]   Indeed, the court in *BlackRock* rejected a similar argument:

> While BlackRock argues that Plaintiffs' assertions are clearly rebutted by the IMAs, the Court disagrees. Even if the Court were to assume that BRA [BlackRock] provided additional services under the IMA, **the Court would also have to assume that the fee retained by BRA was proportionate to the services it performed.** Having reviewed the relevant agreements, there is nothing in either the agreements or the pleadings that establish or assert that BRA's responsibilities in supervising the Funds are so 'plainly substantial' as to warrant retaining its portion of the advisory fee, meaning that the Court would have to assume-based on the size of the Funds only-that the advisory fee was reasonable.

2015 WL 1418848, at *5, n. 5 (emphasis added).

At most, Defendant's argument that the higher fees charged to the Funds are justified

based on any purported additional work or responsibility raises "an evidence-dependent

contention that cannot be afforded dispositive force in [] motion-to-dismiss context." *Goodman,*

2015 WL 965665, at *5; *see also BlackRock*, 2015 WL 1418848, at *5 n.5 ("Whether or not

[defendant's] fee bears a reasonable relationship to the services it performs in discharging any

responsibilities it alone has as the adviser is beyond the scope of this motion."); *Curd*, 2015 WL

4243495, at *5; *Zehrer*, 2014 WL 6478054, at *4; *Am. Chem.,* 2014 WL 5426908, at *6;

*Kasilag*, 2012 WL 6568409, at *3.[10]

---

[9]      Defendant cites to cases that are not remotely analogous. *See Genesis Bio-Pharm., Inc. v. Chiron Corp.,* 27 F. App'x 94, 99 (3d Cir. 2002) (finding that parol evidence rule barred plaintiff's evidence that contradicted written settlement agreement); *Coffman v. Pruco Life Ins. Co.,* No. 10-CV-03663, 2011 WL 4550152 (D.N.J. Sept. 29, 2011) (dismissing breach of contract claim where insurance company followed formula specifically set forth in insurance policy); *Kent v. Tabafunda,* No. 07-4973, 2008 WL 2510723, at *4 (D.N.J. June 19, 2008) ("Plaintiff alleged that Defendants failed to give Judge Sheridan submissions made by Plaintiff…[h]owever, the record in [that case] reveals the opposite.").

[10]      Defendant's reliance on *Hoffman v. UBS-AG,* 591 F. Supp. 2d 522 (S.D.N.Y. 2008) is misplaced because the plaintiffs there "offer[ed] no allegations about the actual services provided by the funds." *Id.* at 539.  Moreover, the plaintiffs **acknowledged in their Complaint**

## C.    Defendant's Alternative Fee Comparison Does Not Support Dismissal

Defendant's effort to justify the fees charged to the Marketfield Fund by comparing the fees charged by that fund's previous investment adviser (Db at 21-22) fails. That comparison is precisely the type of fee comparison that the Supreme Court cautioned against in *Jones* because those fees themselves may not be the product of negotiations conducted at arm's-length. *Jones*, 559 U.S. at 350-51.[11] The record before the Court on this Motion does not include any allegations that the fees charged by the previous investment manager were negotiated at arm's-length or that those fees are not excessive themselves.[12] Second, regardless of what fees were charged to the Marketfield Fund prior to Defendant becoming investment adviser, Plaintiffs allege that the fees Defendant charges the Marketfield Fund are excessive in relation to the services **it** now provides to that Fund.[13]

---

that advisers and subadvisers "perform[ed] **distinct** services." *Id*. at 540 (emphasis added). The Court in *BlackRock* rejected the applicability of *Hoffman* to allegations similar to those asserted here. *See BlackRock*, 2015 WL 1418848, at *6 n.7.

[11]    Upon remand, the grant of summary judgment for the defendant was affirmed because plaintiffs failed to adduce necessary evidence to support the claim in accordance with the Supreme Court's standard. *Jones v. Harris Assoc. L.P.*, No. 07-1624, 2015 WL 4646487 (7th Cir. Aug. 6, 2015). However, this case is still at the pleading stage and, in comparison, the factual allegations here satisfy the *Jones* standard.

