NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

CYNTHIA ANN REDUS-TARCHIS, FREDRIC
OLIVER, BONNIE OLIVER, and MICHAEL
PATTI,

                              Plaintiffs,

                v.

NEW YORK LIFE INVESTMENT
MANAGEMENT LLC,

                              Defendant.

**OPINION**
Cv. No. 14-7991

**Walls, Senior District Judge**

Plaintiffs Cynthia Ann Redus-Tarchis, Fredric Oliver, Bonnie Oliver, and Michael Patti bring an action for breach of fiduciary duty under Section 36(b) of the Investment Company Act of 1940 on behalf of four mutual funds, MainStay Large Cap Growth Fund, MainStay Marketfield Fund, MainStay High Yield Corporate Bond Fund, and MainStay High Yield Opportunities Fund, against the Funds' investment adviser and manager, Defendant New York Life Investment Management LLC. Defendant moves to dismiss Plaintiffs' second amended complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The Court decides this motion without oral argument. Fed. R. Civ. P. 78. Defendant's motion to dismiss is denied.

## PROCEDURAL AND FACTUAL BACKGROUND

This matter involves allegedly excessive management fees taken by the investment adviser and manager of four mutual funds. The MainStay Large Gap Growth Fund ("Large Cap Fund"), the MainStay Marketfield Fund ("Marketfield Fund"), the MainStay High Yield Corporate Bond Fund ("Corporate Bond Fund"), and the MainStay High Yield Opportunities

1

NOT FOR PUBLICATION

Fund ("Opportunities Fund") (collectively, the "Funds") are mutual funds registered under the

Investment Company Act of 1940 ("ICA"). Second Amended Complaint, ECF No. 26 ¶ 20. The

Corporate Bond Fund and Large Cap Fund are two of twelve mutual funds organized as series

within the MainStay Funds, a Massachusetts business trust organized in January 1986. *Id.* ¶ 21.

The Marketfield Fund and Opportunities Fund are two of 38 mutual funds organized as series

within the MainStay Funds Trust, a Delaware statutory trust created in April 2009. *Id.* ¶ 22.

Together, these 50 mutual funds make up the "MainStay Group of Funds," for which Defendant

New York Life Investment Management LLC ("NYLIM") serves as manager and investment

adviser. *Id.* ¶¶ 21-23, 31.

Under substantially similar agreements with the MainStay Funds and the MainStay Funds

Trust, Defendant NYLIM provides advisory and administrative services to the Funds in

exchange for an annual management fee that is calculated as a percentage of each Fund's assets

under management ("AUM"). *Id.* ¶ 35. The fee rate is "blended," meaning that the rate is

reduced for AUM exceeding various dollar-amount "breakpoints" within each fund. For

example, NYLIM charges the Marketfield Fund a management fee of 1.40% for the first $7.5

billion in AUM, 1.38% for AUM between 7.5 and $15 billion, 1.36% for AUM between $15 and

$22.5 billion, and 1.34% for all AUM over $22.5 billion. *Id.* ¶ 36. In fiscal year 2014, both the

Large Cap Fund and the Corporate Bond Fund had AUM exceeding their highest respective fee

breakpoints. *Id.* ¶¶ 98-102.

Defendant NYLIM has subcontracted with investment subadvisers to provide investment

advisory services to the Funds, paying them management fees, established through arm's-length

negotiations, based on AUM for each fund. *Id.* ¶¶ 40-46. According to the second amended

complaint, these subadvisors "perform substantially all of the investment advisory services

2

NOT FOR PUBLICATION

required by each Fund." *Id.* ¶¶ 40, 60-61. NYLIM has also subcontracted with State Street Bank & Trust Company ("State Street") to provide administrative services to each of the Funds, paying State Street an annual fee established through arm's-length negotiations for its services. *Id.* ¶¶ 47-52, 62.

In fiscal year 2014, NYLIM charged the Funds a total of $427,242,000 in management fees, paid the subadvisers $202,596,000 in subadvisory fees, and paid State Street approximately $23,996,000 in administrative fees.[1] *Id.* ¶ 53. After paying the subadvisory and administrative fees, NYLIM retained a "mark-up" of approximately $200,650,000 on fees from the four Funds. *Id.* ¶ 54.

Plaintiff Cynthia Ann Redus-Tarchis has owned shares in the Large Cap Fund since at least July 20, 2011. *Id.* ¶ 16. Plaintiffs Fredric and Bonnie Oliver have owned shares in the Marketfield Fund since at least March 2013. *Id.* ¶ 17. Plaintiff Michael Patti has owned shares in the Corporate Bond Fund and the Opportunities Fund since at least 2002 and September 2014, respectively. *Id.* ¶ 18.

On December 23, 2014, Plaintiffs Cynthia Ann Redus-Tarchis, Fredric and Bonnie Oliver, and Victor and Linda Miller filed a complaint in this Court on behalf of the Marketfield Fund, Large Cap Fund, and Corporate Bond Fund alleging that NYLIM breached its fiduciary duties as manager and investment adviser to the Funds, in violation of Section 36(b) of the ICA, by charging excessively high management fees. Complaint, ECF No. 1. On April 20, 2015, Plaintiffs filed an amended complaint, removing Victor and Linda Miller as parties, adding

---

[1] Plaintiffs note that the fee rate charged to NYLIM by State Street is not publicly disclosed and base their estimated fee rate of 0.05% of AUM on "publicly disclosed administrative services agreements for other mutual funds" involving "State Street and other sub-administrators." ECF No. 26 ¶ 51.