[12]    In support of this argument, Defendant relies on material that was neither relied upon nor referenced in the Complaint. (*See* Db at 21 n.37 (citing the Marketfield Fund's advisory agreement with previous investment adviser).) Consideration of this material is clearly improper on a motion to dismiss. *See In re Burlington Coat Factory Sec. Litig*., 114 F.3d 1410, 1426 (3d Cir. 1997) (holding that "[a]s a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings") (citation omitted).

[13]    Defendant's comparison of fee rates in other cases that were dismissed for failure to allege that fees were excessive in relation to the services provided (*see* Db at 22 n.38), have no relevance here where Plaintiffs set forth those very allegations. *Cf. Krantz v. Prudential Inv. Fund Mgmt. LLC*, 305 F.3d 140 (3d Cir. 2002); *In re Scudder Mut. Funds Fee Litig.*, No. 04 Civ. 1921, 2007 WL 2325862 (S.D.N.Y. Aug. 14, 2007); *Strougo v. BEA Assocs*., No. 98-3725, 1999 WL 147737 (S.D.N.Y. Mar. 18, 1999).

## V.   DEFENDANT REALIZED ECONOMIES OF SCALE AND HAS NOT APPROPRIATELY SHARED THOSE BENEFITS WITH THE FUNDS

"Section 36(b) was enacted in large part because Congress recognized that as mutual funds grew larger, it became less expensive for investment advisers to provide the additional services.  Congress wanted to ensure that investment advisers passed on to fund investors the savings that they realized from these economies of scale." *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 326-27 (4th Cir. 2001). The work required to operate a mutual fund does not increase proportionately with the assets under management.

> [I]nvestment management efforts, the most important (and most expensive) input into portfolio management, do not increase along with portfolio size. A portfolio manager can invest $5 billion nearly as easily as $1 billion and $20 billion nearly as easily as $10 billion. (Size may impair performance, but it imposes little logistical challenge.)

DAVID SWENSEN, UNCONVENTIONAL SUCCESS: A FUNDAMENTAL APPROACH TO PERSONAL INVESTMENT 238 (2005). Therefore, "[a]s scale increases, fees as a percentage of assets ought to decline, allowing both fund manager and fund shareholders to benefit." *Id.*

### A.   The Complaint Adequately Alleges that NYLIM Realized Economies of Scale and Failed to Appropriately Share the Benefits with the Funds.

Plaintiffs' allegations demonstrate that, when coupled with the historical growth in AUM, Defendant's failure to institute additional breakpoints in the Funds' fee schedules has allowed Defendant to reap a windfall in the form of increased profits that are not justified by any change in the nature or quality of the services provided to the Funds.  ¶¶ 98-118.

Although the management fee schedules for the Large Cap Fund and the Corporate Bond Fund include breakpoints, each Fund's AUM have exceeded the last breakpoint in the Funds' fee schedules for many years, such that the Funds have not benefited from economies of scale as AUM have continued to increase beyond that breakpoint.  ¶¶ 98-102.  By not instituting

17

additional breakpoints for the Large Cap and Corporate Bond Funds, Defendant has failed to appropriately share the benefits of economies of scale realized as each Fund's AUM increased beyond the last breakpoint in each respective fee schedule. ¶ 103.

For example, between 2011 and 2014, the Large Cap Fund's AUM increased from approximately $12.9 billion to approximately $20.4 billion; the effective management fee rate paid by the Large Cap Fund decreased by 3 basis points, from 0.63% to 0.60%. ¶ 104. That 3 basis point decrease translates into a savings to the Fund of approximately $6,128,000 annually based on AUM as of the end of fiscal year 2014. ¶ 105. In contrast, due to the increase in AUM from 2011 to 2014, the dollar amount of fees paid by the Large Cap Fund increased by approximately $64,186,000, from $54,425,000 in 2011 to $118,611,000 in 2014. ¶ 105. Thus, the increase in the Large Cap Fund's AUM from 2011 to 2014 produced benefits to Defendant (increased management fees) that were more than 10.5 times the benefits to the Large Cap Fund (reductions in the management fee rate). ¶ 106. Similarly, between 2011 and 2014, the increase in the Corporate Bond Fund's AUM produced benefits to Defendant (increased management fees) that were more than 13.4 times the benefits to the Corporate Bond Fund (reductions in the management fee rate). ¶¶ 108-111.