NOT FOR PUBLICATION

Michael Patti as a Plaintiff, and asserting an additional § 36(b) claim on behalf of the

Opportunities Fund. ECF No. 23. On May 6, 2015, after submitting a letter informing the Court

that Plaintiff Redus-Tarchis had sold shares she previously owned in the Marketfield Fund, ECF.

No. 24 at 2, Plaintiffs filed a second amended complaint. ECF No. 26. In the second amended

complaint, Plaintiffs claim that the fees charged by NYLIM are excessively high for several

reasons. They argue that NYLIM's management fees are disproportionate to the services

NYLIM actually renders to the Funds, pointing to the large "mark-up" between the fees NYLIM

charges to the Funds and the subcontractor fees NYLIM pays to State Street and the subadvisors

for their services. *Id*. ¶¶ 63-77.

Second, Plaintiffs claim that NYLIM has not appropriately shared economies of scale

with the Funds. *Id*. ¶¶ 95-118. NYLIM's management fees increase based on each fund's assets

under management, but Plaintiffs allege that NYLIM's advisory and management costs do not

grow proportionally, allowing NYLIM to achieve economies of scale. The Funds share in some

of these economies of scale through the fee breakpoints discussed, but Plaintiffs claim that the

breakpoints are placed at intervals that do not benefit Plaintiffs and involve insufficient fee

reductions. *Id*. ¶¶ 98-118.

Plaintiffs also argue that, because the Funds performed poorly in fiscal year 2014

compared to benchmarks, the "mark-up retained by Defendant is disproportionate to the low-

quality of the investment management services provided and the poor investment performance

experienced by the Funds under Defendant's management." *Id*. ¶¶ 119-123.

Finally, Plaintiffs claim that the board of trustees that oversees the MainStay Group of

Funds (the "Board") did not negotiate the management fees charged by NYLIM in an arms-

length transaction, allowing NYLIM to set excessively high fees for the Funds. *Id*. ¶¶ 124-137.

4

NOT FOR PUBLICATION

As a result of these various alleged breaches of fiduciary duty, Plaintiffs claim that "[e]ach Fund has sustained millions of dollars in damages due to the excessive management fees paid to Defendant." *Id.* ¶ 140.

On June 19, 2015, Defendant NYLIM filed a motion to dismiss Plaintiffs' second amended complaint for failure to state a claim, arguing that (a) the complaint fails to allege that the Funds' total management fees are disproportionately large, (b) the complaint's claims are contradicted by the management agreements cited in the complaint, (c) the allegations about the Board's negotiation of NYLIM's management fees are conclusory and contradicted by the public record, (d) the allegations about economies of scale fail to support a claim for breach of fiduciary duty, and (e) the allegations about Fund performance fail to support a claim for breach of fiduciary duty. Mot. Dismiss, ECF No. 31. Plaintiffs filed an opposition brief on August 18, 2015, ECF No. 34, and Defendant submitted a reply brief in further support of its motion on October 2, 2015. ECF No. 35.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual

NOT FOR PUBLICATION

enhancement." *Id.* (internal quotations and alterations omitted). "[W]here the well-pleaded facts

do not permit the court to infer more than the mere possibility of misconduct, the complaint has

alleged—but it has not 'shown'—that the pleader is entitled to relief." *Id.* at 679.

In considering a plaintiff's claims, the Court may consider the allegations of the

complaint, as well as documents attached to or specifically referenced in the complaint. *See*

*Sentinel Trust Co. v. Universal Bonding Ins. Co.*, 316 F.3d 213, 216 (3d Cir. 2003); Charles A.

Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1357 at 299 (3d

ed. 2014). "A 'document integral to or explicitly relied on in the complaint' may be considered

'without converting the motion [to dismiss] into one for summary judgment.'" *Mele v. Fed.*

*Reserve Bank of N.Y.*, 359 F.3d 251, 256 n.5 (3d Cir. 2004) (citing *In re Burlington Coat Factory*

*Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)).[2]

A court may also consider and take judicial notice of matters of public record. *Sands v.*

*McCormick*, 502 F.3d 263, 268 (3d Cir. 2007); *Buck v. Hampton Tp. School Dist.*, 452 F.3d 256,

260 (3d Cir. 2006). Such matters of public record may include prior judicial proceedings,

*McTernan v. City of York, Penn.*, 577 F.3d 521, 526 (3d Cir. 2009), filings with the U.S.

Securites and Exchange Commission, *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014), and

other documents deemed to be public records by law, *Del. Nation v. Pennsylvania*, 446 F.3d 410,

414 n.6 (3d Cir. 2006).

If a complaint fails to state a claim upon which relief can be granted, a plaintiff should

ordinarily be granted the right to amend its complaint. The Supreme Court has instructed that:

> The grant or denial of an opportunity to amend is within the discretion of
> the District court, but outright refusal to grant the leave without any

---

[2] "Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim
is based by failing to attach or explicitly cite them." *Mele*, 359 F.3d at 255 n.5.

NOT FOR PUBLICATION

> justifying reason . . . is not an exercise of discretion; it is merely abuse of
> that discretion and inconsistent with the spirit of the Federal Rules.