Although breakpoints were added to the management fee schedule for the Marketfield Fund effective February 28, 2014, the initial breakpoint is set too high at $7.5 billion, failing to share any of the economies of scale realized below that threshold; the breakpoints are spaced too far apart, at intervals of $7.5 billion in AUM; and, the fee reductions made by the breakpoints are too small, with each breakpoint reducing the fee rate by only 2 basis points. ¶ 112. During fiscal year 2014 (the first year in which the Marketfield Fund's breakpoints became effective), breakpoints reduced the effective management fees paid by the Marketfield Fund by 1 basis

point, from 1.40% to 1.39%, translating to a savings to the Fund of approximately $2,738,000. ¶¶ 113-114. In contrast, due to the increase in AUM from 2012 to 2014, the amount of fees paid to the Marketfield Fund increased by approximately $220,301,000 from $30,297,000 in 2012 to more than $250,598,000 in 2014. ¶ 115. Thus, the increase in the Marketfield Fund's AUM from 2012 to 2014 produced benefits to Defendant (increased management fees) that are more than 161 times the benefits to the Marketfield Fund (reductions in management fee rates). ¶ 116.

Although a breakpoint was added to the fee schedule for the High Yield Opportunities Fund's effective February 28, 2014, it is is set too high at $3.0 billion, versus the Fund's AUM of approximately $1.18 billion as of the end of fiscal year 2014. ¶ 117. Thus, the breakpoint has not produced any reduction in the management fee charged to the High Yield Opportunities Fund, enabling Defendant to capture the benefits of economies of scale for itself. ¶ 118.

Plaintiffs have plausibly alleged that (i) each Fund's AUM grew and remained substantially above historic assets levels, resulting in significant increases in the advisory fees charged by NYLIM (¶¶ 78-85); (ii) the increase in the Funds' AUM and advisory fees was not accompanied by a proportionate increase in the nature and quality of the services provided by NYLIM or the effort required to perform those services (¶¶ 86-94); (iii) the Funds' fee rates were not reduced to reflect the economies of scale realized by Defendant (¶¶ 98-118).[14]

In *BlackRock*, the plaintiffs alleged that the breakpoints in the funds' fee schedules "fail[ed] to provide the Funds with an appropriate share of the benefit of economies of scale, in large part because the fee schedule reduces the fee by too small of an amount and spaces the breakpoints too far apart to provide any meaningful benefit of economies of scale." 2015 WL

---

[14] Defendant makes much of the mere presence of breakpoints in the Funds' fee schedules. (Db at 38-39.) However, it is not enough to simply have breakpoints if, as challenged, the breakpoints are inadequate to share economies of scale with the Funds.

1418848, at *6; *compare with* ¶¶ 98, 103, 112, 117-18.  As Plaintiffs do here, the plaintiffs in *BlackRock* "alleged that the increase in investment advisory fees paid by the Fund was not accompanied by a proportionate increase in the work or cost by [defendant]."  2015 WL 1418848, at *6; *compare with* ¶ 86.  Also as Plaintiffs do here, the plaintiffs in *BlackRock* "calculated the fee reductions resulting from breakpoints in the Funds' fee schedules and compared this reduction to the increase in the dollar amount paid by the Fund to [defendant] in order to show that the increase in the Funds' AUMs produced benefits to [defendant] that were up to 8.5 times greater than the benefits received by the Funds."  2015 WL 1418848, at *6; *compare with* ¶¶ 104-111, 113-116.

Citing numerous decisions finding similar allegations sufficient at the motion to dismiss stage, *BlackRock* held that "such allegations allow for an inference that the adviser's 'breakpoints did not give shareholders meaningful benefits from the economies of scale enjoyed by the Funds.'" 2015 WL 1418848, at *7 (citation omitted); *see also Kasilag*, 2012 WL 6568409, at *6 ("Plaintiffs have sufficiently alleged that [the adviser-defendant's] breakpoints did not give shareholders meaningful benefits from the economies of scale enjoyed by the Funds."); *Am. Chem.*, 2014 WL 5426908, at *7 (finding allegation that fund's "assets have grown, this value increase comes with little additional work for Defendants" sufficient at the motion to dismiss stage); *Zehrer*, 2014 WL 6478054, at *4 (denying motion to dismiss where plaintiffs alleged that "Harbor Capital received 'economies of scale' benefits as the Fund grew that were not passed on to the Fund"); *Reso*, 2011 WL 5826034, at *9 (finding plaintiff's "strongest allegations relate[d] to economies of scale factor," where breakpoints provided insufficient economies of scale).