*Foman v. Davis*, 371 U.S. 178, 182 (1962). In the Third Circuit, plaintiffs whose complaints fail

to state a cause of action are entitled to amend their complaint unless doing so would be

inequitable or futile. *Fletcher-Harlee Corp. v. Pote Concrete Contrs., Inc.*, 482 F.3d 247, 252

(3d Cir. 2007).[3] In *Shane v. Fauver*, 213 F.3d 113 (3d Cir. 2000), the Third Circuit stated:

> [W]e suggest that district judges expressly state, where appropriate, that the
> plaintiff has leave to amend within a specified period of time, and that application
> for dismissal of the action may be made if a timely amendment is not forthcoming
> within that time. If the plaintiff does not desire to amend, he may file an
> appropriate notice with the district court asserting his intent to stand on the
> complaint, at which time an order to dismiss the action would be appropriate.

*Shane*, 213 F. 3d at 116 (citing *Borelli v. City of Reading*, 532 F.2d 950, 951 n.1 (3d Cir. 1976)).

## DISCUSSION

Congress enacted the ICA in 1940 to address "its concern with the potential for abuse

inherent in the structure of investment companies." *Daily Income Fund, Inc. v. Fox*, 464 U.S.

523, 536 (1984) (quoting *Burks v. Lasker*, 441 U.S. 471, 480 (1979)). Unlike most corporations,

an investment company, or mutual fund, is "typically created and managed by a pre-existing

external organization known as an investment adviser." *Id*. The investment adviser "generally

supervises the daily operation of the fund and often selects affiliated persons to serve on the

company's board of directors," creating a relationship that is "fraught with potential conflicts of

interest." *Id*. (quoting *Burks*, 441 U.S. at 481). Section 36(b) of the ICA, as amended in 1970,

gives mutual funds and their shareholders some protection from these potential conflicts by

---

[3] The *Fletcher-Harlee* court stated that "to request leave to amend a complaint, the plaintiff must
submit a draft amended complaint to the court so that it can determine whether amendment
would be futile." The court in *Fletcher-Harlee* also noted that the longstanding rule that leave to
amend a complaint must be granted *sua sponte* stands in tension with the longer-standing rule
that a plaintiff must submit a draft amended complaint to the court to allow the court to
determine whether amendment would be futile. *Fletcher-Harlee*, 482 F.3d at 252-53.

NOT FOR PUBLICATION

imposing a "fiduciary duty" on investment advisers and their affiliates. *Id*. at 539. Section 36(b) provides that "investment company advisors owe shareholders in investment companies a fiduciary duty with respect to determining and receiving their advisory fees." *Green v. Fund Asset Management, L.P.*, 286 F.3d 682, 684 (3d Cir. 2002) (citing 15 U.S.C. § 80a-35(b)). Plaintiffs who are shareholders in an investment company may bring suit on behalf of the investment company against an adviser for breach of fiduciary duty, provided that they own shares at the time the action is initiated and continue to own shares throughout the pendency of the litigation. *Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co. (U.S.A.)*, 677 F.3d 178, 182-83 (3d Cir. 2012). A Section 36(b) suit is "similar to a derivative action in that it is brought on behalf of the investment company," and "any recovery obtained in a § 36(b) action will go to the company rather than the plaintiff." *Id*. at 182 (internal quotation omitted). "[D]amages are not recoverable for any period prior to one year before the action was instituted," in this case December 23, 2014. ECF No. 1, *Green*, 286 F.3d at 685 (citing 15 U.S.C. § 80a-35(b)(3)).

Plaintiffs have the burden of proving the breach of fiduciary duty. *Green*, 286 F.3d at 684. "[T]o face liability under § 36(b), an investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones v. Harris Associates L.P.*, 559 U.S. 335, 346 (2010). To determine whether an investment adviser's fee is excessive for the purposes of § 36(b), "a court must examine the relationship between the fees charged and the services rendered by the investment adviser." *Krantz v. Prudential Invs. Fund Mgmt. LLC*, 305 F.3d 140, 143 (3d Cir. 2002), *cert. denied*, 537 U.S. 1113 (2003). The Second Circuit has identified six factors for courts to consider when determining whether fees are excessively large:

NOT FOR PUBLICATION

"(a) the nature and quality of services provided to fund shareholders; (b) the profitability of the fund to the adviser-manager; (c) fall-out benefits; (d) economies of scale; (e) comparative fee structures [in other mutual funds funds], and (f) the independence and conscientiousness of the trustees." *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 409 (2d Cir.), *cert. denied*, 493 U.S. 919 (1989) (citing *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 929-30 (2d Cir. 1982); *see also Jones*, 559 U.S. at 344-46 & 344 n.5 (citing *Gartenberg* factors approvingly and noting that *"Gartenberg* was correct in its basic formulation of what §36(b) requires"); *Krantz v. Prudential Invs. Fund Mgmt. LLC*, 77 F. Supp. 2d 559, 565 (D.N.J. 1999), *aff'd* 305 F.3d 140 (3d Cir. 2002) (applying *Gartenberg* factors to dismiss § 36(b) motion for failure to state a claim); *Benak ex rel. the Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P.*, 2004 WL 1459249, at *7 (D.N.J. Feb. 9, 2004) (same). Courts have held that a "plaintiff need not address all of the *Gartenberg* factors to survive a motion to dismiss, if, when taken as a whole, the complaint demonstrates a plausible claim for relief under § 36(b)." *In re Blackrock Mut. Funds Advisory Fee Litig.*, 2015 WL 1418848, at *4 (D.N.J. Mar. 27, 2015); *Kasilag v. Hartford Inv. Financial Services, LLC*, 2012 WL 6568409, at *2 (D.N.J. Dec. 17, 2012). Ultimately, "the Act does not requires courts to engage in precise calculation of fees representative of arm's-length bargaining." *Jones*, 559 U.S. at 352 (citation omitted).