While Defendant would have Plaintiffs **prove** their claims at the motion to dismiss stage, "Plaintiffs need not establish that [Defendant] failed to pass along economies of scale at this stage of the proceedings; rather, Plaintiffs need to allege sufficient factual content to draw a reasonable inference that [Defendant] failed to do so." *BlackRock*, 2015 WL 1418848, at *7; *see also Curran*, 2010 WL 2889752, at *9. Plaintiffs have done so.

**B.**   **The Decrease in Assets for Some of the Funds In Fiscal Year 2014 Does Not Undermine Plaintiffs' Economies of Scale Allegations.**

Because the assets under management of all of the Funds have increased dramatically over the past several years, *see* ¶¶ 78-85, NYLIM has continued to realize economies of scale despite any decreases in AUM for the most recent fiscal year.

That the AUM of some of the Funds decreased during 2014, does not change the fact that Defendant is still charging the Funds advisory fees that are between 101% and 849% higher than the fees charged to the Funds several years ago, despite no proportionate changes in the services performed or cost incurred by Defendant. ¶¶ 78-86.

In analyzing economies of scale, courts have looked to the growth beyond the one-year period preceding the filing of the complaint. *See, e.g., Curd*, 2015 WL 4243495, at *5 (finding allegation that defendant benefitted from growth in AUM over 17-year period without sharing benefits with the funds supports a plausible claim under § 36(b)); *Goodman,* 2015 WL 965665, at *3-4 (denying motion to dismiss over defendant's argument that economies of scale could not be realized where assets declined during most recent fiscal year and looking to asset levels/fees over 5-year period); *Reso*, 2011 WL 5826034, at *2 (denying motion to dismiss where plaintiffs alleged, *inter alia,* "that the funds in this case have grown over time, allowing [defendant] to take the same percentage from a higher pool of funds with little additional work"); *In re Federated,* 2009 WL 5821045, at *7 (denying motion to dismiss and comparing assets and fees between

2003 and 2007).[15]   Thus, the Complaint raises a plausible inference that Defendant benefitted

from economies of scale while not appropriately sharing those benefits with the Funds.[16]

## VI.   THE FUNDS' UNDERPERFORMANCE AND THE LOW-QUALITY OF DEFENDANT'S SERVICES

The Complaint sets forth allegations regarding the underperformance of the Funds.

Except for the High Yield Opportunities Fund, the investment returns for the other three Funds

trailed behind their benchmarks for the most recent 1- and/or 5-year periods as of the end of

fiscal year 2014.   ¶¶ 120-123.   Even Defendant's authority recognizes that the investment

performance of a fund is an appropriate measure of the quality of an investment adviser's

services. *See, e.g., Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1229 (S.D.N.Y. 1990)

("Given investors' primary objective of making money, the most significant indication of the

quality of an investment adviser's services is the fund's performance relative to other funds of the

same kind."); *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472, 488 (S.D.N.Y. 1988).

The Complaint's allegations regarding the poor investment performance of the Funds

under Defendant's management supports that the fees charged to the Funds are

disproportionately large compared to the services provided. *See Curd*, 2015 WL 2015 WL

4243495, at *5 (holding that that allegations that funds underperformed when compared with

---

[15]     *See also Sins*, 2006 WL 3746130, at *3 (denying motion to dismiss and comparing assets and fees between 1993 and 2002); *Strigliabotti v. Franklin Resources, Inc.*, No. C 04-00883, 2005 WL 645529, *3-4 (N.D. Cal. Mar. 7, 2005) (denying motion to dismiss where plaintiffs alleged, *inter alia*, that "defendants 'have retained excess profits resulting from economies of scale'" as a result of the funds dramatic growth over a 20 year period, "while the nature of the services rendered has not changed") (citation omitted).

[16]     The only case cited by Defendant on this issue was dismissed for reasons not present here. *See In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, No. 04 Civ. 4885, 2006 WL 1520222, at *2-3 (S.D.N.Y. May 31, 2006) (denying leave to amend on futility grounds where plaintiffs relied on evidence that "independently endorse[d] the fee levels at issue" and on statistics that "undercut[]" plaintiffs' renewed allegations).

benchmark funds supports a claim under § 36(b)); *Siemers v. Wells Fargo & Co.*, C 05-04518, 2006 WL 2355411, at *18 (N.D. Cal. Aug. 14, 2006) (holding that allegations of underperformance may support a § 36(b) claim and "[w]hether the underperformance…was serious enough to suggest a breach of fiduciary duty is a question to be resolved on the evidentiary record.").