I.  **The second amended complaint does not only challenge a portion of the total fees paid under the subadvisory structure.**

    As an initial matter, Defendant claims that the second amended complaint fails to state a claim under § 36(b) because Plaintiffs do not challenge the *total* management fees paid by the Funds but instead "focus on the portion of the fee representing the difference between the total management fee and what the Subadvisors and the Funds' Sub-Administrator, State Street Bank

NOT FOR PUBLICATION

& Trust Company, are paid." ECF No. 31 at 12. Defendant points to several district court opinions dismissing § 36(b) actions that challenged only specific portions of fees charged by advisers. *Id.* at 19-20 (citing *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 603 (S.D.N.Y. 2006) (challenging portion of fee paid to brokers); *In re Eaton Vance Mut. Fund Fees Litig.*, 403 F. Supp. 2d 310, 315 (S.D.N.Y. 2005), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110 (2d Cir. 2007) (challenging portion of fees put to "improper use").

The complaint, however, does not challenge only the portion of the management fee that Plaintiffs characterize as a "mark-up." Instead, each count in the complaint alleges that "Defendant breached its fiduciary duty under Section 36(b) by charging investment management fees to [each Fund] that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by Defendant and could not have been the product of arm's-length bargaining." ECF No. 26 ¶¶ 145, 153, 161, 169. Plaintiffs claim that the *total* management fees charged by NYLIM were excessive in proportion to the services it provided, and they point to the "mark-ups" as specific evidence of this claim.

Defendant's interpretation of *Salomon* and *Eaton Vance* would require Plaintiffs to allege only in the most general terms that every single dollar charged to the Funds was excessive, essentially forcing Plaintiffs to claim that Defendant breached its fiduciary duties to the Funds by charging them any management fees at all. Plaintiffs may – and, at summary judgment or trial, must – challenge the total administrative fees charged by NYLIM by pointing to specific reasons that the fees are excessive.

Furthermore, Plaintiffs' allegations about NYLIM's "mark-ups" on its fees to State Street and the subadvisers are only part of the complaint. Plaintiffs also allege that inappropriately-spaced fee breakpoints, insufficient fee reductions at the breakpoints, the poor performance of

10

NOT FOR PUBLICATION

the Funds in comparison to benchmarks, and the Board's management fee negotiations all

demonstrate that NYLIM has breached its fiduciary duty to the Funds. As the Court will discuss,

these allegations, taken together, are sufficient to withstand Defendant's motion to dismiss.

**II.    The *Gartenberg* factors weigh against dismissal.**

Analyzing Plaintiffs' complaint using the *Gartenberg* factors, applied by other courts

within this district and cited approvingly by the Supreme Court in *Jones*, the Court finds that

Plaintiffs have adequately alleged that NYLIM "charge[d] a fee that is so disproportionately

large that it bears no reasonable relationship to the services rendered and could not have been the

product of arm's-length bargaining." *Gartenberg*, 694 F.2d at 928. Some of Plaintiffs' claims

may or may not be unpersuasive at summary judgment, but, taken together, they are sufficient to

withstand this motion to dismiss.

   **a.   Factor One: nature and quality of services**

        **i.   Allegations that NYLIM has delegated "substantially all" of its**
              **responsibilities support Plaintiff's complaint.**

Plaintiffs charge that Defendant's management fees are excessive given the nature and

quality of services provided by NYLIM. They allege that NYLIM's fees are excessive because

NYLIM has assigned "substantially all" of its management and advisory duties to State Street

and the Funds' respective subadvisers (for the Marketfield Fund, Marketfield Asset Management

LLC ("MAM"); for the Large Cap Fund, Winslow Capital Management, Inc.; and for the

Corporate Bond Fund and the Opportunities Fund, MacKay Shields LLC), but still retains nearly

half of the management fees it charges to the Funds. ECF No. 26 ¶¶ 38-55. Plaintiffs provide a

side-by-side comparison of specific duties assigned to NYLIM in its management agreements

with the Funds and duties NYLIM has assigned to the subadvisers in subadvisory agreements,

NOT FOR PUBLICATION

alleging that NYLIM has delegated its responsibility for security selection, broker-dealer

selection, portfolio and tax compliance coordination with the Funds' custodian, assistance with

the pricing of portfolio securities, reporting to the Board, and recordkeeping. ECF No. 26 ¶ 61.

  In response, Defendant claims that it *does* provide substantial services to the funds

directly. It points to the same subadvisory agreements cited by Plaintiffs, which it says reserve

specific responsibilities for NYLIM. The subadvisory agreements provide, for example, that

NYLIM "shall at all times retain the ultimate responsibility for and control of all functions

performed pursuant to" the subadvisory agreements, and that NYLIM "reserves the right to

direct, approve or disapprove any action hereunder taken on its behalf by the Subadvisor." ECF

No. 31 at 23-24. Similarly, Defendant argues that its management agreements with the Funds,

also referenced by Plaintiffs, require it to "retain responsibility for all Fund management

decisions, consistent with the regulatory conditions," to "continually evaluate the performance of

each subadvisor," and to "periodically make recommendations to the Board as to whether the

contract with one or more subadvisors should be renewed, modified, or terminated." *Id*. at 24.