While Defendant claims that "[p]erformance is *not* a *Gartenberg* factor" (Db at 33; emphasis in original), *Gartenberg* explicitly says otherwise:  "**the relative performance of the Fund in terms of return on investment…[is a] factor[] which can be considered in determining if a Section 36(b) violation has occurred**…."  *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 573 F. Supp. 1293, 1316 (S.D.N.Y. 1983) (emphasis added), *aff'd*, 740 F.2d 190 (2d Cir. 1984).

*Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338 (2d Cir. 2006) and *Migdal*, cited by Defendant, are not to the contrary.   The courts there simply held that allegations of underperformance **alone** are insufficient to plead a § 36(b) claim.   *Amron*, 464 F.3d at 344; *Migdal*, 248 F.3d at 327.  Plaintiffs do not rely upon allegations of underperformance alone.[17]

---

[17]     The remaining cases cited by Defendant are distinguishable.  In *In re Franklin*, the court dismissed the entire action as preempted by SLUSA.  478 F. Supp. 2d at 682.  The court addressed the § 36(b) claims in *dicta* and explained that the claims were subject to dismissal in any event where the plaintiffs never "address[ed] the actual services rendered to th[e] Funds," but rather sought to maintain a claim simply based on underperformance and charging above-market fees.  *Id.* at 687.  Similarly, the plaintiffs in *Hoffman* "offer[ed] no allegations about the actual services provided by the funds" and instead "rest[ed] their complaint only on post hoc performance."  591 F. Supp. 2d at 539.  Finally, *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222 (S.D.N.Y. 1990), involved the dismissal of claims **after trial,** and thus provides no support for dismissal of § 36(b) claims at the pleading stage.

## VII.   PLAINTIFFS CHALLENGE THE TOTAL AMOUNT OF MANAGEMENT FEES CHARGED TO THE FUNDS

Defendant's argument that Plaintiffs' claims should be dismissed because they only challenge "a portion of the management services and fees, rather than the total services and fees" (Db at 18-22) is a red herring.  The Complaint identifies the total management fees charged to each Fund (¶¶ 37, 53) and alleges that those fees are "so disproportionately large that they bear no reasonable relationship to the value of the services provided by Defendant and could not have been the product of arm's-length bargaining." ¶¶ 145, 153, 161, 169.

That Plaintiffs quantify the portion of the management fees alleged to be excessive in relation to the services provided, and allege that Defendant retained the excessive portion, does not equate to a challenge to only a "portion" of the fees.   To the contrary, by alleging that (a) Defendant retains more than $200 million in management fees after paying the Subadvisers and State Street reasonable, arm's-length compensation for their services (¶¶ 43, 49), and (b) the $200 million retained by Defendant is excessive in relation to the supervision and oversight services Defendant provides, Plaintiffs necessarily allege that the total amount of management fees charged to the Funds is excessive.  *See Kasilag*, 2012 WL 6568409, at *3 (denying motion to dismiss based on same allegations of adviser charging significantly more than what it cost to provide its investment management services); *Zehrer*, 2014 WL 6478054, at *1 (denying motion to dismiss where defendant allegedly retained approximately $100 million in investment management fees after delegating substantially all investment management responsibility to a subadviser).

Even where plaintiffs have challenged a "portion" of fees under § 36(b), courts have allowed such claims to proceed.  *See, e.g.*, *Am. Chem.*, 2014 WL 5426908, at *5 (denying motion to dismiss claim challenging a "portion of [an] Acquired Fund Fee" where plaintiffs alleged that

defendant's retention of that portion of the fee is excessive in relation to the services provided);

*Curran*, 2010 WL 2889752, at *11 (denying motion to dismiss claim challenging portion of Rule

12b-1 fees where plaintiffs alleged that fees "surpassed the value of those services"); *see also In*

*re Mut. Funds Inv. Litig.*, 590 F. Supp. 2d 741, 760 (D. Md. 2008) ("To the extent that a portion

of the fees paid to the investment adviser defendants was 'disproportionate, excessive, or

unearned,'...plaintiffs (derivatively, on behalf of the funds that paid the fees) may recover that

portion of the fees.") (citation omitted).