Finally, Defendant points out that the complaint itself alleges that NYLIM has the duty to "(i)

periodically assess risk management at the level of the affiliated and unaffiliated service

providers to the Funds; (ii) apply for SEC exemptive relief or SEC staff no-action guidance, (iii)

provide or coordinate the provision of legal services, and (iv) facilitate audits, either by the

Fund's accountants or by regulators," and does not allege that NYLIM has subcontracted out any

of these responsibilities. *Id*. at 25 (quoting ECF No. 26 ¶ 58) (internal quotations omitted).

  In short, NYLIM challenges the sufficiency of Plaintiffs' evidence to support their

allegations by pointing to evidence that contradicts the allegations. Though NYLIM correctly

states that the Court may consider the management and subadvisory agreements cited by

NOT FOR PUBLICATION

Plaintiffs on a motion to dismiss, *Mele*, 359 F.3d at 256 n.5, courts have held in similar contexts

that a defendant's claim that it "provides the Funds with extensive administrative and investment

services that are not delegated to the sub-advisers," even if convincing, is a "merits argument . . .

that is more appropriate at summary judgment." *Kasilag*, 2012 WL 6568409, at *3 (denying

motion to dismiss where plaintiff alleged that defendant adviser paid subadvisers to provide

substantially all management services for a third or less of the fee paid by the fund, even though

defendant claimed it performed extensive services that were not delegated to the subadviser)

(citing *Curran v. Principal Mgmt. Corp.*, 2010 WL 2889752, at *8 (S.D. Iowa June 8, 2010));

*see also Zehrer v. Harbor Capital Advisors, Inc.*, 2014 WL 6478054, at *3-4 (N.D. Ill. Nov. 18,

2014) (denying motion to dismiss § 36(b) claim where plaintiff alleged that defendant adviser

"delegates investment management responsibilities to [subadvisor] but retains almost half the

fees," despite defendant's claim that the allegation was "clearly rebutted" by advisory

agreements).

        At a later stage, NYLIM's defense may be convincing. NYLIM argues, as example, that

the Marketfield Fund management fee cannot be disproportionate to the nature and quality of

services rendered because NYLIM's current subadvisor for the Fund, MAM, charged the Fund a

1.40% management fee – without being sued for breach of fiduciary duty – when it was the

Fund's manager until October 5, 2012. ECF No. 31 at 21. NYLIM only charges 1.39%, with

0.70% going to MAM. This fee cannot be excessive, Defendant says, because the Fund is

actually paying *less* than it did when MAM was the direct manager and kept the entire

management fee for itself. *Id*. Notwithstanding that Plaintiffs' failure to sue MAM has no effect

on their ability to file a claim against NYLIM, this is again a merits argument appropriate at

NOT FOR PUBLICATION

summary judgment, not on a motion to dismiss. This *Gartenberg* factor weighs in favor of Plaintiffs.

### ii. The Funds' performance does not demonstrate poor nature and quality of services.

Plaintiffs also maintain that NYLIM's management fees are "disproportionate to the . . . poor investment performance experienced by the Funds under Defendant's management." ECF No. 26 ¶ 119. According to Plaintiffs, the Corporate Bond Fund, Large Cap Fund, and Marketfield Fund all had lower returns than their respective benchmarks in fiscal year 2014. *Id.* ¶¶ 120-23.

Underperformance is not a *Gartenberg* factor, though, and courts have been "wary about attaching too much significance to a fund's financial performance." *Franklin*, 478 F. Supp.2d at 687; *see also Amron v. Morgan Stanley Advisors, Inc.*, 464 F.3d 338, 344 (2d Cir. 2006) (complaints alleging that funds underperformed peers were insufficient because "allegations of underperformance alone are insufficient to prove that an investment adviser's fees are excessive. . . .") (quotation omitted); *Migdal v. Rowe Price-Fleming Intern., Inc.*, 248 F.3d 321, 327-28 (4th Cir. 2001) ("While performance may be marginally helpful in evaluating the services which a fund offers . . . [e]ven the most knowledgeable advisers do not always perform up to expectations, and investments themselves involve quite different magnitudes of risk."). Though the "nature and quality of services" *Gartenberg* factor already weighs in favor of Plaintiffs, the allegations about Fund performance are of minimal support.

### b. Factor Two: profitability of the fund to the adviser-manager

The second *Gartenberg* factor also weighs in favor of Plaintiffs. As discussed, Plaintiffs complain that, after paying State Street and the subadvisers, NYLIM retains a significant portion

NOT FOR PUBLICATION

of the management fee it charges each Fund. In the case of the Large Cap Fund, Plaintiffs say that NYLIM retained more than half of its $118,611,000 management fee in fiscal year 2014. ECF No. 26 ¶ 53. Combined, NYLIM retained $200,650,000 of the $427,242,000 in management fees it charged the Funds in 2014, approximately 47%. *Id.* Plaintiffs also assert that, "[d]ue to the limited scope of services actually provided by Defendant, the operating expenses incurred by Defendant are low." *Id.* ¶ 73. As a result, the portion of the management fee not paid to State Street or the subadvisers "consists primarily of profit to Defendant." *Id.* ¶ 77.

The complaint advances a plausible claim that the high profitability of NYLIM's services does not justify its management fees. *See Curd ex. Rel. SEI Intern. Equity Fund v. SEI Investments Mgmt. Corp.*, 2015 WL 4243495, at *5 (E.D. Pa. July 14, 2015) (in "nature and quality of services" analysis, finding allegation that defendant "subcontracts the majority of its investment advising duties to sub-advisers, yet keeps 40% of the investment management fees" sufficient to withstand motion to dismiss); *Kasilag*, 2012 WL 6568409, at *7 (finding plaintiff adequately alleged that "the costs and profitability of providing investment management services did not justify" defendant's management fees where defendant earned $157,636,769 in investment management fees and paid $57,583,826 for "sub-advisory services"). This factor favors Plaintiffs.