This case is nothing like the cases cited by Defendant where plaintiffs challenged the

"improper usage of fees" and did not allege (unlike here) that the fees received by defendant

were so disproportionately large and bore no reasonable relationship to the services rendered.

*See In re Salomon Smith Barney Mut. Fund Fees Litig.,* 441 F. Supp. 2d 579 (S.D.N.Y. 2006);[18]

*In re Eaton Vance Mut. Funds Fee Litig.*, 403 F. Supp. 2d 310 (S.D.N.Y. 2005).[19]

## VIII.   APPROVAL OF THE ADVISORY FEES BY THE BOARD IS ENTITLED TO LITTLE OR NO DEFERENCE

The Court in *Jones* held that "a measure of deference to a board's judgment **may** be

---

[18]     Notably, the Second Circuit reversed the dismissal of the § 36(b) claim in *Salomon Smith Barney* as it related to the transfer agency fees. *R.W. Grand Lodge*, 425 F. App'x at 30-31.  As discussed *supra* at Section IV, Plaintiffs here make essentially the same allegation.

[19]     Other authority cited by Defendants is equally inapposite. *See Hecker v. Deere & Co.*, 556 F. 3d 575, 585-86 (7th Cir. 2009) (affirming dismissal of claims under ERISA where plaintiffs alleged, *inter alia*, that defendant had a duty to disclose revenue-sharing arrangement and selected improper investment options); *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 409 (2d Cir. 1989) (post-trial decision dismissing claims where plaintiff failed to allege or prove that fees were excessive in relation to the services); *Benak v. Alliance Capital Mgmt.*, No. Civ.A. 01-5734, 2004 WL 1459249, at *9 (D.N.J. Feb. 9, 2004) (dismissing complaint that "fails to address the overall services provided by Defendant to the Fund...[and] focuses on Defendant's investments in only one out of the approximately fifty different stocks that Defendant purchased on behalf of the Fund's portfolio"); *Olesh v. Dreyfus Corp.,* No. CV-94-1664, 1995 WL 500491, at *19 (E.D.N.Y. Aug. 8, 1995) ("The mere failure of an investment adviser to provide protections against fee increases or to negotiate reduced fees upon a merger does not state a claim, without some allegation to tie this failure to the imposition of excessive fees.").

appropriate in **some instances**," but "the appropriate measure of deference varies depending on the circumstances." *Jones*, 559 U.S. at 349 (emphasis added).

> [W]here the board's process was deficient or the adviser withheld important information, the court must take a more rigorous look at the outcome. When an investment adviser fails to disclose material information to the board, greater scrutiny is justified because the withheld information might have hampered the board's ability to function as "an independent check upon the management."

*Id.* at 351-52 (citation omitted); *see also BlackRock*, 2015 WL 1418848, at *7.

Consistent with Congress's intent "not to rely solely on the fund's directors to assure reasonable adviser fees" and to establish § 36(b) as an "independent check[] on excessive fees," *Daily Income Fund*, 464 U.S. at 540-41, *Jones* emphasized that even a "robust" process will not by itself insulate the adviser from liability for excessive fees. *See Jones*, 559 U.S. at 351.

### A.     Plaintiffs Have Alleged a Deficient Board Approval Process.

Plaintiffs adequately allege that the board approval process was "deficient," rather than "robust," and, therefore, the Funds' fees should be subject to "greater scrutiny" under *Jones*. The approval process was neither competitive nor conducted at arm's length, in contrast to the fee negotiation process between Defendant and the Subadvisers and Sub-Administrator. ¶¶ 43, 49. For example, the Board (i) did not solicit proposals from other investment advisers to provide investment advisory services to the Funds; (ii) did not cause the Funds to contract directly with the sub-contractors for their respective services; (iii) relied on information and analyses that NYLIM prepared or were designed to support NYLIM's rationalization for the fees charged to the Funds; (iv) did not consider information or analyses reflecting the interests of the Funds when assessing the investment management fees or NYLIM's rationalization for those fees; (v) approved the payment by each Fund to Defendant of investment management fees that included a mark-up of 69% to 104% over the fees paid by Defendant to the Subadvisers and

State Street for providing substantially all of the investment advisory and administrative services; (vi) accepted NYLIM's representations that the fees paid by the Funds and retained by Defendant are justified by Defendant's supervision and oversight; (vii) approved investment advisory arrangements that enable Defendant to retain for itself the vast majority of the benefits of economies of scale resulting from increases in each of the Funds' AUM without appropriately sharing those benefits with the Funds; and (viii) did not devote adequate time to consideration of the Funds' management contracts. ¶¶ 126-137.