### c. Factor Three: fall-out benefits

Fall-out benefits are "those collateral benefits that accrue to the adviser because of its relationship with the mutual fund," *Jones*, 559 U.S. at 344 n.5, such as "commissions on non-Fund securities business generated by Fund customers" or "interest income on funds (known as 'float') held by the Broker from the date when a redemption check is issued by the Fund to its

NOT FOR PUBLICATION

customer until the date it clears." *Gartenberg*, 694 F.2d at 932. Because Plaintiffs allege no such benefits, this factor favors the Defendant.

> ### d.  Factor Four: economies of scale
>
> > #### i.  Plaintiffs are not restricted to evidence within the one-year statutory period.

As an initial matter, Defendant contends that Plaintiff cannot allege any economies of scale because § 36(b)(3) only allows Plaintiffs to recover fees paid in the year immediately preceding their suit, and publicly filed documents demonstrate that AUM for all four Funds actually declined in 2014. ECF No. 31 at 36. Plaintiffs base their claims on the overall growth in each Fund's AUM from 2009 to 2014 (from December 31, 2012 to 2014 for the Marketfield Fund). ECF No. 26 ¶¶ 78-84. Defendant cites *In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, where the Southern District of New York held that, "while it may be possible in certain circumstances to demonstrate the existence of excessive fees by using statistical trends that do not fall squarely within the applicable one-year time period, the Investment Adviser Defendants are correct in asserting that this approach weakens Plaintiffs' economies of scale argument considerably." 2006 WL 74439, at *2 (S.D.N.Y. Jan. 11, 2006). *See also In re Scudder Mut. Funds Fee Litig.*, 2007 WL 2325862, at *16-17 (citing *AllianceBernstein* to hold that plaintiffs' allegation that funds' assets and expense ratio increased over fifteen-year period was insufficient to demonstrate economies of scale).

However, other courts have accepted economies of scale allegations based on AUM growth outside the one-year statutory period. *See*, e.g., *The Lynn M. Kennis v. First Eagle Investment Mgmt., LLC*, 2015 WL 5886178, at *2, *7 (D. Del. Oct. 8, 2015) (plaintiff adequately alleged economies of scale by showing growth in AUM and advisory fees "[b]etween 2009 and

NOT FOR PUBLICATION

the present" without "proportionate increase in the level of services provided" by adviser); *Curd*, 2015 WL 4243495, at *4-5 (plaintiff's allegations about economies of scale "in particular" demonstrated plausible claim for relief where plaintiff alleged that fund grew from 1997 to present without any reduction in management fee calculation); *Blackrock*, 2015 WL 1418848, at *1, *6-7 (plaintiff adequately alleged economies of scale by showing growth in AUM from 2007 to 2013 without proportionate increase in costs); *Zehrer*, 2014 WL 6478054, at *1, *4 (plaintiff's allegations that defendant "received 'economies of scale' benefits as the Fund grew" from 2006 to 2013 without sharing them with fund "alone may not be sufficient to survive a motion to dismiss," but still "support [plaintiff's] claim that the fees are disproportionate to the services rendered and are not the product of arm's length bargaining."); *Sins v. Janus Capital Mgmt., LLC*, 2006 WL 3746130, at *3 (D. Col. Dec. 15, 2006) (plaintiff adequately alleged that "growth in Fund assets has not been matched by a proportional, as opposed to marginal, decrease in fees" between 1993 and 2002).

This Court finds the latter group of cases more persuasive. A manager for a fund that grows one year and then remains the same size continues to enjoy economies of scale even without further growth.  Though Plaintiffs may only recover fees paid by the Funds in the one-year statutory period, they may point to historic growth to support their assertion that NYLIM enjoyed economies of scale in 2014 without adequately sharing them with the Funds.

### ii. Plaintiffs adequately allege that NYLIM's management fees and costs are not proportional.

Plaintiffs' claims regarding economies of scale are sufficient to withstand dismissal. Simply declaring that a "fund grew over time while not simultaneously lowering its fees" is not enough to show that economies of scale were not passed on to investors. *Franklin*, 478 F. Supp.

17

NOT FOR PUBLICATION

at 687 (citing *In re Goldman Sachs Mut. Funds Fee Litig.*, 2006 WL 126772, at *9 (S.D.N.Y.

Jan. 17, 2006) ("Mere assertions that fees increased with the size of the Funds are not enough to

establish that benefits from economies of scale were not passed on to investors.")). But Plaintiffs

make specific factual allegations that NYLIM's management and advisory costs have not grown

at the same rate as the Funds' assets under management, and that NYLIM has enjoyed a larger

profit as a result. These declarations are sufficient to withstand a motion to dismiss. *See*

*Franklin*, 478 F. Supp. at 687 (allegation must "address the actual services rendered" to Funds

"'to show how the fees were disproportionate to th[e] relationship between fees and services.'")

(quoting *Migdal*, 248 F.3d at 327).