In *BlackRock*, the court assessed substantially the same allegations and found them sufficient to "allow for an inference of rubber-stamping by the Boards." 2015 WL 1418848, at *7. The court explained that the issue is not whether a board failure alone would support a plausible claim, but rather, that the allegations regarding a deficient board process "'inform the amount of deference given to the board's approval....'" *Id.* (citation omitted).

Similarly, in *Kasilag* the court found allegations similar to those here sufficient to support an inference that the board of directors may not have adequately considered important facts when approving investment management fees. Among other things, the board in *Kasilag* was alleged to have been responsible for overseeing 85 mutual funds, precluding it from assessing each fund individually, and approving contracts that provided exorbitant fees in relation to the services provided. *Kasilag*, 2012 WL 6568409, at *7. The court held that "the directors' approval requires somewhat less deference than it would have had they diligently performed their 'watchdog' role." *Id.* These decisions are in accord with other courts around the country that have found similar allegations sufficient to withstand a motion to dismiss. *See Goodman*, 2015 WL 965665, at *3, *5(assessing substantially similar allegations and finding them to support an inference of "rubber-stamping" by the Board); *Am. Chem.*, 2014 WL 5426908, at *7 (finding

allegations, including that "[f]unds' board of directors is not sufficiently independent and conscientious in reviewing the[] fees," "meet Rule 8's liberal pleading standard"); *Reso*, 2011 WL 5826034, at *6 (recognizing the evidentiary difficulties associated with pleading facts regarding a board of directors' approval process, and deeming allegations "to be specific enough to raise an inference of lack of independence."); *Hunt*, 2006 WL 1581846, at *4 (holding that "a failure of the trustees to receive full information and act conscientiously may be indicative of a breach of fiduciary duty under section 36(b)").

Defendant's cases are distinguishable. Unlike in those cases, Plaintiffs do not allege that either a deficient board approval process or the Board's reliance on information provided by NYLIM, standing alone, pleads a violation of § 36(b). *See Migdal*, 248 F.3d at 328 ("[P]laintiffs assert that they do not need to allege excessive fees because they instead alleged that the directors of the funds were not independent."); *Krantz v. Prudential Inv. Fund Mgmt. LLC*, 77 F. Supp. 2d 559, 563 (D.N.J. 1999) ("The only factual allegation . . . that the Fund's directors serve on boards of multiple funds for which they receive significant compensation—fails to state a claim for relief.").[20] Further, Defendant's reliance on *Amron* for the mundane proposition that service on multiple boards of other mutual funds is insufficient as a matter of law to challenge trustee independence (Db at 28 n.52) does not advance its position because that is not what Plaintiffs allege.[21]

Plaintiffs have pled numerous facts and circumstances, which when read as a whole,

---

[20] The Third Circuit affirmed the dismissal of the § 36(b) claim in *Krantz* because the plaintiff failed to even allege that the fees were excessive in relation to the services provided. *Krantz v. Prudential Inv. Fund Mgmt. LLC*, 305 F.3d 140, 143 (3d Cir. 2002).

[21] Defendants rely on other inapposite authority. *See Verkouteren v. Blackrock Fin. Mgmt., Inc.,* 37 F. Supp. 2d 256 (S.D.N.Y. 1999) (basing § 36(b) claim entirely on a challenge to the independence of board of directors), *aff'd,* 208 F.3d 204 (2d Cir. 2000); *Wexler v. Equitable Capital Mgmt. Corp.*, No. 93 Civ. 3834, 1994 WL 48807, at *4 (S.D.N.Y. Feb. 17, 1994) ("Plaintiff makes no claim that the fee is disproportionately large.").

support a plausible § 36(b) claim.