Plaintiffs allege that the Funds' AUM, and therefore the management fees charged by

Defendant, have grown substantially over the past several years. According to the complaint, the

Corporate Bond Fund's AUM grew from approximately $5.7 billion to $8.7 billion from October

31, 2009 to October 31, 2014, resulting in a management fee increase from $23,720,000 in fiscal

year 2009 to approximately $47,715,000 in fiscal year 2014. ECF No. 26 ¶¶ 78-79. The Large

Cap Fund's AUM grew from $3.6 billion to approximately $20.4 billion over that time period,

with a management fee increase from approximately $14,548,000 in fiscal year 2009 to

approximately $118,611,000 in fiscal year 2014. *Id.* ¶¶ 80-81. The Opportunities Fund's AUM

grew over the same time period from approximately $206 million to $1.18 billion, with a

management fee increase from $1,087,000 in fiscal year 2009 to $10,318,000 in fiscal year 2014.

*Id.* ¶¶ 84-85. And the Marketfield Fund's AUM grew from approximately $4.4 billion as of

December 31, 2012 (after NYLIM became the Fund's manager) to approximately $9 billion at

the end of fiscal year 2014, with a management fee increase from approximately $30,297,000 in

fiscal year 2012 (paid to both managers) to $250,598,000 in fiscal year 2014. *Id.* ¶¶ 82-83.

NOT FOR PUBLICATION

Over these same time periods, Plaintiffs charge that the increase in management fees "was not accompanied by a proportionate increase in the work or cost required by Defendant to provide services to the Funds," allowing NYLIM to achieve economies of scale. *Id.* ¶ 86-87. They allege that NYLIM's "supervision and oversight of the Subadvisers has not meaningfully increased;" that NYLIM has "continued to request and evaluate the same or substantially the same reports and other information" from subadvisers without an increase in cost; that the cost of providing administrative services has not "meaningfully increased;" and that NYLIM has been required to "monitor compliance with the same or substantially the same regulatory requirements . . . maintain the same or substantially the same financial, accounting, and other books and records . . . prepare the same or substantially the same reports and informational materials for the Boards . . . and provide[ ] the same or substantially the same officers or office space," all without a proportional increase in cost. *Id.* ¶¶ 88-94. These charges are sufficient to support a claim that Defendant enjoyed the benefit of economies of scale in 2014 for each of the Funds.

### iii.  Plaintiffs adequately allege that the fee breakpoints do not sufficiently share economies of scale with the Funds.

Plaintiffs acknowledge that the management agreements incorporate breakpoints into the Funds' fee structures to pass on some of the economies of scale realized by NYLIM, *id.* ¶ 36, but they contend that the breakpoints are spaced inappropriately and result in negligible reductions in overall management fee rates. Plaintiffs claim that the highest fee breakpoints for the Corporate Bond Fund and the Large Cap Fund are too low, preventing them from sharing in economies of scale for the significant AUM in each Fund above the breakpoints. *Id.* ¶¶ 98-111. As example, the highest breakpoint for the Large Cap Fund is $9 billion in AUM. *Id.* ¶ 36. The Large Gap

NOT FOR PUBLICATION

Fund grew from $12.9 billion in AUM to approximately $20.4 between 2011 and 2014, resulting in a management fee increase from $54,425,000 in fiscal year 2011 to $118,611,000 in fiscal year 2014. *Id.* ¶¶ 104, 106. Because all the growth occurred above the highest breakpoint, Plaintiffs allege that the Fund's overall fee rate decreased only 0.03% over this time period, resulting in savings to the Fund of less than 10% of NYLIM's management fee increase. *Id.* ¶¶ 105-107. Plaintiffs also claim that the initial fee breakpoint for the Marketfield Fund is too high, preventing the Fund from sharing in economies of scale "realized below that threshold," and that the remaining breakpoints for the Marketfield Fund are spaced too far apart and include fee reductions that are too small, again preventing the Fund from sharing the benefit of economies of scale with NYLIM. *Id.* ¶ 112-16. Plaintiffs similarly claim that the single Opportunities Fund breakpoint is too high, placed above the Fund's current AUM and preventing the Fund from sharing any economies of scale at all. *Id.* ¶ 118.

Plaintiffs' "Goldilocks"-type claims about the breakpoints may not be enough to prove a breach of fiduciary duty at summary judgment, but courts have held similar claims sufficient to withstand a motion to dismiss. *See*, e.g., *Blackrock*, 2015 WL 1418848, at *6-7 (claims that "breakpoints set forth in the fee schedules fail to provide the Funds with an appropriate share of the benefit of economies of scale, in large part because the fee schedule reduces the fee by too small of an amount and spaces the breakpoints too far apart . . . allege sufficient factual content to draw a reasonable inference" that defendant failed to share economies of scale); *Kasilag*, 2012 WL 6568409, at *6 (denying motion to dismiss complaint alleging that adviser's "fee schedule sets the initial breakpoints too high, spaces them too far apart, and reduces the fee by too small an amount to give Plaintiffs any meaningful benefit of economies of scale"). The Court finds that the *Gartenberg* economies of scale factor weighs in Plaintiffs' favor.

NOT FOR PUBLICATION

### e.   Factor Five: comparative fee structures

Courts may also consider "a comparison of the fees [in question] with those paid by similar funds." Jones, 559 U.S. at 344 n. 5 (citing *Gartenberg*, 694. F.2d at 929-932). The Supreme Court has urged caution applying this factor, recommending that "courts should not rely too heavily on comparisons with fees charged to mutual funds by other advisors" because other fees might be the result of non-arm's-length negotiations or other circumstances that make direct comparison inappropriate. *Jones*, 559 U.S. at 350. In this case, Plaintiffs do not compare the fees charged by NYLIM to fees paid by any other funds, so the Court will not consider this factor.