**B.      Board Approval Cannot Be the Basis for Dismissal at the Pleading Stage.**

Defendant attempts to defend the conscientiousness of the Board by relying on statements included in the Funds' annual shareholder reports. (*See* Db at 29-31.)  However, self-serving recitations in the annual reports, at most, create a factual dispute.  In *Curran*, the defendants similarly "ask[ed] the Court to review 'publicly disclosed detailed explanations of the steps taken in setting fees' and 'credit the presumption that these directors are doing their jobs with respect to overseeing the fees paid by the SAM funds.'"  2010 WL 2889752, at *9 (citation omitted). The court rejected defendants' invitation, holding that it would require the court to engage in a factual inquiry that would be inappropriate at the motion to dismiss stage, and noting that these types of "fact-intensive inquiries, suggests [sic] that resolution of the § 36(b) claim against [defendant] is unlikely even at the summary judgment stage of litigation."  *Id*.; *see also Reso*, 2011 WL 5826034, at *6 (minimizing consideration of care and conscientiousness at the pleading stage because "this factor . . . may be difficult to satisfy without discovery.").

Defendant's attempt to distinguish *BlackRock* (Db at 31) likewise fails.  In *BlackRock*, the defendants also argued that the annual reports of the funds at issue demonstrated that the board reviewed materials from "unaffiliated third-party sources" prior to approving the advisory fee agreements.  *See* Mem. of Law in Support of Defs.' Mot. for Judgment on the Pleadings (Dkt. No. 34-1) at 15, *In re BlackRock Mut. Funds Advisory Fee Litig*., No. 3:14-cv-01165 (D.N.J.); *compare with* Db at 29 (arguing that the Trustees relied upon information from "independent, third-party sources").   The court rejected that argument, explaining that

"arguments regarding the strength of the Consolidated Complaint when tested by the facts should be made at a later time." *BlackRock*, 2015 WL 1418848, at *8.[22]

The Complaint alleges that Defendant delegates substantially all of its investment management services, yet charges the Funds a markup between 69% to 104% over the fees paid to the sub-contractors for its supervision and oversight services. Thus, even if the board approval process were "robust," those allegations support a claim under § 36(b) that the management fees Defendant charges to the Funds are disproportionately large when compared to the services rendered and outside an arm's length negotiated range. *See Jones*, 559 U.S. at 351 ("[A] fee may be excessive even if it was negotiated by a board in possession of all relevant information . . . .").[23]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant's motion to dismiss.

---

[22]    Moreover, the Complaint alleges that the information and analysis relied on by the Board were either prepared by Defendant "**or** were designed to support Defendant's rationalization of the fees charged to the Funds." ¶ 129 (emphasis added). Thus, Defendant's argument that Plaintiffs' claims are contradicted by the "public record" (Db at 31) has no merit.

[23]    Defendant's argument regarding purported "fee waivers" or "contractual breakpoints" that NYLIM has agreed to (Db at 30-31, 39), is beside the point. Plaintiffs allege that the total investment management fees charged to each Fund in 2014 are excessive regardless of any fee waivers. *See Zehrer*, 2014 WL 6478054, at *1 n.4 (denying motion to dismiss where defendant argued that it "also entered into 'voluntary fee waivers' that added two breakpoints…which saved the Fund nearly $7 million."); *see also Curd*, 2015 WL 4243495, at * 5 n.8 (noting that defendant "is not contractually obligated to waive any fees.").

Dated:  August 18, 2015

**SZAFERMAN, LAKIND,**
**BLUMSTEIN & BLADER, P.C.**


/s/ Arnold C. Lakind
Arnold C. Lakind
Robert L. Lakind
Daniel S. Sweetser
101 Grovers Mill Road, Suite 200
Lawrenceville, NJ 08648
Tel:  (609) 275-0400
Fax:  (609) 275-4511

**ZWERLING, SCHACHTER &**
**ZWERLING, LLP**
Robin F. Zwerling
Jeffrey C. Zwerling
Susan Salvetti
Andrew W. Robertson
Ana M. Cabassa-Torres
41 Madison Avenue
New York, NY 10010
Tel: (212) 223-3900
Fax: (212) 371-5969

**KLAYMAN & TOSKES, P.A.**
Lawrence L. Klayman
2424 N. Federal Highway, Suite 450
Boca Raton, FL 33431
Tel:  (561) 997-9956

*Attorneys for Plaintiffs*

31