### f.   Factor Six: independence and conscientiousness of the trustees

The final *Gartenberg* factor is the "expertise of the independent trustees of a fund, whether they are fully informed about all facts bearing on the investment adviser's service and fee, and the extent of care and conscientiousness with which they perform their duties. . . ." *Jones*, 559 U.S. at 349 (quoting *Gartenberg*, 694 F.2d at 930). "Where a board's process for negotiating and reviewing investment-adviser compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process." *Id*. at 351 (citing *Burks*, 441 U.S. at 484). "Thus, if the disinterested directors considered the relevant factors, their decision to approve a particular fee agreement is entitled to considerable weight, even if a court might weigh the factors differently," but if "the board's process was deficient or the adviser withheld important information, the court must take a more rigorous look at the outcome." *Id*. To prevail on this factor, Plaintiffs must overcome a "presumption under the ICA that natural persons are disinterested." *Migdal*, 248 F.3d at 331 (citing 15 U.S.C. § 80a-15(c)).

NOT FOR PUBLICATION

Plaintiffs allege that the MainStay Group of Funds' Board "has approved the Management Agreements each year without devoting the time and attention necessary to independently assess the investment advisory fees paid by each Fund or to effectively represent the interests of Fund shareholders *vis-à-vis* Defendant." ECF No. 26 ¶ 126. Plaintiffs claim that (a) Board members serve only part-time, and most have other full-time jobs, (b) Board members have oversight responsibilities for 46 funds in addition to the Funds in question, and that in approving Defendant's management fees, (c) "the Board relied on information and analyses that were prepared by Defendant or were designed to support Defendant's rationalization for the fees charged to the Funds," (d) Defendant did not provide information to the Board "reflecting the interests of the Funds or their shareholders" with respect to the management fees, (e) Defendant did not provide "appropriate information" about its delegation of responsibilities to the subadvisers and State Street, the cost of providing these services, or economies of scale realized by Defendant, and (f) the Board did not solicit proposals from other potential advisers or attempt to contract directly with the subadvisers or State Street. *Id*. ¶¶ 127-34.

These assertions are insufficient for Plaintiffs to meet their burden to show that the Board was not independent or conscientious in its approval of NYLIM's fees. Directors may serve on other boards and keep other employment without compromising their independence. *See Amron*, 464 F.3d at 345 (Allegation that directors "serve on the boards of many other mutual funds, businesses, and charitable organizations" was insufficient "as a matter of law" to show directors did not exercise independence and conscientiousness); *Krantz*, 305 F.3d at 143-144 ("[N]either the ICA nor the SEC proscribes the use of multi-board membership within mutual fund complexes. In fact, as noted, membership on the boards of several funds within a mutual fund complex is the prevailing practice in the industry . . . . Plaintiff has failed to allege any facts that,

22

NOT FOR PUBLICATION

if true, would support a claim that the 'independent' directors of the Fund were actually 'interested.'") (internal quotations omitted); *Migdal*, 248 F.3d at 331 ("The fact that directors of the funds might be busy does not suggest that they were in any way 'interested' as defined by the ICA.").

Second, Plaintiffs' allegation that the Board received information about compensation and subadviser contracts directly from NYLIM does not establish a lack of independence or conscientiousness. "[T]hat the directors were dependent on the investment advisers for information sheds no light on the question of whether the directors are disinterested. One would expect any conscientious director to request information from management and staff on the day-to-day operation for which they are responsible." *Migdal*, 248 F.3d at 331. In fact, as Defendant argues, the ICA explicitly requires a fund's manager to provide such information to the board of trustees. ECF No. 31 at 29; *Migdal*, 248 F.3d at 331 (noting that 15 U.S.C. § 80a-15(c) states that "It shall be the duty of the directors of a registered investment company to request and evaluate, and the duty of an investment adviser to such a company to furnish, such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such company.").

In any event, Defendant points to SEC filings in the public record demonstrating that the Board did *not* simply react passively to information provided by NYLIM. Instead, the Board engaged two "independent, third-party" consulting firms to provide "information about other funds' fees, expenses, and performance," created a "Contracts Committee" tasked with "overseeing contracts to which the Funds are or are proposed to be parties and [ensuring] that the interests of the Funds and their shareholders are served by the terms of these contracts," and requested and reviewed a report from NYLIM "that addressed economies of scale." ECF No. 31

NOT FOR PUBLICATION

at 30-31. These filings contradict Plaintiffs' claims that the Board did not exercise independence or conscientiousness in approving Defendant's management fees. The final *Gartenberg* factor weighs in Defendant's favor.

## CONCLUSION

As pleaded in the second amended complaint, two *Gartenberg* factors – fall-out benefits and the independence and conscientiousness of the Funds' directors – weigh in favor of Defendant, and three factors – the nature and quality of services provided by Defendant, the profitability to Defendant of managing the Funds, and economies of scale realized by the Defendant – weigh in favor of Plaintiffs. The Court gives "considerable weight" to the independent Board's approval of NYLIM's management fees, *Jones*, 559 U.S. at 349, but taking the second amended complaint as a whole, it finds that Plaintiffs have adequately alleged a "combination of facts that plausibly support an inference" that NYLIM's fees, "given all of the surrounding facts and circumstances, [are] disproportionately large to the services rendered in exchange for [those fees]." *Blackrock*, 2015 WL 1418848 at *5. Defendant's motion to dismiss the second amended complaint is denied. An appropriate order follows.

DATE: 28 Octobre 2015

William H. Walls
Senior United States District Court Judge

24